1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF CALIFORNIA
2                             --o0o--

3   UNITED STATES OF AMERICA,    ) Docket No. 21-MJ-89
                                 ) Sacramento, California
4                  Plaintiff,    ) June 1, 2021
                                 ) 2:33 p.m.
5            v.                  )
                                 )
6   SEAN MICHAEL McHUGH,         ) Re: Detention hearing
                                 )
7                  Defendant.    )

8                    TRANSCRIPT OF PROCEEDINGS
9           BEFORE THE HONORABLE KENDALL J. NEWMAN
                 UNITED STATES MAGISTRATE JUDGE
10

    APPEARANCES (via Zoom):
11
    For the Plaintiff:       HON. McGREGOR W. SCOTT
12                           United States Attorney by
                             MS. KATHERINE THERESA LYDON
13                           Assistant U.S. Attorney
                             501 I Street, Suite 10-100
14                           Sacramento, CA 95814

15  For the Defendant:       OFFICE OF THE FEDERAL DEFENDER by
                             MS. ALEXANDRA PARADIS NEGIN
16                           801 I Street, 3rd Floor
                             Sacramento, CA 95814
17

18

19                   JENNIFER COULTHARD, RMR, CRR
20                      Official Court Reporter
                       501 I Street, Suite 4-200
21                      Sacramento, CA 95814
                       jenrmrcrr2@gmail.com
22                        (530)537-9312

23  Proceedings recorded via mechanical Steno - transcript produced
    via Computer-Aided Transcription
24

25

1          SACRAMENTO, CALIFORNIA, TUESDAY, JUNE 1, 2021

2                          --o0o--

3      (In open court via Zoom.)

4          THE CLERK:  Calling magistrate case 21-89-JDP, United

5   States v. Sean Michael McHugh, on for detention hearing.  And

6   this is a Rule 5 arrest out of the District of Columbia.

7          THE COURT:  And good afternoon.  I'm Judge Newman.  If

8   I could please have appearances for the record starting with

9   government's counsel.

10         MS. LYDON:  Good afternoon, Judge Newman; Katherine

11  Lydon on behalf of the United States.  We consent to appear via

12  Zoom.

13         THE COURT:  Ms. Lydon, good afternoon.  It's been

14  quite awhile.  Good to see you.

15         MS. LYDON:  It has.

16         THE COURT:  And for the defense.

17         MS. NEGIN:  Good afternoon, Your Honor; Lexi Negin

18  from the Federal Defender's Office on behalf of Sean McHugh.

19         Your Honor, Mr. McHugh is present in custody at the

20  Sacramento County Jail.  I can see him on the screen, and he

21  does consent to appear by Zoom today.

22         THE COURT:  Thank you, Ms. Negin.  Good afternoon.

23  Good to see you also.

24         And Mr. McHugh, I'm Judge Newman.  Before we turn to

25  your detention hearing, I do want to remind you, sir, you have

1    the right to remain silent.  You are not required to make any

2    statements here today.  And I must caution you if you make any

3    statements, they could be used against you not only today but

4    in future proceedings in this matter.

5              In this matter I should note that I received the

6    pretrial services report and supplemental report.  I also

7    received a communication from Ms. Negin earlier today,

8    including some of the legal authorities that have arisen out of

9    other proceedings for some of the other people who have been

10   charged arising out of the January 6th proceedings, a

11   response -- a very brief response from Ms. Lydon as a result.

12   And I have read through the opinion that was provided to me as

13   a result of that January 6th.  And there's obviously a couple

14   concerns that I want to throw out there, one of which is

15   understandably some of the folks -- well, first, let me --

16   before I throw out my concerns, let me ask Ms. Lydon.  I want

17   to make sure the record is correct.  Ms. Lydon, is the

18   government moving for Mr. McHugh's detention?

19             MS. LYDON:  We are.  We move for detention as a danger

20   and on the current bail package also as a risk of

21   nonappearance.

22             THE COURT:  Thank you.  So I was going to address --

23   we've got a couple different concerns, one of which is the

24   focus out of the other proceedings that were provided from D.C.

