**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:21-cr-00453-JDB** |
| | : | |
| **SEAN MICHAEL MCHUGH,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS COUNTS TWO, FIVE, SIX, SEVEN, AND EIGHT
OF THE SUPERSEDING INDICTMENT**

> *"Right now we're storming the Capitol. We're going to Congress
> and we're gonna let them know that we don't want them to accept
> the Electoral College votes…"*
>
> *--Sean McHugh, morning of January 6, 2021*

TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 3

LEGAL STANDARD ...................................................................................................... 11

ARGUMENT .................................................................................................................... 12

   I.    18 U.S.C. §1512(c)(2) should not be dismissed.................................................... 12

       A.    *Section 1512(c)(2)'s text, structure, and history confirm that its prohibition on obstructive conduct covers the defendant's actions on January 6, 2021.* ........................................... 13

       B.    *The certification of the Electoral College vote is an "official proceeding".* ............................. 24

       C.    *18 U.S.C. §1512(C)(2) is not unconstitutionally vague, is not vague as applied to this case, and provides sufficient notice.* ................................................................................................. 26

   II.   Section 231(a)(3) is not unconstitutionally vague and provides sufficient notice. ........................ 33

       A.    *Section 231(a)(3) is not vague and provides fair notice.* ........................................... 34

       B.    *Section 231(a)(3) does have a scienter requirement.* ............................................ 36

   III.   18 U.S.C. §1752 properly states an offense. ................................................................. 38

       A.    *18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted by the Secret Service.* ............................................................................... 39

       B.    *18 U.S.C. §1752 is properly pled regardless of whether former Vice President Pence was "temporarily visiting" the Capitol Building on January 6, 2021.* ........................................ 43

CONCLUSION ................................................................................................................. 46

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the Defendant's Motion to Dismiss Counts Two, Five, Six, Seven, and Eight of the Superseding Indictment (hereinafter "Defendant's Motion"). For the reasons outlined below, Defendant's Motion is unsupported by the law and should be denied.

## BACKGROUND

The United States adopts the procedural background outlined in the Defendant's Motion. In addition, the United States offers salient factual background below.

As laid out in the indictment, on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the United States Capitol building. They assembled to debate and certify the vote of the Electoral College of the 2020 U.S. Presidential Election, which resulted in Joseph R. Biden amassing more electoral votes than President Donald J. Trump, and thus winning the election.

Vice President Michael Pence was under Secret Service protection and was present at the United States Capitol building. Vice President Pence was present for the beginning of the joint session and remained in U.S. Capitol until the session concluded. The U.S. Capitol Police ("USCP") set up security barriers on the Capitol grounds. On the west side of the Capitol, USCP set up metal bike rack barriers along First Street. Within the West Front of the Capitol building, USCP set up additional temporary metal barriers, green snow fencing, and signage stating, "Area Closed By Order of the United States Capitol Police Board." The Lower West Terrace on the West Front was closed to members of the public. Below is a map of the restricted area:



As a result of the actions of defendant McHugh and hundreds of others who stormed the restricted Capitol grounds and building, Congress was forced to halt its proceedings and evacuate. Vice President Mike Pence, who had been presiding over Congress's Joint Session, was taken by Secret Service to a secure location within the Capitol for his own protection. After the building was secured later that day, Congress reconvened and completed counting, certifying, and declaring the Electoral College vote result.

McHugh traveled to D.C. from Sacramento, California by airplane with at least two other individuals. Compl., Aff. Supp. Crim. Compl. & Arrest Warrant ("Aff.") ¶ 17, ECF No. 1. Records show that he lodged in D.C. between January 5th and January 7th. *Id.* at ¶ 22. McHugh brought to the Capitol a megaphone, bear spray, and a holster. The short travel reservation combined with the items McHugh chose to pack suggests that the defendant's *only* purpose in coming to D.C. was to participate in an anticipated violent riot. The defendant came to D.C. prepared for conflict carrying chemical spray for offensive use.  As he marched with a large crowd to the Capitol he filmed

himself with his phone saying: "Right now we're storming the Capitol. We're going to Congress and we're gonna let them know that we don't want them to accept the Electoral College votes…"

Several videos show multiple instances where Sean McHugh is at the front of rioters encouraging the crowd with his megaphone (recovered in the search of the defendant's home) to intimidate officers and approach police lines while officers attempt to fend off rioters from breaching various barricades. For example, McHugh was seen gesturing to the crowd to advance on the police while yelling things like "Come on! Let's go!"; "Come on you guys, come on you guys! Bring it in!" *See* Compl., Aff. Supp. Crim. Compl. & Arrest Warrant ("Aff.") ¶ 3, ECF No. 1. ¶ 13-14. In one video, a female voice is audible from off-camera and heard saying, "Sean, tell them to get over here." McHugh responds by using his megaphone to direct the crowd. *Id*. ¶ 19.





McHugh also verbally attacked law enforcement officers.  Video captures him yelling various obscenities at officers through his megaphone like, "You guys like protecting pedophiles?"; "You're protecting communists!"; "I'd be shaking in your little shit boots too"; "There is a second amendment behind us, what are you going to do then?"; "You ain't holding the line!" *Id.* ¶ 12.




At approximately 1:40pm, a large group of protesters started to move a metal sign toward a police barricade. McHugh was positioned at the front of the barricade. McHugh turned around, saw the sign coming toward him and yelled into his megaphone at the officers, "Yeah bitch!" He then directed the rioters with his megaphone to, "***Put it up there! Put it up there!***" *Id.* (emphasis added). McHugh then took a position at the side of the sign, grabbed it, and pushed it into officers. *Id.* ¶ 13. Joseph Padilla is in the blue jacket immediately to McHugh's left in the photo below:



Another publicly available video shows McHugh scuffling with an officer in an attempt to remove another barricade. *Id.* ¶ 15.



Still in the general area of the West Terrace, video captures McHugh deploying bear spray at officers. Other footage captures the spray bottle, which McHugh holstered at his right hip. *Id.* ¶ 16.





The megaphone, bear spray, and bear spray holster McHugh used at the Capitol were recovered from McHugh's residence on May 27, 2021 during the execution of a search warrant.



