**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **v.** ) | **Case No. 21-453 (JDB)** |
| **SEAN MICHAEL MCHUGH,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**DEFENDANT SEAN MCHUGH'S REPLY IN FURTHER SUPPORT OF HIS TO**
**MOTION TO DISMISS COUNTS TWO, FIVE, SIX, SEVEN, AND EIGHT OF**
**THE SUPERSEDING INDICTMENT**

The defendant, Sean McHugh, files this reply to the government's response filed on December 7, 2021. *See* ECF Dkt. No. 42. For the reasons discussed below, Counts 2, 5, 6, 7, and 8 of the Superseding Indictment still fail to state an offense and fail to give proper notice to the defendant.

**I.    THE PLAIN LANGUAGE, LEGISLATIVE HISTORY, AND**
**CONGRESSIONAL INTENT CONTINUE TO SUPPORT A CONCLUSION**
**THAT NO VIOLATION OF 1512(c)(2) HAS BEEN STATED HERE**

In his moving papers, Mr. McHugh showed, among other things, that he did not disrupt an "official proceeding" of the government for purposes of 18 U.S.C. §1512(c)(2). *See* Def. Mot. at 3-17 (ECF Dkt. No. 41).  Section 1512(c)(2)'s purpose is to protect the integrity of hearings before tribunals and its remit does not extend to ceremonial and administrative events such as the electoral count that took place on January 6, 2021, which does not qualify as an "official proceeding" under the statute. *Id*.

In response, the government contends that Mr. McHugh has inserted an "adjudicatory" gloss to the "official proceeding" definition that is unsupported.  *See* Gov't Res. at 24-25.  The

government is wrong.  While §1512(c)(2) does not include the specific word "adjudicatory," the

Court's inquiry does not end there.  Rather, the Court should examine the legislative history of

the statute and carefully analyze the key words that are in the statute. *See* Antonin Scalia &

Brayn A. Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) (where a statute

addresses a technical subject, it is a "term of art" that requires a look at its ordinary legal

meaning.  Here, §1512(c)(2)'s legislative history, and the ordinary legal meaning of the term

"proceeding" that is contained in the statute, supports dismissal of this count.

Section 1512(c)(2)'s legislative history shows that its abiding purpose is protecting the

integrity of hearings before tribunals by preventing witness tampering and destruction of

evidence.  *See* Def. Mot. at 3-7.  Likewise, the ordinary legal meaning of "proceeding" is:

> 1. The regular and orderly progression of a lawsuit, including all acts and events
> between the time of commencement and the entry of judgment. 2. Any procedural
> means for seeking redress from a tribunal or agency. 3. An act or step that is part
> of a larger action. 4. *The business conducted by a court or other official body; a
> hearing*. 5. *Bankruptcy*. A particular dispute or matter arising within a pending
> case – as opposed to the case as a whole.

Black's Law Dictionary, "proceeding" (11th ed. 2019) (emphasis added).  The legal definition of

"proceeding" plainly describes the word to mean "a hearing" and "hearing" means "the hearing

of the arguments of the counsel for the parties upon the pleadings, or pleadings and proofs;

corresponding to the trial of an action at law." *Id*. (definition of hearing).  These legal definitions,

together with the legislative history, strongly support the conclusion that there must be some

kind of adjudicative hearing – i.e., an "official decision about who is right in (a dispute)."

(Merriam-Webster.com Dictionary, definition of "adjudicate" (2021)). *See also United States v.

Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) ) (investigation conducted by Bureau of

Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses

"events that are best thought of as hearings (or something akin to hearings").

If not "adjudicative," the term "a proceeding before the Congress" in §1515(a)(1)(B) requires, at a minimum, some kind of investigative or legislative action or purpose. Here, there was no adjudicative, investigative, or legislative purpose to the gathering of Congress to certify the electoral vote. The event on January 6, 2021 was purely a ceremonial meeting of both houses of Congress. The outcome was already finally determined. Any objections or speeches were purely political performances that could have no impact on the outcome. No "proceeding before the Congress" took place, because there was nothing towards which to "proceed."

The government tries to contend that the definition of "proceeding before congress" as outlined in §1515(a)(1)(B) should be read broadly because, unlike 18 U.S.C. §1505, no specific agencies and committees are identified. *See* Gov't Res. at 25. However, Mr. McHugh does deny that Congress is covered by §1512(c)(2), the issue is whether Congress's ceremonial vote count that day qualified as a "proceeding" (a word that exists in both statutes).