25   really seem to focus on whether or not there was actually any

1   physical altercations involving the named defendants in those

2   matters.  And, in fact, the proceeding you talked about noted

3   that there was an opportunity for the people to engage in

4   assault, they didn't do so; whereas, here there is evidence

5   presented that Mr. McHugh both did get into some physical

6   matters, pushing barriers with law enforcement but even more

7   disturbing is spraying people at the time, but we also have a

8   person who has a previous criminal record, so we're not seeing

9   someone that's just caught up in the June 6th proceedings, but

10  there's a criminal record here.

11          So Ms. Negin, I wanted to throw out those thoughts or

12  concerns, but undoubtedly you're going to want to address all

13  of that, so let me let you do so.

14          MS. NEGIN:  Well, Your Honor, with respect to danger,

15  as the Court saw from the *Munchel* case, the issue is that the

16  government has to prove by clear and convincing evidence that

17  there's an identified and articulable threat to the community,

18  either to an individual or of the community by releasing

19  Mr. McHugh.  So we don't have that here.  There is -- he's been

20  out in the community for five months now since this event.  He

21  came back from D.C., he picked up his life and nothing has

22  happened since then.  According to pretrial services, he's been

23  reporting to probation as required.

24          Your Honor, he does obviously have an alcohol issue

25  that can be addressed with pretrial conditions.  So to the

1   extent that there's a concern about dangerousness with the

2   driving -- you know, driving while intoxicated obviously is a

3   concern, and that has to be addressed, but there are release

4   conditions that can address the alcohol issue here.  He was

5   very candid with pretrial services about that; definitely needs

6   treatment and that should definitely be part of any release

7   package.

8        THE COURT:  Ms. Negin, can I interrupt?  I apologize,

9   but there was one thing I wanted to ask Ms. Lydon before

10   hearing from you because this also may have been a concern.

11        In the pretrial services report, supplemental report,

12   it talks about the defendant's girlfriend, Ms. Hunt, and her

13   willingness to be a third-party custodian.  But also in

14   information and looking back at the complaint and affidavit,

15   there's reference to this other woman involved and he was

16   traveling with.  Is that believed to be Ms. Hunt or someone

17   else?

18        MS. LYDON:  I don't have any information to suggest

19   that it's Ms. Hunt, no.

20        THE COURT:  Okay.  I simply wanted to make sure that

21   no one was suggesting:  Yes, no, this is the same woman who was

22   traveling with him; she's not an appropriate custodian.

23        Okay.  Sorry, Ms. Negin.  Thank you.  Go ahead.

24        MS. NEGIN:  Well, Your Honor, and I can add to that

25   that Ms. Hunt -- I can -- as much as I can, based on the

1   information and belief that I have, I can tell the Court -- I

2   can proffer to the Court that it, indeed, is not Ms. Hunt and

3   that Ms. Hunt was actually objecting to him going to

4   Washington, D.C. when she knew about the plans.  She's very

5   against these actions.

6         And I realize that there's -- with respect to the

7   conditions of release here, I think Ms. Hunt plays into whether

8   he's a risk of flight.  She would also be a third-party

9   custodian.  But in talking to her, she's a good third-party

10  custodian because she's actually very concerned about all these

11  issues.  And when I talked to her about her responsibility as a

12  third-party custodian, I have tell you that Mr. McHugh should

13  have more concerns about Ms. Hunt right now than the Court, to

14  be perfectly honest with you, so -- and not to make light of

15  it, but I just want to tell the Court that I spoke to Ms. Hunt

16  at length.  I talked to her about many of the -- much of the

17  information here that she did know and that she didn't know,

18  and she is -- appears to be a very, very responsible person and

19  would be, I think, an excellent third-party custodian as well

20  as an unsecured surety.  She doesn't have surety to offer.

21        But, Your Honor, I did want to correct one thing.  I

22  want to stay on dangerousness for a minute.  Your Honor, with

23  respect to dangerousness here, I did say -- and I had very

24  little time to put this together, but I did say in the paper

25  that -- in the document I filed with the Court, one, two,

1    three, four, five, six, seven, eight -- I think seven cases

2    where defendants have been released that were accused of

3    actually assaulting officers, one with a skateboard, one with a

4    fire extinguisher, one with a crutch -- multiple officers with

5    a crutch; there was a plastic riot shield shoved into officers,

6    one defendant used his fists to strike the officers.  There was

7    one defendant that was using a taser to break the line and then

8    someone else who struck the officer with a lacrosse stick.