Although the picture below of the label is somewhat out of focus, there is a clear warning of "irreversible eye damage if sprayed in the eye" and a warning that the spray is a "Hazzard to Humans".



The FBI also seized McHugh's phone during the search warrant and discovered that McHugh sent the following text to another individual discussing the events of January 6th: "I unloaded a whole can of bear spray on a line of cops I got three of them down really really good".

## LEGAL STANDARD

A defendant may move to dismiss an indictment or count thereof for failure to state a claim prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(B). A count in an indictment can fail to state an offense if it alleges a violation of a statute that is unconstitutional. *See Al Bahlul v. United States*, 767 F.3d 1, 79 (D.C. Cir. 2014). "A motion to dismiss an indictment challenges the adequacy of an Indictment on its face. Thus, the indictment must be viewed as a whole and the allegations

must be accepted as true at this stage of the proceedings." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011) (citations omitted). The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.*

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). "An indictment must contain every element of the offense charged, if any part or element is missing, the indictment is defective and must be dismissed." *See United States v. Hillie*, 227 F. Supp. 3d 57, 70 (D.D.C. 2017).

## ARGUMENT

### I.     18 U.S.C. §1512(c)(2) should not be dismissed.

Congress enacted a prohibition on "Tampering with a record or otherwise impeding an official proceeding" in Section 1102 of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 807, and codified it within the pre-existing Section 1512 as subsection (c).  That prohibition applies to

> (c) [w]hoever corruptly--
>
>> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>>
>> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added).

A person violates that statute when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding.  *See* 18 U.S.C. § 1512(c)(2); § 1515(a)(1)(B). Section 1512(c)(2) is not unconstitutionally vague or overbroad, and nothing in its text, structure, or history limits it to obstruction tied to documentary or tangible evidence. Nor does the Supreme Court's decision in *Yates v. United States*, 574 U.S. 528 (2015)—which construed a different term in a different statute—support imposing such an atextual limitation in Section 1512(c)(2).  But even if such a limitation existed, the statute encompasses the defendant's alleged conduct in this case.

### A.  *Section 1512(c)(2)'s text, structure, and history confirm that its prohibition on obstructive conduct covers the defendant's actions on January 6, 2021.*

In Section 1512(c)(2), Congress comprehensively prohibited conduct that intentionally and wrongfully obstructs official proceedings.  The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a wide range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, and burning a building to conceal the bodies of murder victims.  It also includes storming into the Capitol to derail a congressional proceeding.  A defendant who, acting with the necessary *mens rea*, obstructs (or attempts to obstruct) Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

Section 1512(c)(2)'s text and structure demonstrate that it serves as a comprehensive prohibition on corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning."  *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted).  If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well."  *National Ass'n of Mfrs. v. Department of*

*Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted).  Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) reach broadly.  For example, the words "obstruct" and "impede" can "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'"  *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries).  Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on."  *Influence*, Oxford English Dictionary, *available at* http://www.oed.com.  By their plain meaning, therefore, the string of verbs in Section 1512(c)(2) are properly viewed as "expansive" in their coverage.  *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).

Section 1512(c)'s structure confirms that straightforward interpretation.  Section 1512(c) consists of two provisions, which both require the defendant to act "corruptly."  First, Section 1512(c)(1) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding."  Section 1512(c)(2), by contrast, applies more generally to any acts that "otherwise obstruct[], influence[], or impede[]" an official proceeding.

The term "otherwise," consistent with its ordinary meaning, conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes.  *Burge*, 711 F.3d at 809; *United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition in that statute applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *see also United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section

1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering"); *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com (defining otherwise as "in another way" or "in any other way"); *see also Gooch v. United States*, 297 U.S. 124, 127-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "for ransom or reward or otherwise" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court").

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—when that result is accomplished by a different *means, i.e.*, by conduct other than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503, which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catch-all clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)); *cf. United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing similar "[o]mnibus" clause in 18 U.S.C. § 1503 as a catchall that is "far more general in scope than the earlier clauses of the statute").

Consistent with that interpretation, courts have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *Petruk*, 781 F.3d at 440, 447; disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *Volpendesto*, 746 F.3d at 286; and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished). *See also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Section 1512(c)(2) also applies to the defendant McHugh's alleged conduct, which involved trespassing into the restricted Capitol area and confronting and assaulting law enforcement officers in order to prevent a Joint Session of Congress from certifying the results of the 2020 Presidential election.  In so doing, the defendant hindered and delayed the certification of the Electoral College vote, an "official proceeding" as that term is defined in the obstruction statute.  *See* 18 U.S.C. § 1515(a)(1)(B).  Because construing Section 1512(c)(2) to reach that conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it."  *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

In contrast, reading Section 1512(c)(2) as limited only to obstructive acts akin to the document destruction or evidence tampering captured in Section 1512(c)(1) suffers at least three flaws. *First*, it would give rise to unnecessarily complex questions about what sort of conduct qualifies as "similar to but different from" the proscribed conduct "described in [Section 1512](c)(1)." *United States v. Singleton*, No. 06-CR-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished); *see id.* (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-CR-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object"). So construed, for example, Section 1512(c)(2) may not encompass false statements made to obstruct a proceeding—though courts have widely upheld convictions for such conduct. *See Petruk*, 781 F.3d at 447 (collecting cases).

*Second*, limiting Section 1512(c)(2) in that way would effectively render that provision superfluous in light of the comprehensive prohibitions against document and evidence destruction in both Sections 1512(c)(1) and 1519. *See Yates*, 574 U.S. at 541 n.4 (plurality opinion) (Section 1512(c)(1) provides a "broad ban on evidence-spoliation") (internal quotation marks omitted). By contrast, the straightforward interpretation that treats Section 1512(c)(2) as a catch-all for corrupt obstructive conduct not covered by Section 1512(c)(1) would "give effect to every clause and word" of Section 1512(c). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catch-all provision in Section 1503's omnibus clause to obstructive acts "directed against individuals" would render that catch-all superfluous because "earlier, specific[]

prohibitions" in Section 1503 "pretty well exhaust such possibilities") (internal quotation marks omitted); *United States v. Watt*, 911 F. Supp. 538, 546 (D.D.C. 1995) (rejecting interpretation of the Section 1503 omnibus clause that would "serve no other purpose than to prohibit acts already prohibited in the first part of the statute" because that reading would "reduce[] the omnibus clause to mere redundancy").