In an unpersuasive effort to transform the Joint Session on January 6, the government notes that the Joint Session is a deliberative body where objections are permitted and a decision must be made pursuant to the procedures set forth in 3 U.S.C. §15. *See* Gov't. Res. at 26. However, the courts interpret "official proceeding" more narrowly. It is not enough to be a deliberative body where decisions are made. There also must be characteristics of a hearing, such as findings of fact, and the power to issue subpoenas. *See, e.g., United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (explaining that agency investigations may qualify as "proceedings" under 18 U.S.C. §1505 if those investigations involve "some adjudicative power" such as the power to issue subpoenas, and compel sworn testimony in conjunction with an investigation). In other words, it is not enough that a decision is made in a formal environment, but rather that the characteristics surrounding the event must be "akin to a hearing." *Id*. *See also*

*United States v. Sandlin*, 21-CR-88 (DLF), Dkt. No. 63, Memorandum Opinion at 7 (ruling that an "official proceeding" under §1512(c)(2) does not include any and all series of actions before Congress; rather, the proceeding must be akin to a formal hearing).

Nor does the fact that 3 U.S.C. §15 provides Congress with the authority to lodge objections transform the Joint Session into a "hearing" or "official proceeding." Although the Electoral Count takes place in a "formal environment," has proscribed procedures, it is not a "hearing."  It is, in the plain text of the statute, simply a "meeting" of both houses. 3 U.S.C. §15. And although 3 U.S.C. §15 provides for the lodging of objections; these "objections" are not the same type of objections that exist in a typical "proceeding before Congress," as contemplated in §1512.  As explained in detail in the defendant's motion to dismiss, the Congress's "counting of the votes" is purely ceremonial; the count is predetermined because the Joint Session does not have the authority to change any of the votes that have been certified by the states.  Congress makes no decision because there is no decision for Congress to make.  Moreover, the vote count is neither investigative nor legislative.  Simply put, the "counting function" of Congress does not have an "adjudicative," or "judicial" or "hearing" aspect to it.  The "electoral vote is merely ministerial.  Vasan Kesavan, "*Is the Electoral Count Act Unconstitutional*?" 80 North Carolina Law Review 1653, 2002, at page 258.

Two recent cases – *United States v. Caldwell*, 21-CR-28 (APM) and *United States v. Sandlin,* 21-CR-88 (DLF) have found that the vote count on January 6 was a "proceeding before Congress."  In neither case, however, did those courts consider or resolve the arguments raised by Mr. McHugh here.  In *Caldwell*, for example, the district court did not address the ceremonial and predetermined nature of the electoral count, and how that predetermination is antithetical to the vote count being considered a "proceeding" or "hearing." *See Caldwell* Opinion, Dkt. No.

558.

Similarly, the *Sandlin* court ruled that a "proceeding" need not be "court-like" and did

not require an "administration of justice." Dkt. No. 63 at 8-9.  However, not considered by the

*Sandlin* court, is whether the Joint Session is not a "proceeding" at all because 3 U.S.C. §15 that

governs the Joint Session repeatedly makes clear, A Joint Session is simply a "meeting" of both

Congressional bodies:

> The Senate and House of Representatives shall ***meet*** in the Hall of the House of
> Representatives……..When the two Houses have voted, they shall immediately
> again ***meet***….

3 U.S.C. § 15. (emphases added).  Not only does the language of the statute governing the Joint

Session plainly describe it as a meeting, the House and the Senate meet together only for

ceremonies or events. (i.e., for the State of the Union, *see* U.S. Const., Article II, Section 3, and

to hear speeches from visiting dignitaries).  In fact, the only time the Constitution mentions

"proceedings" in reference to Congress, the ***bicameral*** nature of the Congress is stressed.[1]  It

follows that a "proceeding before Congress" in §1512 must refer to a separate and bicameral

adjudicative, investigative, or legislative functions of the House or the Senate.

The *Sandlin* court also held that a "proceeding" must be akin to a formal hearing.