9        I also went on the Department of Justice's website to

10   look at all of the individuals who have been charged in this,

11   and many more of them than those seven who have been charged

12   with physically assaulting officers have been released.

13       And so I understand the Court, you know, can't just

14   release him because other people have been released, but when

15   we're looking at assaultive conduct within this case and within

16   the other defendants here, Mr. McHugh's actions are, you know,

17   relatively minor.  I mean, there is -- I think the Court

18   pointed the most serious thing was spraying the spray into the

19   crowd, but there's no indication that he approached an officer

20   closely or that his hands were ever on an officer.

21       And so with respect to dangerousness, we have to look

22   outside, you know, of the events of January 6th and what's

23   happened since then.  He poses no articulable threat to anyone

24   with appropriate conditions.  I'm not saying you should just

25   release him on OR, of course, but I think with strict pretrial

1    supervision and particularly with getting this alcohol

2    situation addressed that dangerousness can be addressed with

3    conditions because we're looking at are there no conditions

4    that can address dangerousness.

5           Your Honor, I realize his record is lengthy and I've

6    looked at it, and the pretrial services report is a little bit

7    complicated because I think -- well, I'm not sure.  It's hard

8    to verify.  I have verified, as much as I can, the convictions

9    that were listed, but I can't verify that the other things that

10   are listed aren't related to those convictions.  So I'm a

11   little concerned it's overstating the history here.

12          But what I wanted to point out to the Court is in the

13   last ten years -- Mr. McHugh is now -- he's very young.  He's

14   only 34 years old now.  In the last ten years, there are two

15   DUIs and another misdemeanor looks like trespassing case.  All

16   his previous cases have been reduced to misdemeanors, which

17   means the state court found -- you know, you have to pass some

18   kind of threshold to get your felony cases reduced to

19   misdemeanors, it's not automatic, and so he does have a lot of

20   misdemeanors, many of them very old dating back to when he was

21   a juvenile even, but he's been -- you know, he has been --

22   recently these things are not necessarily minor because a DUI

23   is not necessarily minor, but he's not driving, he doesn't have

24   his license and he needs to stop drinking.

25          So with respect to dangerousness, Your Honor, I

1    think --

2         THE COURT:  Let me interrupt you a moment.  And I

3    wanted to ask, again, what you were addressing about the

4    drinking because -- and in some ways this goes to the

5    appropriateness of Ms. Hunt as well because you said, "Oh, if

6    anything, he should be afraid of Ms. Hunt because of how . . ."

7    but, yet, he admits that in January of this year he was

8    drinking a pretty substantial amount.  So where the heck was

9    she for all of this if she's, you know, the straight and narrow

10   and scary one, and especially given that we have a person who's

11   got a history of drinking and then drinking and driving without

12   a valid license.  I guess one of the questions is, should he be

13   in rehab somewhere?

14        MS. NEGIN:  Yeah.  And Your Honor, he indicates that

15   he is willing to be in rehab, and I think that's appropriate,

16   for alcohol.  I think that's totally appropriate.  There's

17   obviously an alcohol problem here.  And when you hide it from

18   the people that you're living with, that's even more of a

19   problem.  I think that it's completely appropriate for him to

20   go into in-patient treatment.

21        One of the things he said is that he believes, because

22   he's done it before, that he could be sober without in-patient

23   treatment and -- but he's willing to go to in-patient,

24   basically.  He wants to stop this madness, I will say, with

25   respect to the alcohol situation and even with respect to

1 January 6th.

2       This is not a person, like many of the other people

3 caught up in this, who have remained committed to anything here

4 or participated with any groups or had any firearms or anything

5 else.  He went, he came back and resumed his life.  And so,

6 yes, he has an alcohol problem and that needs to be addressed,

7 but I think addressing that with conditions would ameliorate

8 the dangerousness.