Nor does the fact that Congress adopted a more general catch-all in Section 1512(c)(2) render superfluous other obstruction prohibitions found in Chapter 73, the criminal code's chapter on obstruction of justice.  Instead, the catch-all in Section 1512(c)(2) serves to capture "known unknowns."  *See Yates*, 574 U.S. at 551 (Alito, J., concurring) (quoting *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009)).  Indeed, "the whole value of a generally phrased residual clause . . . is that it serves as a catchall" to ensure that the full range of conduct Congress sought to regulate comes within the statute, including "matters not specifically contemplated" by more specific provisions.  *Beaty*, 556 U.S. at 860.  In any event, "[r]edundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54.

Judicial treatment of the nearby omnibus clause in Section 1503, which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice," 18 U.S.C. § 1503, is instructive. Drafted in "very broad language," the omnibus clause or "catchall provision," *see Aguilar*, 515 U.S. at 599, principally operates to criminalize obstructive conduct that falls outside the narrower prohibitions within Section 1503 and neighboring provisions.  *See, e.g.*, *United States v.*

*Sussman*, 709 F.3d 155, 168-70 (3d Cir. 2013) (removing gold coins from safe-deposit box);

*United States v. Frank*, 354 F.3d 910, 916-19 (8th Cir. 2004) (removing car to avoid seizure);

*United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th Cir. 1997) (instructing employee to

remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984)

(hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (warning

suspect about impending search warrant to prevent discovery of heroin); *Howard*, 569 F.2d at

1333-34 (attempting to sell grand jury transcripts).  No court, however, has held that the omnibus

clause's broad language should be given an artificially narrow scope to avoid any overlap with

Section 1503's other, more specific provisions.  *Cf. Pasquantino v. United States*, 544 U.S. 349,

358 n.4 (2005) ("The mere fact that two federal criminal statutes criminalize similar conduct

says little about the scope of either.").  The same is true for the catch-all provision in Section

1512(c)(2).

Similarly, Section 1512(c)(2)'s partial overlap with other obstruction statutes does not

render those other provisions superfluous.  For example, the omnibus clause in 1503 and the

congressional obstruction provision in 1505 both reach an "*endeavor*[] to influence, obstruct, or

impede" the proceedings—a broader test for inchoate violations than Section 1512(c)(2)'s

"attempt" standard.  *See United States v. Sampson*, 898 F.3d 287, 301 (2d Cir. 2018) ("[E]fforts

to witness tamper that rise to the level of an 'endeavor' yet fall short of an 'attempt' cannot be

prosecuted under § 1512."); *United States v. Leisure*, 844 F.2d 1347, 1366-67 (8th Cir. 1988)

(collecting cases recognizing the difference between "endeavor" and "attempt" standards).

Section 1519, which covers destruction of documents and records in contemplation of an

investigation or agency proceeding, does not require a "nexus" between the obstructive act and

the investigation of proceeding—but Section 1512(c)(2) does.  The existence of even

"substantial" overlap is not "uncommon" in criminal statutes. *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014). But given that Sections 1503, 1505, and 1519 each reach conduct that Section 1512(c)(2) does not, the overlap provides no reason to impose an artificially limited construction on the latter provision.

*Third*, importing into Section 1512(c)(2) a nexus-to-tangible-evidence-or-documents requirement would require inserting an extratextual gloss that would render the verbs in Section 1512(c)(2) nonsensical. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted). The *actus reus* that those verbs encompass is obstructing, influencing, and impeding; a defendant cannot "obstruct" a document or "impede" a financial record. *Cf. Yates*, 574 U.S. at 551 (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon.").

*Legislative History*: Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there" and resort to legislative history is unnecessary. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *see Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's authoritative statement is the statutory text, not the legislative history.") (internal quotation marks omitted); *see also United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 251-52 (S.D. Tex. 2020) (declining to consider Section 1512's legislative history in rejecting the claim that the statute was limited to document destruction). Regardless, the legislative history of Section 1512(c)(2)—particularly when

considered alongside the history of Section 1512 more generally—provides no support for a

contrary conclusion.

When Congress in 1982 originally enacted Section 1512, that legislation did not include

what is now Section 1512(c).  *See* Victim and Witness Protection Act of 1982 (VWPA), Pub. L.

No. 97-291, § 4(a), 96 Stat. 1248, 1249-50.  Its title then, as now, was "Tampering with a

witness, victim, or an informant."  *Id.*; 18 U.S.C. § 1512.  As that title suggested, Section 1512 as

originally enacted targeted conduct such as using intimidation, threats, or corrupt persuasion to

prevent testimony or hinder, delay, or prevent communication of information to law enforcement

or the courts as well as intentionally harassing another person to hinder, delay, or prevent that

person from taking certain actions.  *See* Pub. L. No. 97-291, § 4(a) (now codified as Section

1512(b) and Section 1512(d)).  For example, Section 1512 as enacted in 1982 included a

prohibition on using intimidation, physical force, or threats, with the intent to "cause or induce

any person to . . . alter, destroy, mutilate, or conceal an object with intent to impair that object's

integrity or availability for use in an official proceeding."  *Id.* § 4(a) (originally § 1512(a)(2)(B);

now codified at § 1512(b)(2)(B)).

Twenty years later, following the collapse of the Enron Corporation, Congress passed the

Sarbanes-Oxley Act of 2002.  Pub. L. No. 107-204, 116 Stat. 745; *see Yates*, 574 U.S. at 535

(plurality opinion).  That legislation, which principally aimed to "prevent and punish corporate

fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers

accountable for their actions," S. Rep. No. 107-146, at 2 (2002), included several different

provisions, *id.* at 11 (describing different components of the law); *see also* 148 Cong. Rec.

H4683-84 (daily ed. July 16, 2002) (outlining new provisions).  Foremost among them were two

new criminal statutes, 18 U.S.C. § 1519 and 18 U.S.C. § 1520, which were intended to "clarify

and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14. The Senate Judiciary Committee Report on the Sarbanes-Oxley Act discussed those two provisions in detail. *See id.* at 14-16.