Dkt. No. 63 at 7, 9.  A "hearing" is defined as a "judicial session, open to the public, held for the

purpose of deciding issues of fact or of law. Black's Law Dictionary (11th ed. 2019).  The Court

reasoned that the vote count is a formal hearing because of the procedures it must follow

pursuant to 3 U.S.C. § 15, but did not address the "ceremonial and ministerial" nature of the

meeting, or consider the procedures that govern the meeting in the context of the meeting's

---

[1] "Each House may determine the Rules of its *Proceedings*….[e]ach House shall keep a Journal of its
*Proceedings*…" Article I Section V. (emphases added).

ceremonial nature.  Dkt. No. 63 at 7-9.  The ceremonial nature of the vote count, however, is crucial to determining whether or not that count is akin to a formal hearing and, in turn, whether it may constitute a "proceeding."  The vote count is entirely ministerial – it certifies vote counts that have been determined.  It does not meaningfully decide any issues of fact or law because those have already been decided by each state, and the Joint Session does not have the power under the Constitution to actually reject the votes of any State. *See* Vasan Kesavan, "*Is the Electoral Count Act Unconstitutional?*" 80 North Carolina Law Review 1653, 2002 (hereafter, "Kesavan").

The history of objections lodged at the Electoral Count were mostly made in the 1800's because of the confusion of when new states were admitted to the union and how that impacted whether their votes should count.  Objections were ultimately rejected because it was determined that the Joint Session did not have the authority to judge the proceedings already had in the states. *See* Kesavan at 1678-1694.  In 1876, the most tumultuous election, Samuel Tilden and Rutherford Hayes were separated by one electoral vote and four states sent Congress multiple electoral returns. *Id.*  Instead of the Joint Session resolving this issue, Congress formed a separate commission to sort through the chaos and decide the issues of fact and law presented.  *Id*.  To address issues like this that arose during these rare occasions in history, Congress drafted the Electoral Count Act of 1887, placing on the states, the responsibility on the states to resolve disputes about electors and their appointments and certifications.  Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 540, 543 (July 2004).

In 1969, there was an objection that a vote sent up to Congress from North Carolina should not be counted because it reflected the "faithless" elector that had refused to give his vote

to Richard Nixon, despite Nixon winning the popular vote in that State.  The objection was rejected, and the vote at issue counted, because of the strong reminder of representatives such as R. Rarick who said, "We are not election supervisors nor given the discretion to recompute the vote received from a sovereign state.  The Constitution clearly proscribes our duty as to 'count the electoral votes,' the *ministerial* function of a central *collecting agency* and a *tabulating point*." *See Kesavan* at 1694, 2022 (emphases added).  For all these reasons, the Electoral Count is not a proceeding akin to a formal hearing.  Rather, it is a ceremonial meeting of both houses of Congress steeped in the tradition that decides nothing.  It is a political performance conducted in order to give the country a feeling of finality over the already final election results.  As a result, the Electoral Count does not qualify as an "official proceeding" and count Five of the Superseding Indictment should be dismissed.

## II.   THE COUNTS AT ISSUE ALSO SHOULD BE DISMISSED BECAUSE" 18 U.S.C. §1512(C)(2) REMAINS UNCONSTITUTIONALLY VAGUE

In his moving papers, Mr. McHugh explained that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague because it requires a factfinder to speculate as to the meaning of "corruptly...influences," the phrase "official proceeding," and where exactly the line must be drawn in determining if a defendant is *otherwise* obstructing, impeding, or influencing an official proceeding before Congress.  *See* Def. Mot. at 9-17.  In response, the government contends that a provision is only impermissibly vague if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *See* Gov't. Res. at 28.  That, however, is precisely the situation confronting Mr. McHugh here. In, *United States v. Williams*, the Supreme Court reversed a circuit court's finding of vagueness with regard to a pandering statute.  553 U.S. 285 (2008). *Id*.  The Supreme Court reasoned that:

"What renders a statute vague is not the possibility that it will

> sometimes be difficult to determine whether the incriminating fact
> it establishes has been proved; but *rather the indeterminacy of
> precisely what that fact is*.  Thus, we have struck down statutes that
> tied criminal culpability to whether the defendant's conduct was
> "annoying" or "indecent" – wholly subjective judgments without
> statutory definitions, narrowing context, or settled legal meanings.

*Id*. at 306. (emphasis added).  The reasoning in *Williams* is exactly what Mr. McHugh

argues -viz, that the language in §1512(c)(2) would leave a juror to doubt precisely what fact or

facts are needed to make a decision.  The word "corruptly" in §1512(c)(2) creates the same

problem as the words "annoying" and "indecent" that the *Williams* court acknowledged were

impermissibly vague in the pandering statute.

Try as it might, the government cannot successfully ignore the vagueness of the language

of 18 U.S.C. §1512(c)(2).  It cites to a series of cases to argue that "corruptly" is not vague and

that the defendant's reliance on *United States v. Poindexter,* 951 F.2d 369, 379 (D.C. Cir. 1991)

is misplaced. *See* Gov't. Res. at 29-31. It is the government, however, that misunderstands the

crux of *Poindexter*.