9       Now, with respect to risk of flight --

10       THE COURT:  Let me address one other thing.  Let me

11 tell you a thought I've had, and I want to then get a response

12 from you and a response from Ms. Lydon as well.

13       My initial inclination is to allow him to go into

14 alcohol rehab if there is a more significant bond signed by

15 probably his dad.  His dad's clearly got assets, dad has a

16 property.  It would be interesting if not only Ms. Hunt but

17 also the father is saying, "Yeah, we will make sure that he

18 complies"; he clearly needs alcohol treatment, maybe some

19 mental health, some other counseling; and then he realizes not

20 only does he let himself down or the Court, but he's going to

21 mess up his girlfriend and his father's financial well-being

22 for quite a long time.

23       Ms. Negin, let me hear from you, your thoughts on

24 that, and then we'll hear from Ms. Lydon.

25       MS. NEGIN:  Your Honor, I know that with respect to

1    secured bond, his father couldn't offer that because of

2    financial -- basically because of financial reasons of things

3    he wants to do with the property.  As the Court knows, the

4    secured --

5             THE COURT:  And I'm not worried about a secured one,

6    but I'm talking about a significant financial unsecured but

7    where he realizes that means the government could go and

8    foreclose against those properties or any other assets that dad

9    has.

10            MS. NEGIN:  Right.  Your Honor, I can certainly talk

11   to his father about that.

12            The conversation I had with his father was mostly

13   about secured bond, which was, you know, as the Court knows,

14   there's a lot of other considerations for people like trying to

15   refinance while there's a lien on their home and things like

16   that, so --

17            THE COURT:  Right.

18            MS. NEGIN:  -- I will talk to his father about

19   unsecured with an in-patient -- you know, with a residential

20   treatment program --

21            THE COURT:  Right.

22            MS. NEGIN:  -- I think the combination of those things

23   and I can come back to the Court.  I certainly would ask for

24   that because I think -- you know, I just -- I wanted to address

25   that I think risk of flight -- he doesn't have anyplace to go.

1   He's from Auburn, he lives in Auburn, there's no other ties

2   anywhere, and he can get himself to D.C. and to the D.C. court

3   and will respond to the courts.

4          He's very very -- I want the Court to know he's very

5   respectful here to the Court, the system.  There is no

6   disrespect going on here.  Yes, he was caught up in this event,

7   but it hasn't persisted.  And so to that extent I think we have

8   a situation where we could fashion conditions, and I'd be

9   willing to put this over to do that.

10          THE COURT:  And Ms. Lydon, I don't want you to think I

11   am ignoring the fact here is a person who's had two failures to

12   appear, a probation violation, but I'm wondering if a large

13   part of that is, you know, alcohol and other related.  And

14   rightly or wrongly, I've heard from defense counsel many times

15   over the years and I think they often comment and say federal

16   court is a whole different bailiwick, and so -- but Ms. Lydon,

17   I know you would probably still like to see him in custody, but

18   what of my proposal of a more significant bond and in-patient

19   treatment?

20          MS. LYDON:  Your Honor, the government has really

21   serious concerns here about danger.  So if you'd permit, I'd

22   like an opportunity to highlight some really -- some of the

23   facts that make the government so concerned about danger --

24          THE COURT:  Uh-huh.

25          MS. LYDON:  -- as well as highlight some of the

1  factors about his criminal history that we think underscore

2  that.

3          THE COURT:  Okay.

4          MS. LYDON:  So with respect to the offense that he's

5  charged with, I think Your Honor highlighted exactly the two

6  important things here, that his conduct was assaultive, that

7  he -- it appears from the screen shot that's under paragraph 16

8  of the complaint that he was shooting bear spray or some

9  chemical substance directly at a line of police officers.  He

10 rammed a line of police officers with a large metal pole while

11 they were trying to defend the west terrace of the U.S. Capitol

12 building.  And he also had a leadership function within the

13 crowd or riled up the crowd using a bullhorn, which was later

14 recovered in the search warrant of his apartment to yell

15 threatening things at the officers, like he yelled, "I'd be

16 shaking in your little -- expletive -- boots too; there is a

17 second amendment behind us, what are you going to do then," and

18 taunting them that "You ain't holding the line."