By contrast, the Sarbanes-Oxley Act's legislative history provides limited explanation of Congress's objective in enacting Section 1512(c). The only discussion of Section 1512 in the Senate Judiciary Committee Report, for example, noted that the pre-existing prohibition in Section 1512(b) made it a crime to induce "another person to destroy documents, but not a crime for a person to destroy the same documents personally"—a limitation that "forced" prosecutors to "proceed under the legal fiction that the defendants [in then-pending *United States v. Arthur Andersen*] are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves." S. Rep. No. 107-146, at 6-7. Similarly, Senator Hatch observed that the legislation "broaden[ed]" Section 1512 by permitting prosecution of "an individual who acts alone in destroying evidence." 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). At a minimum, nothing in these passing references casts doubt on the plain meaning of Section 1512(c)(2), which is reflected in the interpretation described above.

Section 1512(c) also differed from the newly enacted Sections 1519 and 1520 in that Congress added the former to an existing statutory section: Section 1512. *See Yates*, 574 U.S. at 541 (plurality opinion) (noting that, unlike Section 1519, Section 1512(c)(2) was placed among the "broad proscriptions" in the "pre-existing" Section 1512). Moreover, although Section 1512(c) as enacted in the Sarbanes-Oxley Act recognized two distinct prohibitions, *see* Pub. L. No. 107-204, § 1102, 116 Stat. 807 ("Tampering with a record *or* otherwise impeding an official

proceeding") (emphasis added; capitalization altered), Congress did not amend Section 1512's

title.  That title, "Tampering with a witness, victim, or an informant," § 1512, thus encompassed

the pre-existing provisions aimed at a defendant's obstructive conduct directed toward another

person,[1] but did not reflect the newly enacted prohibitions in Section 1512(c) that criminalized a

defendant's own obstructive act, either through destroying documents (§ 1512(c)(1)) or

otherwise impeding a proceeding (§ 1512(c)(2)).  *See Yates*, 574 U.S. at 541 n.4 (plurality

opinion) (noting that Congress added Section 1512(c)(1), which covered evidence-spoliation, to

Section 1512 "even though § 1512's preexisting title and provisions all related to witness-

tampering").

Section 1512(c)'s legislative and statutory history thus offers two reasons to interpret

Section 1512(c)(2) consistently with its plain text and structure.  First, Section 1512(c) aimed at

closing a "loophole" in Section 1512: the existing prohibitions did not adequately criminalize a

defendant's *personal* obstructive conduct *not* aimed at another person.  *See* 148 Cong. Rec.

S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch).  Read together in this light, Section

1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove

that the defendant induced another person to destroy evidence) in relation to an official

proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that

*otherwise* impedes or influences an official proceeding (though not necessarily through another

person).  *See Burge*, 711 F.3d at 809-10.  Second, no substantive inference is reasonably drawn

from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in

---

[1] *See* § 1512(a) (applies to killing, attempting to kill, or using physical force or the threat of physical force against a person to prevent testimony or induce a witness to withhold information); § 1512(b) (applies to using intimidation, threats, or corrupt persuasion against a person to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts); § 1512(d) (applies to intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions).

fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered). Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

**B. The certification of the Electoral College vote is an "official proceeding".**

The defendant contends that the certification of the Electoral College vote is not an "official proceeding" for purposes of Section 1512(c)(2). *See* Defendant's Motion at 7-9. That contention is incorrect. Section 1515(a)(1)(B) defines an "official proceeding" as a "proceeding before the Congress," which encompasses the certification proceeding undertaken by the Joint Session on January 6, 2021. None of the defendant's new arguments undermines that straightforward analysis.

*1. The defendant adds elements to the obstruction statute that don't exist.*

The defendant suggests that contextual features and history support the reading that the certification of the Electoral College vote is not an official proceeding. That approach overlooks the provision's plain language and fails on its own terms. For example, without citing to any authority, the defendant argues "'obstruction of an official proceeding before Congress' was never intended to apply to an event, like the vote count, that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication." Defendant's Motion at 9. Rather, the defendant claims that the statute applies only to "adjudicative proceeding[s]" and not

"ceremonial and administrative task[s]". *Id*. As an initial matter, the "adjudicatory" gloss the

defendant purports to give to the "official proceeding" definition in Section 1515(a)(1) finds no

support in the statute itself. *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 195 (2012).

> 2. *The defendant's appeal to legislative history does not support his claim.*

The defendant's appeal to the history of the Electoral Act of 1887 offers no insight for

how to interpret the term "official proceeding" in Section 1512.  It does not follow that *only*

proceedings in which Congress is exercising its power of inquiry satisfy the "official

proceeding" definition.  Had Congress sought to limit the "official proceeding" definition in that

way, it could have—but did not—import precisely that language from 18 U.S.C. § 1505, which

applies to "due and proper exercise of the power of inquiry under which *any inquiry or*

*investigation* is being had" (emphasis added) by Congress. *See Russello v. United States,* 464

U.S. 16, 23 (1983) (refraining from concluding that "differing language in the two subsections

has the same meaning in each").  Congress considered, but ultimately did not enact a narrower

prohibition on obstructing the exercise of a legislative power of inquiry, *see* S. 1722, 96th Cong.

§ 1323(a)(2)(C) (1979), opting instead for the broader provision covering obstruction of any

"proceeding before the Congress" currently found in Section 1515(a)(1)(B).  *See United States v.*

*Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991) (discussing the unenacted Senate version of

Section 1512).  The broader language Congress used in Section 1515(a)(1)(B) thus covers a

broader range of proceedings than "inquir[ies] or investigation[s]" covered in Section 1505—

including the Joint Session that meets to certify the Electoral College vote.

> 3. *Even if the defendant's added elements to the obstruction statute were applied, the*
>    *Electoral College vote still qualifies as an "official proceeding."*

Even if the defendant's suggested statutory gloss applied, the certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would qualify. Far from a "ministerial act", the certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15. That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election. Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress. U.S. Const. amend. XII. Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act. 3 U.S.C. § 15; *see* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. Rev. 1653, 1659 (2002) (Under the Electoral Count Act, "the President-elect is not elected by 'We the People' on election day, or even by the electors on the day they cast their votes, but by the joint convention of the Senate and House of Representatives on the day the electoral votes are formally counted"). As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. 3 U.S.C. § 15. And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16. Nothing in the history the defendant describes suggests a different conclusion.