In *Poindexter*, the Court ruled *specifically* that the adverb "corruptly" should be read

"transitively" and requires that the defendant "corrupt" *another* into violating their legal duty.

The reason that *Poindexter* reached a different outcome than *United States v. Morrison*, 98 F. 3d

619 (D.C. Cir. 1996) was because, in *Morrison*, the word "corruptly" was applied exactly as

described in the statute, i.e., persuading another to violate their legal duty.  *Id*. at 630.  So,

*Morrison* and *Poindexter* are not at odds as the government suggests.  Rather, the cases go hand

and hand to rule that the word "corruptly" is only clear when it is applied transitively to

circumstances where one individual corrupts another to violate their legal duty.  That is because

the word "corruptly" in the statute at issue in *Poindexter* and *Morrison* is followed by another

phrase that provides context and identifies the specific action required to violate the law.  Such

circumstances are absent in this case as §1512(c)(2) has no such requirement.  Indeed, the phrase

"corruptly influences" does not resolve the ambiguity – it heightens the unconstitutional

vagueness of the statute – because "influence" alone is another vague word that may mean many

things and lacks the definiteness of "influencing another to violate their legal duty" at issue in

*Poindexter* and *Morrison*.  *See also Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir.

1968) (holding that a statute that criminalized "leading an immoral or profligate life" vague

because "immoral" is synonymous with "corrupt, depraved, indecent, dissolute," all of which

would result in "an almost boundless area for the individual assessment of another's behavior").

The government further questions *Poindexter* by citing to *Arthur Andersen v. United*

*States*, 544 U.S. 696 (2005), a case that involved a jury instruction that failed to "convey the

requisite consciousness of wrongdoing." *Id*. at 698.  This holding is not inconsistent with

*Poindexter*, which involved an entirely different dispute and has no bearing or effect on why the

word "corruptly" was deemed vague in *Poindexter*.  The cases the government cite from the 7th,

2nd, and 11th Circuits are inapposite for the same reason.  *See* Gov't. Res. at 30-31.  *Poindexter*

remains good law and identifies one of the many problems that the word "corruptly" presents in

the obstruction statute.  It is impermissibly vague because it does not provide a discernable

standard for what conduct is prohibited, thereby allowing for arbitrary or discriminatory

enforcement as in this case.  For this reason too, count Five of the Superseding Indictment should

be dismissed.

The statute is especially vague as applied to Mr. McHugh.  Next, the government

apparently contends Mr. McHugh's statements made to law enforcement and the crowd while

using a megaphone, along with his alleged "attempt" to pull back a back a barricade on the

capitol grounds, is sufficient to show that he "impeded" or "influenced" the electoral count. *See*

Gov't. Res. at 31. McHugh, however, could not have possibly been on notice that, by wielding a megaphone and exercising his free speech rights under the First Amendment to express his anger regarding the election, he was committing a felony obstruction of an official proceeding. *See* Def. Mot. at 14-17.

In response, the government desperately resorts to misrepresenting Mr. McHugh's conduct. *See* Gov't Res. at 31 (asserting that Mr. McHugh "entered the Capitol grounds alongside a mob of rioters, assaulted officers in multiple ways, harassed and berated law enforcement officers outside the Capitol building, and instructed the crowd to attack officers"). The video surveillance, however, shows only that Mr. McHugh remained on the Capitol grounds, allegedly sprayed an unknown substance while far away from officers, and used a megaphone to chant, "Our House! And C'mon, Let's Go.[2]" If anything, the fact that the government contends that these acts fall under the statute, and is tantamount to corruptly obstructing or influencing an official proceeding, amply demonstrates the unconstitutionally vague nature of the statute generally, and as applied to Mr. McHugh specifically.

At most, Mr. McHugh's actions are typical of a protest, similar to the thousands that have occurred in our country where protesters mass and law enforcement has to contain the crowd by deploying tear gas and control tactics. Being involved in a protest, or even a riotous protest, does not mean that one has the specific intent to obstruct a proceeding. The most glaring problem with charging January 6 defendants with §1512(c)(2) is that it conflates their other alleged conduct, such as the alleged assaults on police officers on the grounds of the Capitol with an intent to obstruct an official proceeding taking place in the Capitol building. Here, there is no