19         Then once the line started to break, he exhorted the

20 crowd into the bullhorn to rush it, yelling "Come on, let's

21 go," and ushering people toward the line into the U.S. Capitol

22 where they delayed and attempted to disrupt the transfer of

23 power.  So this assaultive conduct was exceptional.

24         I can't speak to the specific cases that Ms. Negin

25 characterized because I haven't had a chance to read all of

1    them in that short brief, but based on my understanding of the

2    defendant's charge, his conduct was really exceptional and

3    really dangerous.

4          With respect to his criminal history, it's some of the

5    longest criminal history I've ever seen in a pretrial services

6    report.  Just the prior arrests and prior convictions take up

7    seven pages of the original pretrial services report, and it

8    ranges back a full two decades.  It includes violent offenses

9    including domestic violence.  It includes sex offenses, three

10   prior rape offenses as an adult and one as a juvenile.  The

11   rapes were charged as by force or fear.  Looks like in 2010

12   ultimately pleaded to sex with a minor for that one.  Then in

13   2015, again, an arrest for rape by sex by a person incapable of

14   consent requiring -- a person under the statute requiring that

15   the perpetrator be over the age of 21 and the victim under the

16   age of 16.  Burglary in 2011.  Obstructing a police officer in

17   2013.  Theft offenses, numerous DUIs, including four separate

18   arrests in 2017 and 2018.

19         And of particular concern, he committed most of those

20   offenses, the vast majority of them, while on probation.  So

21   prior conditions have failed to protect the community and have

22   failed to dissuade the defendant from committing further

23   crimes.

24         And most recently, while on probation he traveled to

25   the U.S. Capitol and tried to storm the Capitol.  So we have a

1    lot of concern that any conditions could be fashioned that

2    would mitigate the danger here.

3           With respect to the particular individuals highlighted

4    as potential custodians in the pretrial services report,

5    currently his father has indicated he's not willing to put up

6    his house.  And that's understandable, but it is concerning.

7    It speaks to, as of what we know right now, his father's level

8    of confidence that he could control this individual and protect

9    the community.

10          Ms. Hunt, the defendant's girlfriend, based on what's

11   in the pretrial services report, does not appear to the

12   government to be an appropriate custodian candidate for a few

13   reasons.

14          So page 3 of the pretrial services report caused the

15   government to have some concern about candor.  Initially, the

16   pretrial services officer had asked whether she had any

17   criminal -- any arrests, and she indicated no.  And then when

18   the pretrial services officer said that a criminal history

19   report would be run, Ms. Hunt said that she had been booked and

20   released for fraud.  While not technically arrested, that

21   answer would have been responsive to the call of the question.

22   Ultimately that booking resulted in an arrest and a conviction

23   for felony fraud.  I think we would need to know a lot more

24   about Ms. Hunt before she could really be considered, but as of

25   right now I just really don't think that the danger is

1    overcome.

2          I appreciate Your Honor's desire to find a way to

3    release this defendant, but I think right now, given the

4    incredibly strong indicia of dangerousness, we're very far.  So

5    for now the government strongly requests that the defendant be

6    detained as a danger to the community.

7          And of course it's Ms. Negin's prerogative to bring a

8    bail review motion down the road should they be able to

9    generate a really substantial package.

10          THE COURT:  Ms. Negin, anything else briefly?

11          MS. NEGIN:  Well, Your Honor, I really have to object

12    to Ms. Lydon's recitation there.  She said many -- she's mixing

13    and matching false things in the pretrial services report.

14    Arrests are not convictions.  The pretrial services report has

15    scant information about these things, like it will say

16    "disposition unknown."  And I don't know if that's related to

17    another case that was for conviction or if that's a completely

18    separate case.  And so I do take offense at the argument that

19    he's had, for example, three rapes as if those are convictions,

20    and they're not, and --

21          THE COURT:  Let me interrupt because here's -- the

22    more I hear and think this through, here's what's going to

23    happen, which is -- and you can tell by my comments today, I

24    think that Mr. McHugh should be detained with the information I

25    currently have as both a fly risk but especially as a danger.