### C.  18 U.S.C. §1512(C)(2) is not unconstitutionally vague, is not vague as applied to this case, and provides sufficient notice.

There is a "strong presumpt[ion] of validity that attaches to an Act of Congress." *United States v. National Dairy Prods. Corp.,* 372 U.S. 29, 32 (1963). Therefore, a court construes congressional enactments as constitutional whenever possible. *Skilling v. United States,* 130

S.Ct. 2896, 2928 (2010); *see United States v. Bowdoin*, 770 F. Supp. 2d 142, 149 (D.D.C. 2011). However, the defendant invokes the rule lenity. Defendant's Motion at 2-3. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). As outlined below, there is no grievous ambiguity with any charge in this case, and no guess work by the Court is required.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may

find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say

with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107

(quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)).  Rather, a provision is

impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate

as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith*

*v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the

statute, either standing alone or as construed, made it reasonably clear at the relevant time that

the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it

'do[es] not mean the same thing to all people, all the time, everywhere.'"  *Bronstein*, 849 F.3d at

1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)).  A statute is instead vague

where it fails to specify any "standard of conduct . . . at all."  *Coates v. Cincinnati*, 402 U.S. 611,

614 (1971).  "As a general matter," however, a law is not constitutionally vague where it "call[s]

for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances

where a man's fate depends on his estimating rightly . . . some matter of degree.'"  *Johnson*, 576

U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

The defendant argues that Section 1512(c)(2) is unconstitutionally vague. Defendant is

wrong and fails to overcome the strong presumption that Section 1512(c)(2) passes constitutional

muster. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong

presumptive validity that attaches to an Act of Congress has led this Court to hold many times

that statutes are not automatically invalidated as vague simply because difficulty is found in

determining whether certain marginal offenses fall within their language."). Section 1512(c)(2)

does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent"

that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604.  Section 1512(c)(2)'s prohibition on "corruptly . . . obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306.

The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding.  While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

### 1. *The "corruptly" element does not invite arbitrary application.*

The defendant's targeted attack on "corruptly," relying on *United States v. Poindexter*, is equally unavailing.  As noted above, the D.C. Circuit in *Poindexter* held that the term "corruptly" was "vague . . . in the absence of some narrowing gloss."  951 F.2d at 378. *Poindexter* is inapposite for three reasons.[2]

First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b)

---

[2] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459.  As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement."

and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a

potential witness at trial. *Id*. at 629-30. Other courts have similarly recognized "the narrow

reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual

circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*,

*United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to

"corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir.

1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir.

1997) (same for 18 U.S.C. § 1503). The defendant's invocation of *Poindexter* accordingly fails

to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v.

United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt" and

'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id*. at 705

(citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*,

869 F.3d at 502.

Third, courts have encountered little difficulty when addressing Section 1512(c)'s

elements following *Arthur Andersen.  See United States v. Friske*, 640 F.3d 1288, 1291 (11th

Cir. 2011); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States

v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as

acting with "consciousness of wrongdoing");*United States v. Matthews*, 505 F.3d 698, 706 (7th

Cir. 2007) (upholding instruction defining "corruptly" as acting "with the purpose of wrongfully

impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction

for § 1512 ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding

the due administration of justice.").  Such efforts demonstrate that the statute's "corruptly"

element does not invite arbitrary or wholly subjective application by either courts or juries.

"One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974).  In this case, the defendant is alleged to have entered the Capitol grounds alongside a mob of rioters, and he assaulted officers in multiple ways. This was all part of his effort (*by his own admission*) to stop Congress from certifying the Electoral College vote. Along the way, the defendant harassed and berated law enforcement officers outside the Capitol building, and instructed the crowd to attack officers.  ("Put it [the metal sign] up there!"). Defendant's contention that "there is no evidence that he had any intent to 'influence' or 'impede' what was happening inside the building" is simply false. Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section 1512(c) provided ample notice to the defendant that *his conduct* was criminal.  His vagueness challenge accordingly fails.

   *2.  The term "official proceeding" is not unconstitutionally vague.*

   The defendant further contends that the term "official proceeding" in Section 1512(c) is vague. Defendant's Motion at 15. As explained above, no indeterminacy exists. The Joint Session of Congress qualifies as an "official proceeding" under both the lay and legal definitions of the term. It also contains the necessary "adjudicatory" features to satisfy the defendant's extra-textual construction. For that reason, Section 1512(c) provided the defendant with more than "a fair warning … of what the law intends to do if a certain line [was] passed" on January 6, 2021.  *Arthur Andersen*, 544 U.S. at 703 (citation omitted).

   *3.  The defendant's survey of the government's charging decisions is flawed and*
       *irrelevant.*

   In an effort to support the defendant's claim, he highlights five Capitol riot cases, arguing that they prove the obstruction statute is inconsistently applied, thereby revealing vagueness.

Defendant's Motion at 13-14. This effort is flawed.

As a threshold matter, the government's charging decisions reflect clear consistency with Section 1512(c)(2)'s offense elements. Each defendant charged had the intent to "corruptly"—through wrongdoing, such as violence and force—obstruct, interfere with, and impede the certification of the Electoral College vote count. Their obstructive methods varied: for instance, some defendants assaulted officers outside the Capitol; others entered the Senate Chamber and rifled through Senators' paperwork. But such factual distinctions lack salience under the statute. Each type of conduct "corruptly" "obstruct[ed], influence[d], or impede[d]" a proceeding before Congress, accordingly, comes within the statute's scope.  18 U.S.C. § 1512(c).

Moreover, the vagueness doctrine asks whether "*the statute* … provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304 (emphasis added). The defendant cites no authority, and the government has found none, showing that charging decisions postdating the offense conduct have any bearing on this inquiry. The relevant question turns on whether the statute fairly informed the defendant that he would face criminal sanction for his conduct on January 6, 2021. The answer is yes, for the reasons articulated above.