---

[2] The allegation that he pushed a sign into officers is not supported by the video evidence. The allegation that Mr. McHugh said "Put it up there!" in reference to this sign is just further support that his intention was not to push a sign into an officer but, if anything, to encourage the crowd to put the sign up. Lastly, the evidence does not support him instructing the crowd to attack officers.

evidence- and the government does not contend – that Mr. McHugh entered the Capitol building or even tried to enter the Capitol to disrupt the Electoral Count. *Cf. Sandlin* Opinion at 24-26 (refusing to find the word "corruptly" vague as applied to Sandlin because he allegedly engaged in advance planning, forcibly breached Capitol building, assaulted Capitol police officers inside the building, and encouraged others to steal paperwork from Senate Chamber.).   In contrast to *Sandlin*, there is no nexus between Mr. McHugh's alleged actions and an intent to obstruct a proceeding.  The government is now trying to broadly charge Mr. McHugh and many January 6 defendants with obstruction by attributing unrelated actions and statements to the intent of obstructing an "official proceeding.  The government's broad and inconsistent charging decisions, along with the inherently vague words in the statute as well as the vague "residual clause" that is the basis for charging these defendants, show that 18 U.S.C. §1512(c)(2) is unconstitutionally vague and does not provide fair notice to Mr. McHugh.

The *Sandlin* case is instructive.  In *Sandlin*, the Court found the term "corruptly" in §1512(c)(2) was not impermissibly vague in his case because Sandlin's alleged behavior was so intertwined with his concerted efforts to obstruct the vote that it fit squarely within the term.  *Id.* at 25.  The Court noted in its opinion, however, that other cases with different facts could present closer questions. *Id*. Here, Mr. McHugh's conduct does not fit squarely within the core coverage of "corruptly" and his actions, even as exaggerated by the government, are not inextricably intertwined with a clear intent to obstruct.  Accordingly, the statute is vague as to Mr. McHugh.

Shortly after the *Sandlin* decision, the district court in *United States v. Caldwell*, 21-cr-28 (APM), also ruled that §1512(c)(2) is not impermissibly vague.  *See Caldwell* Opinion Dkt. No. 558.  In *Caldwell*, the district court asserts that the term "corruptly" must be understood in its intransitive form and that is why *Poindexter* does not control in a prosecution under 1512(c)(2).

*Id*. at 22-33.  However, it is the intransitive form of the term "corruptly" that makes it especially vague in this case.

The district court in *Caldwell* relied on *Arthur Anderson* and other circuit decisions that interpreted "corruptly" to require the "consciousness of wrongdoing." *Id*. at 23-24.  That interpretation readily applied to the *Caldwell* defendants who conspired and pre-planned their January 6, 2021 attack and that (except for one) forcibly breached the Capitol.  *Id*. at 3-5.  With those alleged facts, none of which are present here, a logical nexus existed between the conscious wrongdoing and the intent to halt the vote.  That same nexus, however, does not exist or apply to those individuals, like McHugh.  Further, the "consciousness of wrongdoing" of the acts attributed to Mr. McHugh – entering the Capitol grounds and allegedly assaulting a police officer – are unconnected to the intent or "consciousness" of halting a vote occurring inside the building that Mr. McHugh did not even try to enter.

The government lastly argues that Mr. McHugh's First Amendment right to political protest and to airing his opinions through a megaphone are somehow not implicated here because the obstruction statute is "related to the suppression of free expression." *See* Gov't. Res. at 33. The government misunderstands Mr. McHugh's argument.  His argument is not that the entire obstruction statute should be invalidated because it violates the First Amendment.  Rather, Mr. McHugh argues that the government is impermissibly using Mr. McHugh's political statements as a basis for charging him with acts obstruction, and that Mr. McHugh did not have fair notice that his protected expressions were potentially criminal.  In this regard, the government highlights a message that Mr. McHugh allegedly sent the morning of January 6, 2021, saying "Right now we're storming the Capitol." *See* Gov't Res. at 1.  However, "storm" does not necessarily mean physically breaching the building to halt the vote, it can also  mean assembling

as a large group on the grounds of the Capitol.  Indeed, messages Mr. McHugh sent right after provides crucial context:  "We're going to Congress and we're gonna let them know that we don't want them to accept the Electoral College votes." *Id*.  Taken all together, Mr. McHugh's messages, and the undisputed fact that Mr. McHugh never entered the Capitol building, shows his intent was rather to protest on the grounds of the Capitol, and not to forcibly halt, obstruct, or impede any Congressional meeting.  Going to Congress to let them know his opinions is a completely acceptable form of expressing dissent and certainly should not form the basis of an obstruction charge.