1    And it is possible, and I highlight that, that you may be able

2    to address those concerns.  So Ms. Negin, if you find it

3    appropriate to say, "Judge, you know, from your comments at the

4    last one we're back because the father is willing to post a

5    substantial bond, we do have alcohol treatment available for

6    him" and then -- but that is without prejudice to the

7    government arguing, as they are today, saying, "No, it doesn't

8    matter whether he has alcohol treatment or not, Judge, or what

9    the bond is, this guy has proven himself a danger in part

10   because" -- and I will share this concern the more hearing

11   Ms. Lydon speak.  This isn't the situation where the guy had a

12   few beers and went out and did something stupid.  He flew

13   across the country and was involved in this incident and

14   involving it with bear spray and firing up the crowd,

15   et cetera.  So that's a significant concern.

16        But also, candidly, if you're back before me, I'm

17   going to want more information as to where it says "disposition

18   unknown" on some of these other charges.  So we say do we have

19   a lengthy and really troubling criminal history but the only

20   things in the last multiple years are some DUIs related or is

21   there, in fact -- has there been multiple rapes.  And that

22   would be a significant factor, potentially, as well with regard

23   to danger, so --

24        And then the other thing, and this is really also for

25   Mr. McHugh's benefit, Mr. McHugh, because I'm ordering you

1    detained now -- many times, and Ms. Negin will be it talking to

2    you about this -- the view is, hey, we could spend a lot of

3    time here back and forth with Judge Newman, but ultimately it's

4    going to be heard and reviewed and determined in D.C.; maybe

5    you want to bypass back in front of me and say, nope, let's get

6    you in front of a judge there to determine this, but that's my

7    inclination.  But let me hear first from Ms. Negin.

8           MS. NEGIN:  Well, Your Honor, the first thing I'm

9    going to do is ask the Court to order pretrial to redo the

10   criminal history section of the pretrial services report and

11   verify information or not because I agree that all of the

12   convictions listed there -- every time Ms. Zepeda listed a case

13   number with a disposition, I have been able to double check

14   those, so I am confident about those and I don't have a problem

15   with that.  And if the Court were just looking at that or

16   Ms. Lydon was just arguing that, I wouldn't have such a strong

17   objection, but because this pretrial services report -- I mean,

18   you know, I know rap sheets are hard to read and I understand

19   that this information is hard to get in a day.  Ms. Zepeda has

20   done it over a holiday weekend and everything.  I mean, I get

21   it.  It's just that this needs to be more accurate because if

22   this goes to D.C. the way it is, you know, the judge in D.C. is

23   not going to know what to do with all these disposition

24   unknowns.

25           A disposition unknown to me probably means nothing

1    happened, but I don't know.  So I would ask the Court to please

2    ask -- you know, order pretrial services to do their best to

3    update this report and to submit a supplement to the Court and

4    to me so that when Mr. McHugh goes to D.C., we have accurate

5    information.

6              The second request I have --

7              THE COURT:  Let me interrupt -- let me interrupt a

8    moment.

9              Ms. Zepeda, is that something you can do and at least

10   include if there are case numbers or something even if you

11   can't run to ground what the disposition was?

12             PRETRIAL SERVICES OFFICER:  Good afternoon, Your

13   Honor.

14             With regards to the cases that do have a case number

15   listed and associated with them, those I did verify with online

16   court records through each of the counties listed.

17             With regards to the arrests that show unknown

18   dispositions, that's because the California Law Enforcement

19   Telecommunications System report that was generated and

20   provided to us listed them as arrests but did not list any

21   dispositions associated with them.

22             The best that I can do is contact the local law

23   enforcement agencies where he may have been arrested and

24   attempt to obtain information regarding the arrests on those

25   dates.  But if they don't have any further information for me,

1    then I will not be able to provide any further details because

2    there are no additional details in the CLETS report.

3            THE COURT:  And maybe what you can just do is even

4    supplement -- even if you say that and say you contacted them

5    and say there's no other information available, I think that

6    would be helpful.