The defendant further states that "the government does not specify what 'influence' these defendants had or how exactly they 'impeded.'" Defendant's Motion at 14. But the government does not have to describe in the charging instrument how it will prove those statutory elements at trial. *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (en banc) ("[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed."). If the government fails to carry its burden on these elements at trial, the jury will say so. But that future presentation has no bearing on the question

here—whether Section 1512(c)'s text provided the defendant with adequate notice of its sweep.

    4.   *The defendant's suggestion that the obstruction statute invites arbitrary abridgments of First Amendment speech is inapposite to the case at bar.*

    The defendant suggests in passing that the First Amendment shields him from prosecution. As an initial matter, the defendant's actions—attacking officers to stop the Certification of the Electoral College vote—is not "expressive conduct" protected by the First Amendment. *See Texas v. Johnson*, 491 U.S. 397, 403 (1989). But even if it were, Section 1512(c)(2) is "related to the suppression of free expression," *id.*, and is thus constitutional under *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Under *O'Brien*, a statute is constitutional if (1) "it is within the constitutional power of the Government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* A prohibition on obstructing official proceedings satisfies each of those requirements. Indeed, the Supreme Court has upheld a limitation on political demonstrations where the asserted government interest is far less significant. *See Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 299 (1984) (upholding a ban on overnight camping on the National Mall based on interest in "conserving park property").

## II.    Section 231(a)(3) is not unconstitutionally vague and provides sufficient notice.

    The defendant next challenges Section 231(a)(3) as unconstitutionally vague and suggest that it interferes with his First Amendment rights. Specifically, the defendant claims the following terms are too vague to satisfy the requirements of Due Process: (1) "any act"; (2) "to obstruct, impede, or interfere"; (3) "incident to and during the commission of a civil disorder"; (4) "in any way obstructs, delays, or adversely affects commerce; and (5) "civil disorder".

Defendant's Motion at 18-22. However, the defendant does not appear to challenge the statute as being vague as applied *in his case*. Thus, it appears the defendant is making only a facial vagueness challenge. A defendant "who engages in some conduct that is clearly proscribed," such as attacking a police officer, "cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010).

As part of The Civil Rights Act of 1968, Congress established that it is a federal crime for a person to commit, or attempt to commit, any act "to obstruct, impede, or interfere with any . . . law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce . . . ." 18 U.S.C. § 231(a)(3). The term "civil disorder" is defined in this statute to mean "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(2). The term "law enforcement" includes state and local officers. 18 U.S.C. § 232(7).

Congress designed the civil disorder statute to provide federal support when people "agitate and incite such violence by the use of facilities in interstate commerce." 90th Congress, 1st Session, House Report No. 472, at 2-3. Recognizing the need to support local law enforcement, Congress believed the federal government should lend a hand. Senate Congressional Record, March 6, 1968, at 5537.

### A. Section 231(a)(3) is not vague and provides fair notice.

The civil disorder statute criminalizes the intentional interference with the lawful activities of police and firefighters during a civil disorder. It prohibits not the presence at a civil disorder, but rather, "an act committed during the course of such disorder." *United States v.*

*Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971). Yet, the defendant argues that the statute is vague and, therefore, unconstitutional because of the lack of *mens rea*. This argument ignores the requirement that a defendant act with the intent to impede or interfere, which saves the statute for a claim of vagueness. *Cf. United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) (reading intent requirement into statue to save it from constitutional challenge). That express scienter requirement addresses any vagueness concerns.

The civil disorder statute punishes only concrete, *intentional* "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere with" firefighters or law enforcement. Contrary to the defendant's argument, those terms are quite different from statutory terms that courts have found to be vague, such as statutes that turn on subjective judgments of whether the defendant's conduct was "annoying" or "indecent." *See United States v. Williams*, 553 U.S. 285, 293 (2008). There are numerous federal and state statutes that criminalize obstructing the government's efforts to enforce the law and maintain public order. *See, e.g.,* 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation); 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the administration of tax laws); *see also United States v. Jeter*, 775 F.2d 670, 679 (6th Cir. 1985) (holding that the federal obstruction of justice statute, 18 U.S.C. § 1503, is neither overbroad nor vague); *United States v. Brice*, 926 F.2d 925, 930–31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101–20.305, which prohibits impeding or disrupting government duties).

The intent element in Section 231(a)(3) is a powerful limitation on criminal liability, and the concerns described in the defendant's motion are illusory. Section 231(a)(3) does not

prohibit a person's *presence* at a civil disorder, nor a person's *participation* in a civil disorder.[3] The civil disorder statute prohibits not the presence at a civil disorder, but rather, "an act committed during the course of such disorder." *United States v. Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971). It covers intentional conduct, not "mere inadvertent conduct." *United States v. Featherston,* 461 F.2d 1119, 1122 (5th Cir. 1972). Section 231(a)(3) strictly prohibits only obstructive conduct and unprotected speech, such as threats. Thus, contrary to the defendant's arguments, the statute does not apply to protected speech such as criticizing police through yelling or gestures, and the defendant cites no cases where the statute has been applied to conduct that merely annoys or offends officers.

The statute's intent is plain and provides ample notice. No one could credibly claim to believe that he could lawfully "storm" (the defendant's words) the U.S. Capitol to prevent the peaceful transition of power, attack federal officers with a metal sign, try to defeat barricades, and cover several officers with bear spray. Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden." *Mechanic*, 454 F.2d at 854.

### B. Section 231(a)(3) does have a scienter requirement.

The *mens rea* element in Section 231(a)(3) undercuts the defendant's arguments. The statue is properly interpreted as containing a *mens rea* requirement. Contrary to the defendant's suggestion that individuals could be charged under this statute or merely engaging in protected speech or expression, the statute only criminalizes those acts which are done with the intent to obstruct, interfere, or impede. Notably, two circuits have already endorsed such a construction of this statute.   As the Seventh Circuit has noted:

---

[3] As noted in the Background Section, hundreds of individuals were present and participated in the January 6th riot. However, only a small percentage have been charged with violating Section 231(a)(3).