## III.     SECTION 231(A)(3) IS STILL UNCONSTITUTIONALLY VAGUE

In his moving papers, Mr. McHugh explained that §231(a)(3)'s imprecise language is overbroad and unduly vague, both generally and as applied to him, and impermissibly relies on a police officer's subjective reaction to the conduct of others to determine whether or not the statute has been violated. See Def. Mot. at 17-22.

To try to paper over these material flaws in the statute, the government purports to read an express *mens rea* requirement into §231(a)(3) by contending there must be an intent on the part of the defendant to impede or interfere.  *See* Gov't Res. at 35.  In so contending, the government ignores that various parts of the statute do not rely on the defendant's *mens rea* but rather allow for police officers' and the government to subjectively determine what does, or does not, constitute improper conduct by a defendant, rather than providing enumerated conduct that can be readily understood and uniformly applied.  In this regard, it is not the defendant who decides whether or not there is (1) civil disorder; (2) if his conduct is "incident to" that civil disorder; and (3) whether that conduct delayed, obstructed, or adversely affected commerce. That leaves a lack of an express scienter requirement as whole because it is impossible to intend

to obstruct or impede a civil disorder where a potential defendant that (1) has no way of knowing

what civil disorder is; (2) cannot know if their actions are incident to that civil disorder and; (3)

cannot possibly know whether their conduct delays or obstructs or adversely affects commerce.

Moreover, the government fails to address Mr. McHugh's remaining arguments regarding

the inherent vagueness that exists in the statute.  Nor does the government address why

§231(a)(3) is not impermissibly vague as applied to Mr. McHugh.  Mr. McHugh could not have

been on notice that he was allegedly committing a civil disorder given the unconstitutionally

vague nature of the statute.

### IV.   18 U.S.C. §1752 REMAINS AMBIGUOUS AND THE LEGISLATIVE HISTORY CONTINUES TO COMPEL THE CONCLUSION THAT THE UNITED STATES SECRET SERVICE IS THE ONLY ENTITY DESIGNATED TO RESTRICT AREAS UNDER THE STATUTE

The government argues that 18 U.S.C. §1752 is unambiguous and, therefore, there is no

need to consider the legislative history of the statute.  *See* Gov't. Res. at 40.  The government is

wrong.

The language of §1752 is unclear.  It states: "restricted building or grounds" means any

posted, cordoned off, or otherwise restricted area."  Yet, it does not identify who may do the

restricting, and Congress could not possibly have intended that anyone could impose a

restriction.  This lack of clarity and guidance to law enforcement or to the public as to who is

authorized to impose restrictions under the statute makes the statute ambiguous.  Given this

ambiguity, we must look to the legislative history to determine what Congress intended.  *See*

*U.S. v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir.  2008) (citing *Staples v. United States*,

511 U.S. 600, 605 (1994)).

The government is incorrect that the legislative history supports broad authority for any

entity to restrict Congressional grounds.  *See* Govt. Res. at 41-42 (citing *United States v. Bursey*,

416 F.3d 301 (4th Cir. 2015)).  *Bursey*, however, involved in *what manner* the area is deemed restricted, holding that §1752 did not require a physical demarcation and that the presence of law enforcement was sufficient to mark the area as restricted.  *Id*. at 308.  *Bursey* actually supports Mr. McHugh's position, fully supported by the legislative history, that only the Secret Service is vested with the power to set federal restricted areas because, in *Bursey*, the Secret Service was the entity that designated an area at the Columbia airport as restricted.  *Id*. at 304.

The government seeks to have the Court forego any consideration of the legislative history of §1752 even though the Senate Judicial Committee report unambiguously vests the Secret Service with the power to set federal restricted areas.  S. Rep. No. 91-1252 (1970) at 7.  If Congress did not intend to vest that authority with the Secret Service, it would not have named that agency specifically.  Moreover, vesting this power with the Secret Service makes perfect sense, as it is the entity that is charged with protecting the President and Vice President.

The government contends that, because the current version of the statute does not specifically reference the Secret Service, that means Congress purposefully removed it to broaden the authority to other entities.  This assumption is unfounded and the government cites to no legislative statement or other authority stating that this was intended as part of revising the statute.  In the absence of any such clear direction, the Court should not interpret §1752 to provide authority for any entity to restrict the grounds other than the entity that protects the President and Vice President and has historically had the sole authority to do so.