7            Before you -- but then Ms. Negin wanted to address

8    point number two, and then I wanted to address one thing.  Go

9    ahead.

10           MS. NEGIN:  Also, that's very helpful what Ms. Zepeda

11   just said.  If she can just list instead of "disposition

12   unknown" if it says "arrest only," that certainly would be

13   better than disposition unknown because disposition unknown

14   makes it sound like there's some disposition that's just not

15   known as opposed to arrest only.  So I think arrest -- I don't

16   want Ms. Zepeda to have to call, you know, every agency unless

17   that's an easy thing to do, but I think if we can just change

18   "disposition unknown" to indicate an arrest or something like

19   that, that would be more accurate.  And so I would ask for that

20   if she feels comfortable noting that that's what that is.  That

21   sounds like what Ms. Zepeda just said that is, so I don't know,

22   but I would ask that that --

23           PRETRIAL SERVICES OFFICER:  Your Honor, if I may with

24   regards to that, the reason we do list "disposition unknown" is

25   because we can't verify or confirm that, in fact, it was just

1   an arrest.

2          THE COURT:  Understood.  And so that's why we're

3   asking you to -- that's what I understood you to say.  So see

4   if you can contact to see if there is any other information

5   available and maybe otherwise just note "No other information,"

6   you know.  "Contacted; no other information available."

7          But I also want to make clear that my decision today

8   is not -- no offense to Ms. Lydon, but not noted based on her

9   recitation of other things where it says "disposition unknown."

10  I know from the government's perspective that's troubling, but

11  mine is based on:  A, he does have a criminal history,

12  including failures to appear on probation violation and then

13  especially in light of the factual allegations in this case.

14  That's why I'm ordering him detained.

15         But Ms. Negin, was there a point two?  Sorry.

16         MS. NEGIN:  Sure, sure.  The point two, Your Honor, is

17  I think -- because we're in a Rule 5 situation, I think what I

18  would recommend that we do, because obviously detention can be

19  brought up in D.C. because the Court's going to detain him

20  without prejudice for a further -- you know, new information or

21  additional information.  He does have a right to a preliminary

22  hearing in this case; has not been indicted.  I'm going to ask

23  the Court to not -- I'm going to ask the Court to issue its

24  ruling today and then send him on his way but also assert his

25  right to his preliminary hearing, which I think is going to

1    happen in D.C. and the marshals are just going to have to get

2    him there within the time limits.

3          So I'm going to ask that the Court make its ruling and

4    then I think, appropriately, he goes to -- because I think any

5    appeal of the Court's ruling would also go to the District of

6    Columbia District Court Judge, so I would ask that we proceed

7    that way if that makes -- if I'm following the procedures

8    correctly.

9          THE COURT:  So the way -- in other words, what I'm

10   going to do is order him detained.  I will be signing the order

11   having him transported forthwith to the District of Columbia.

12          But what I'm not sure about -- I don't know if

13   Ms. Lydon has an update on this -- I don't know if that means

14   that they're actually being transported at this point or

15   whether or not they're having Zoom appearances and the feeling

16   is now that we're not in any hurry, you know, huge hurry to

17   send him someplace; he'll be appearing remotely there.

18   Ms. Lydon, do you know?

19          MS. LYDON:  I think the answer is both.  So they will

20   transport him to D.C. forthwith and then hearings I think

21   generally are still being held via Zoom.

22          MS. NEGIN:  Your Honor, can I have a breakout room

23   really quick?  I'm so sorry to interrupt.  I'm just -- I know

24   Mr. McHugh -- can I just have, like, a three-minute breakout?

25          THE COURT:  Of course.

1          Alex, if you would put Ms. Negin and her client in a

2    breakout room, let them talk.

3          And Ms. Negin, you can either message Ms. Waldrop or

4    just tell us how long and we'll bring you back.

5          MS. NEGIN:  Thank you.

6          THE COURT:  Okay.

7       (Off-the-record discussion.)

8          MS. NEGIN:  Thank you, Your Honor, for that breakout

9    room.

10          We're ready to proceed in the way I suggested, which

11    was to go ahead and get him on his way to Washington, D.C. with

12    the -- asserting his right to a timely preliminary hearing.