> It is true that Section 231(a)(3) does not specifically refer to intent, but it only applies to a person who "commits or attempts to commit any act to obstruct, impede, or interfere" with firemen or law enforcement.  Under such phraseology, it will not be presumed that Congress intended strict liability for inadvertent or accidental occurrences where, as here, the crime is grounded on the common law.

*Nat. Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969). Two years later, the Eighth Circuit agreed that "§ 231(a)(3) must be construed to require intent." *Mechanic*, 454 F.2d at 854.

The Seventh Circuit's reasoning in in *National Mobilization Committee* is highly persuasive because the statutory language also supports a finding that Congress intended a *mens rea* requirement in Section 231(a)(3).   The plain language of the statute requires proof that the "act" was done "to obstruct, impede, or interfere with a police officer or firefighter."   The natural reading of this is that the United States must prove the defendant's intent in carrying out the "act" was "to obstruct, impede, or interfere with."  This Court, like the Eighth Circuit in *Mechanic*, should adopt the Seventh Circuit's reasoning and construe Section 231(a)(3) as containing an intent element.

However, even where statutes do not expressly contain a scienter requirement, courts "generally interpret [ ] criminal statutes to include broadly applicable scienter requirements, even when the statute by its terms does not contain them."  *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (quoting *United States v. X-Citement Video, Inc.*, 531 U.S. 64, 70 (1994)); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a mens rea element even when none appears on the face of the statute.").  As the Supreme Court "has made clear[,] scienter requirements alleviate vagueness concerns." *Gonzales v. Carhart*, 550 U.S. 124, 129 (2007); *accord Jones*, 975 F.3d at

1048 (noting that "even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement").

The importance of the scienter requirement in an overbreadth analysis is on display in the Supreme Court's 2008 opinion in *Williams*. 553 U.S. 285. In that case, the Supreme Court rejected an overbreadth challenge to a statute prohibiting, among other things, presenting and promoting child pornography. *Id.* at 294–97.  The Supreme Court acknowledged that the words "present" and "promote" in the statue could, "in isolation," be viewed as targeting mere advocacy for child pornography. *Id.* However, the Supreme Court rejected that construction espoused by the defendant based on textual indicators, including the statute's scienter requirement. *Id.*; *see also id.* at 307 (Stevens, J., concurring) (observing that the Supreme Court's construction would be "compelled by the principle that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality'").

III.    **18 U.S.C. §1752 properly states an offense.**

In relevant part, 18 U.S.C. § 1752 ("Restricted building or grounds") criminalizes:

> (a)  Whoever—
>
>> (1)  knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
>>
>> (2)  knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;
>
> (c)  In this section—
>
>> (1)  the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>>
>>> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

> > (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
> >
> > (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.
> >
> > (2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752.  In short, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off area where "a person protected by the Secret Service is or will be temporarily visiting."  *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd* 831 F. App'x 513 (D.C. Cir. 2021).  Section 1752 therefore "focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting."  *United States v. Griffin*, No. 21-CR-00092 (TNM), 2021 WL 2778557 *6 (D.D.C. July 2, 2021).

### A.  *18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted by the Secret Service.*

The defendant next argues that because the Capitol Police—not the Secret Service—barricaded the area around the Capitol, he should not be charged with violating 18 U.S.C. § 1752(a)(1), (2), and (4).  Defendant's Motion at 23-28.  Judge McFadden and Judge Mehta have both recently concluded, that argument lacks merit.  *See United States v. Griffin*, Case No. 21-CR-00092-TNM, 2021 WL 2778557 (D.D.C. July 2, 2021) ("[s]ection 1752 says nothing about who must do the restricting."); *United States v. Thomas Edward Caldwell et al.*, Case No. 1:21-cr-00028-APM, ECF Docket No. 412 (D.D.C. Sept. 14, 2021) ("The court finds Judge McFadden's reasoning in Griffin persuasive and adopts it in full here.")

To determine the meaning of a statute, the Court "look[s] first to its language, giving the

words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting

*Moskal v. United States*, 498 U.S. 103, 108 (1990)); *see also Pub. Investors Arbitration Bar*

*Ass'n v. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C. 2013) ("a reviewing court must accord first priority

in statutory interpretation to the plain meaning of the provision in question").  Here, the plain

text of the statute is "unambiguous," so the "judicial inquiry is complete." *Babb v. Wilkie*, 140 S.

Ct. 1168, 1177 (2020).

Section 1752's text is clear. It proscribes certain conduct in and around "any restricted

building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term

"restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or

otherwise restricted area . . . of a building or grounds where the President or other person

protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). Through a

cross-reference, Section 1752 makes clear—and the defendant does not appear to dispute—that

"person[s] protected by the Secret Service" include the Vice President and the Vice President-

elect. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or

grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, §

1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging

in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business,"

§ 1752(a)(2).

That straightforward analysis has a straightforward application to the facts alleged in the

defendant's case. The Indictment alleges that, on January 6, 2021, a protected person was present

inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol

building and grounds was posted, cordoned off, or otherwise restricted—making it a "restricted

building or grounds" under § 1752(c)(1). The Indictment further alleges that the defendant

knowingly and without lawful authority entered and remained in that restricted ground. It also alleges that the defendant, knowingly and with the intent to impede or disrupt government business, engaged in disorderly conduct that resulted in a disruption to government business. In short, the allegations closely track the statutory language.

Looking outside Section 1752's language, the defendant urges the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area. That is so, the defendant claims, because (1) Section 1752(c)(B) defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"; and (2) it is the Secret Service who protects the President and others, so it is the Secret Service who must make the designation of a restricted area. Those arguments fail on the merits.

Section 1752 is directed not at the Secret Service, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668-69 (2006). "Indeed, the only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting." *Griffin*, 2021 WL 2778557, at *7.

Second, Section 1752's statutory history undercuts the defendant's argument. *See id.* at *4-*5 (explaining how Congress has consistently "*broadened* the scope of the statute and the potential for liability"). An earlier version of the statute explicitly incorporated regulations promulgated by the Department of the Treasury (which at the time housed the Secret Service) governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations); *see* Pub. L.