## V.   THE COUNTS AT ISSUE SHOULD BE DISMISSED BECAUSE FORMER VICE PRESIDENT MIKE PENCE WAS NOT "TEMORARILY VISITING" THE U.S. CAPITOL ON JANUARY 6, 2021

As an initial matter, the government cannot amend the Grand Jury's indictment through a pleading.  The Superseding Indictment in this case charges Mr. McHugh with conduct "*where*

*the Vice President was temporarily visiting.*"  *See* ECF No. 39 (emphasis added).  The

superseding indictment does not charge that "Vice President Mike Pence and his family were

present" in the U.S. Capitol building when Mr. McHugh is alleged to have violated 18 U.S.C. §

1752.  *See* Gov't. Res. at 43.  The indictment does not charge what the government now

apparently wishes it did and those counts at issue cannot stand on the basis of what might have

been.  Moreover, even if the indictment did charge that "Vice President Mike Pence and his

family were present" in the U.S. Capitol building on January 6, 2021, the indictment still would

fail to state any offense. Section 1752 requires, in pertinent part, that the restricted area be

"grounds where the President or other person protected by the Secret Service is or will be

temporarily visiting." 18 U.S.C. § 1752(c).

The government acknowledges, as it must, that Vice President Pence worked at the

Capitol building.  *See* Govt. Res. at 44.[3]  Contrary to the government's assertion, this fact is not

"irrelevant."  To the contrary, it could not be more relevant that Vice President Pence lived in

D.C. and had a permanent U.S. Capitol office. The statute and the "temporarily visiting" part of

the statute, was promulgated specifically to address the difficulties of protecting the President

"when he is outside the White House complex traveling or residing temporarily *in some other*

*section of the country.*"  Auth. Of Sec'y Treasury to Ord. Closing of Certain Sts. Located Along

the Perimeter of the White House, 19 Op. O.L.C. 109 (1995) ("*Authority of the Secretary*")

(emphasis added).[4]  In the floor debate on the bill, legislators discussed "the problems

---

[3] The government incorrectly contends Mr. McHugh asserted in his motion to dismiss that "Vice
President Pence 'lived and worked' in the Capitol building." Gov't Res. at 44.  This deliberately misreads
what Mr. McHugh wrote.  He wrote, "the Capitol is a federal government building in the District of
Columbia, where he lived and worked," meaning that the Vice President lived and worked in the District of
Columbia.  *See* Def. Mot. at 27.  In any event, the government does not dispute that the Vice President
worked in the Capitol.
[4] Available at https://www.justice.gov/file/20226/download.

confronting the Secret Service when protecting the President *outside of Washington*." *Id*. (emphasis added).  Nonetheless, Mr. McHugh does not suggest the statute applies "only to locations outside the District of Columbia." Mr. McHugh simply highlights the obvious:  that a person generally cannot be said to be "temporarily visiting" his own office building located approximately four miles from his residence.

The government contends Vice President Pence was only "temporarily visiting" the Capitol because he was "physically present . . . for a particular purpose" and "intended to leave at the close of the session." *Id*.  This novel interpretation of "temporarily visiting" proves too much and is unworkable.  If adopted by the Court, every person "physically present" at the Capitol that day—or any day- every Congressperson, every staffer, every U.S. Capitol Police officer—is just "temporarily visiting" the Capitol.  By that logic, only a person meandering aimlessly through the Capitol for no purpose, or a person who never intended to leave the Capitol, would fall outside the scope of "temporarily visiting."  The Court should reject the government's invitation to effectively read all meaning out of an express limitation in a criminal statute. *See United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself" and "is founded on the tenderness of the law for the rights of individuals . . . .").

To the extent that unidentified family members of Vice President Pence are now alleged to constitute a basis to impose federal criminal liability on thousands of people for trespassing on January 6, the government's argument fares no better. *See* Gov't Res. at 31.  Members of Vice President Pence's family were, in the government's own words, allegedly "present" to "attend" and "to observe" a Congressional meeting in a federal building where the Vice President maintains a *permanent* office and *presides*.  The Vice President's family members were not on

vacation or at a speaking event. That a family member may not work independently or have an independent office at the U.S. Capitol does not transform the U.S. Capitol into a "temporary visit," as expressly required by the criminal statute at issue. After almost one year of charging January 6 defendants and just weeks after filing a Superseding Indictment that does not mention them, the government now tries to shoehorn new protectees into this case out of the blue and without providing a basis for why they were "temporarily visiting" as intended by Congress. The Court should reject the government's transparent and improper efforts to save Counts that should be stricken.