13          THE COURT:  Absolutely.  Okay.  As well as when he

14    gets to D.C., it may be that an attorney there feels that he

15    could also address the Court's concerns.  They can always put

16    it back before the Court for a bail review as well.  So I will

17    sign it.  I'm ordering him detained and transported forthwith

18    to the District of Columbia.

19          And two things I wanted to address.  Ms. Lydon, I want

20    to remind the government of its obligations to comply with

21    *Brady v. Maryland* and its progeny.  Failure to do so may result

22    in sanctions and a written order will follow.

23          Second thing is, Mr. McHugh, they will take up the

24    issue of prisoner restraint level as well once you appear in

25    D.C., but at this point I'm not going to order particular

1    restraints.  I'll leave that to both the jail.  As long as

2    you're on best behavior in the jail, they can, you know,

3    oftentimes just move you within the jail without any

4    restraints.  And second thing, the marshals will determine how

5    they shackle you or not when they were transporting you on the

6    planes, et cetera; but otherwise, I'm not ordering any other

7    restraint levels.

8              Ms. Lydon, anything else today?

9              MS. LYDON:  Briefly, Your Honor.  Thank you.

10             THE COURT:  Sure.

11             MS. LYDON:  With respect -- Ms. Negin mentioned that

12   she's asserting the right to a timely preliminary hearing but

13   also requesting that he be transmitted forthwith to D.C.  So

14   during the break I took a look at Rule 5 and Rule 5.1,

15   specifically Rule 5.1(b), which indicates that scheduling or

16   selecting a district, a defendant arrested in a district other

17   than where the offense was committed may elect to have the

18   preliminary hearing conducted in the district where the

19   prosecution is pending.

20             I understand her request that he be transported to

21   be -- requesting the preliminary hearing be held in the

22   District of Columbia rather than here.  So while I haven't

23   found anything specifically speaking to whether the time period

24   for calculating those 14 days starts here or in D.C. -- when he

25   arrives in D.C. with an indictment, the time period would start

1    in -- well, no.  Actually, with a complaint it's always, in my

2    experience, started when the defendant makes his initial

3    appearance in the district where he arrives.

4            THE COURT:  Correct.

5            MS. LYDON:  Is that your -- okay.  Good.

6            So I just wanted to make sure we didn't end up in a

7    situation where if, unfortunately, the marshals' bus were to

8    take a circuitous route that the time period would elapse while

9    he was in Tennessee or something.

10           THE COURT:  And even if -- from the judge that has

11   authority to explain why time is being excluded in light of the

12   transportation, et cetera.

13           So Ms. Negin, is there anything you wanted to address

14   in that regard?

15           MS. NEGIN:  Yeah.  I don't think there's any rule that

16   we couldn't exclude time or anything like that.  I'm just

17   asking for him -- I'm asserting his right --

18           THE COURT:  Right.

19           MS. NEGIN:  -- to a preliminary hearing.

20           THE COURT:  Right.

21           MS. NEGIN:  And I'm asserting his right to a

22   preliminary hearing in the District of Columbia.

23           THE COURT:  Right.

24           MS. NEGIN:  Those are the two things I'm doing.  I

25   don't have any other basis to force --

1           THE COURT:  Right.  And that's where all of that will

2    occur.  Exactly.

3           Okay.  Ms. Lydon, anything further today?

4           MS. LYDON:  No.  Thank you, Your Honor.

5           THE COURT:  Ms. Negin, anything further today?

6           MS. NEGIN:  No.  Thank you, Your Honor.

7           THE COURT:  Mr. McHugh, good luck to you, sir.  Thank

8    you.

9           Thank you, everyone.  Stay healthy.

10       (Concluded at 3:15 p.m.)

11

12                C E R T I F I C A T E

13

14    I certify that the foregoing is a true and correct

15    transcript of the record of proceedings in the above-entitled

16    matter.

17    _____          June 3, 2021
      JENNIFER L. COULTHARD, RMR, CRR             DATE
18    Official Court Reporter

19

20

21

22

23

24

25

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312