91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971).  Congress subsequently struck

subsection (d) and did not replace it with language limiting the law enforcement agencies

allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9,

2006). Congress was clearly aware that the prohibitions in 18 U.S.C. § 1752 could turn on

decisions made by the Secret Service but chose not to include that in the revised statute. But

Congress's decision in 2006 to eliminate reference to regulations indicates that the statute no

longer depends (if it ever did) on whether the Secret Service has defined an area as "restricted."[4]

The defendant's reading of the statute, which would require the Secret Service to "cordon

off" a private residence "no matter how secure the location or how imposing the preexisting

walls" leads to "pressing absurdities." *Griffin*, 2021 WL 2778557 at *6.  Section 1752 sets clear

limitations on where restricted areas may be established.  As relevant here, the statute only

criminalizes entry into a restricted area "of a building or grounds where the President or other

person protected by the Secret Service is or will be temporarily visiting…" The statute does not

criminalize an individual who enters an area in a building or grounds separate from where a

Secret Service protectee is present, regardless of restrictions placed by law enforcement or

anyone asserting themselves as law enforcement.

Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off

"building or grounds where the President or other person protected by the Secret Service is or

will be temporarily visiting."  18 U.S.C. § 1752(c)(1)(B).  At the time the defendant entered the

U.S. Capitol on January 6, 2021, three Secret Service protectees—Vice President Mike Pence

and two immediate family members—were present.  The defendant's conduct accordingly falls

---

[4] The fact that the legislative history refers to the Secret Service does not help his argument because Section 1752 is not a "regulatory statute."  *Griffin*, 2021 WL 2778557, at *4.  In any event, because Section's statutory text is clear, "there is no reason to resort to legislative history."  *Id.* (quoting *United States v. Gonzales*, 520 U.S. 1, 6 (1997)).

within the Section 1752's plain sweep because he unlawfully entered a restricted building while the Vice President and his family were "temporarily visiting."

**B. 18 U.S.C. §1752 is properly pled regardless of whether former Vice President Pence was "temporarily visiting" the Capitol Building on January 6, 2021.**

The defendant disputes that the Vice President and Vice President-Elect were "temporarily visiting" the U.S. Capitol, but his argument defies the statute's plain terms, purpose, and structure. Defendant's Motion at 26-28.

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[5]

Either definition describes the former Vice President's activities on January 6. Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. Similarly, the Vice President's family members came to the U.S. Capitol for a particular purpose: to observe these proceedings. Finally, as President of the Senate, Vice President Pence oversaw the vote certification. Given the presence of the Vice President and his family members, the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).

The defendant stresses Section 1752's use of the term "temporarily": "The plain meaning of 'temporary' is 'lasting for a time only.'" Defendant's Motion at 27. But that definition only

---

[5] https://www.merriam-webster.com/dictionary/visit

confirms the government's application of the statute in this case.  Vice President Pence and his family had traveled to the U.S. Capitol to oversee and attend the Joint Session of Congress—a proceeding of limited duration.  At the close of the proceeding, they left—confirming the "temporary" nature of their visit.

The defendant offers two further observations—both irrelevant.  First, he notes that Vice President Pence "lived and worked" in the Capitol building.  *Id.*  The defendant *must* concede that Vice President Pence never lived inside the Capitol building.  He may have worked there, but that does not detract from the fact that he and his family members "temporarily visit[ed]" the U.S. Capitol on January 6.

Section 1752(c)(1)(B) defines the restricted area by reference to the location of the protectee—not his place of employment. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building.  And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]."[6]  The same is true for Vice President-Elect Harris.

The defendant's contrary construction, taken to its logical end, would neuter the government's ability to deter and punish those individuals who seek unauthorized access to the President's or Vice President's location.  First, the defendant's argument would restrict Section 1752(c)(1)(B)'s application to only locations outside the District of Columbia—on the view that any visit by the President or Vice President to a location within municipal limits cannot be "temporary" because they reside in the District of Columbia.  Second, under the defendant's construction, Section 1752(c)(1)(B) would not apply where the President or Vice President

---

[6] This argument also ignores the fact that the Vice President's family did not live or work at the U.S. Capitol. Assuming, *arguendo,* the defendant's argument that the Vice President cannot "temporarily visit" a place where he maintains an office, the charges in the Superseding Indictment remain supported because these other Secret Service protectees did not work at the U.S. Capitol or have offices there.

temporarily stayed at their permanent residences in Delaware or California—on the view that

such a trip would not qualify as "visiting." No support exists for the defendant's effort to insert

such large and irrational exceptions into the statute's sweep. *See Lovitky v. Trump*, 949 F.3d

753, 760 (D.C. Cir. 2020) (noting that courts will avoid a "statutory outcome … if it defies

rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so

contrary to perceived social values that Congress could not have intended it") (citation omitted).

All told: the defendant's position defies Section 1752's clear purpose. *Cf. Genus Med.*

*Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 637 (D.C. Cir. 2021) ("[I]f the

text alone is insufficient to end the inquiry, we may turn to other customary statutory

interpretation tools, including structure, purpose, and legislative history.") (internal quotation

marks and citation omitted). In drafting Section 1752, Congress sought to protect "not merely

the safety of one man, but also the ability of the executive branch to function in an orderly

fashion and the capacity of the United States to respond to threats and crises affecting the entire

free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White*

*House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the

statute comprehensively deters and punishes individuals who seek unauthorized access to the

White House grounds and the Vice President's residence—fixed locations where the President

and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or

grounds" where they happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B).

All the relevant metrics—plain language, statutory structure, and congressional purpose—

foreclose the defendant's crabbed reading of Section 1752(c)(1)(B). This Court should reject it.

The defendant's cited cases—involving either an arrest or conviction under Section 1752—do

not discuss the "temporarily visiting" language. Doc. No. 20 at page 22; *see United States v.*

*Bursey*, 416 F.3d 301 (4th Cir. 2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990); *Blair v. City of Evansville, Ind.,* 361 F. Supp.2d 846 (S.D. Ind. 2005).  They accordingly lack relevance to the present dispute.

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at any hearing on this motion, the government respectfully requests that the defendant's motion be denied.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

*/s/ JACOB J. STRAIN*
JACOB J. STRAIN
Utah Bar No. 12680
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530