In effect, the government reads the words "temporarily visiting" out of the statute completely. Under the government's limitless interpretation, the words "temporarily visiting" are meaningless and superfluous. "The Government's reading is thus at odds with one of the most basic interpretive canons, that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *see also Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative") (citing *United States v. Menasche*, 348 U.S. 528, 538–539 (1955)).

If Congress wanted to define "restricted building or grounds" to encompass anywhere a Secret Service protectee "is or will be physically present" at any given time, Congress easily could have, and would have, omitted the words "temporarily visiting" or used the words "physically present" instead in § 1752(c)(1)(B). *See Burgess v. United States*, 553 U.S. 124, 130 (2008) ("As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated.") (alteration and ellipsis in original) (quoting *Colautti*, 439 U.S. at 392-393 n.

18

10).  "Congress did not write the statute that way."  *Russello v. United States*, 464 U.S. 16, 23

(1983) (quoting *United States v. Naftalin*, 441 U.S. 768, 773–774 (1979)).  Consequently, the

statute simply does not restrict any government building in which a Secret Services protectee is

or will be "physically present."  *Id*.  And, "[r]eading the statute to proscribe a wider range of

offensive conduct," as the government now urges, "would raise the due process concerns

underlying the vagueness doctrine."  *Skilling v. United States*, 561 U.S. 358, 408 (2010).

Contrary to the government's assertion (Govt. Res. at 45), it is entirely rational that

section 1752(c)(1)(B) would not apply at the President and Vice President's "permanent

residences in Delaware or California."  State criminal and property law protects all individuals

on their private property and in their private residences.  This existing protection suffices.

Moreover, Congress does not have the power to federally prosecute and punish any and all

criminal conduct anywhere in the United States:

> Under our federal system, the "'States possess primary authority for defining and
> enforcing the criminal law.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993)
> (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)); *see also Screws v. United
> States*, 325 U.S. 91, 109 (1945) (plurality opinion) ("Our national government is
> one of delegated powers alone. Under our federal system the administration of
> criminal justice rests with the States except as Congress, acting within the scope
> of those delegated powers, has created offenses against the United States"). When
> Congress criminalizes conduct already denounced as criminal by the States, it
> effects a "'change in the sensitive relation between federal and state criminal
> jurisdiction.'"  *United States v. Enmons*, 410 U.S. 396, 411–412 (1973) (quoting
> *United States v. Bass*, 404 U.S. 336, 349 (1971)).

*United States v. Lopez*, 514 U.S. 549, 561 n. 3 (1995).  It is entirely rational and reasonable for

Congress to legislate so as not to exceed the scope of its Constitutional authority.

Lastly, the government's contention that enforcing the statute as written "would neuter

the government's ability to deter and punish those individuals who seek unauthorized access to

the President's or Vice President's location" (Govt. Res. at 44) is both beside the point and

wholly unsupported.  Section 1752 expressly delineates three definitions of the term "restricted building or grounds" pursuant to which individuals may be criminally punished.  "When 'a statute includes an explicit definition' of a term, 'we must follow that definition . . . .'"  *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020)).  In addition, section 3056(d) criminalizes obstruction and interference with a Secret Service officer's performance of his or her "protective functions," including deterring and punishing those individuals who the government fears may seek unauthorized access to the President's or Vice President's location.  See 18 U.S.C. §3056(d); s*ee also Authority of the Secretary*, 19 Op. O.L.C. at 109 (§ 3506 "grants the Secretary broad authority to take actions that are necessary and proper to protect the President").

The government's purported concern should be directed to Congress to amend the statute, not to a request that this Court interpret a statute contrary to its language.  The Supreme Court has recently rejected other government attempts to stretch federal criminal statutes beyond their natural boundaries.  *See Kelly v. United States*, 140 S.Ct. 1565, 1574 (2020) (government's use of federal fraud statutes to try to criminalize the regulatory actions of government officials an impermissible and overbroad application of the statute); *Van Buren*, 141 S.Ct. at 1661 (finding the government's broad construction of the computer fraud and abuse statute would implicate a large amount of commonplace activity not meant to be covered by the statute).  This Court should reject the government's attempt to do the same here.

## **CONCLUSION**

For all of the reasons discussed above, and his moving motion to dismiss, Sean McHugh, respectfully requests that the Court (i) dismiss counts 2, 5, 6, 7, and 8 of the Superseding Indictment and (ii) grant him such other and further relief as the Court deems just and proper.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Maria_Jacob@fd.org

/s/ Sabrina P. Shroff
_____
Sabrina P. Shroff
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500