**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES OF AMERICA** |
| **v.** |
| **SEAN MICHAEL MCHUGH,** |
| **Defendant.** |

**Criminal Action No. 21-453 (JDB)**

## MEMORANDUM OPINION

On January 6, 2021, a violent mob attacked the United States Capitol during a Joint Session of Congress, causing millions of dollars in damage, injuring approximately 140 law enforcement officers, and forcing members of Congress and the Vice President to evacuate for their safety. Defendant Sean McHugh is alleged to have been an active participant in the events of that day, and he has been charged by indictment with eight felonies and two misdemeanors related to his conduct at the Capitol. McHugh now moves to dismiss five of the counts against him on a variety of statutory and constitutional grounds. For the reasons explained below, and joining the conclusions of five other judges in this District who have decided nearly identical motions, the Court will deny McHugh's motion.

## Background

The Twelfth Amendment of the United States Constitution provides that, after the members of the Electoral College "meet in their respective states and vote by ballot for President and Vice-President," they "shall sign and certify [the results of their vote], and transmit [them] sealed to the seat of the government of the United States, directed to the President of the Senate." U.S. Const. amend. XII. The President of the Senate (i.e., the Vice President) is then directed to, "in the presence of the Senate and House of Representatives, open all the certificates[,] and the votes shall

1

then be counted." Id.  In the Electoral Count Act of 1887 ("ECA"),[1] Congress provided greater structure for this procedure and set forth a process by which disputes regarding the electors' ballots would be decided by the Congress.  Federal law thus provides that "Congress shall be in session on the sixth day of January succeeding every meeting of the electors" and that "[t]he Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day," 3 U.S.C. § 15, for the purpose of counting the votes of the electoral college and "[declaring] the result," id. § 16.

And so, at 1:00 PM on January 6, 2021, Congress assembled in a joint session presided over by the Vice President in order to certify the Electoral College's election of Joseph Biden as the 46th President of the United States (the "January 6th Certification").  Then-President Donald Trump, who had lost the 2020 election to President-elect Biden, held a political rally that morning at the opposite end of the National Mall from the Capitol.  At this rally, Trump and others reiterated their claims that the 2020 election was fraudulent or otherwise illegitimate.  See Trump v. Thompson, 20 F.4th 10, 17–18 (D.C. Cir. 2021).  Shortly after Trump's speech, in which he "announced to his supporters that 'we're going to walk down Pennsylvania Avenue . . . to the Capitol,'" and urged the "crowd to 'demand that Congress do the right thing and only count the electors who have been lawfully slated,'" id. at 18 (quoting Donald J. Trump, Rally on Electoral College Vote Certification, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification), a large crowd marched down the National Mall toward the United States Capitol, id.

---

[1] In 1948, the ECA was modified slightly and incorporated into Title 3 of the U.S Code when Congress enacted that title into positive law.  See Act of June 25, 1948, Pub. L. No. 80-771, 62 Stat. 672.  The provisions originally enacted in 1887, now with somewhat altered language and organization, can thus be found at 3 U.S.C. §§ 5–6, 15–18.  So while the terms Electoral Count Act and 3 U.S.C. § 15 are interchangeable, since 1948 it has been the language of Title 3 which has governed the appointment and certification of electors.

At the Capitol, U.S. Capitol Police had established a security perimeter, setting up "permanent and temporary security barriers" and a "perimeter fence line" made up of metal bike racks. Statement of Facts [ECF No. 1-1] ¶¶ 2, 5. This perimeter was manned by Capitol Police officers and included signs clearly designating the area "closed." Id. ¶ 5; accord Gov't Resp. in Opp'n to Def.'s Mot. to Dismiss [ECF No. 42] ("Gov't Opp'n") at 3. When the mob arrived at the Capitol, what started as a rally turned into a protest, which quickly devolved into a riot and then a violent attack on the United States Capitol. Participants assaulted police officers, breached first the perimeter fence line and then the Capitol building itself, and forced the assembled members of Congress and the Vice President to flee for their safety. See generally Trump, 20 F.4th at 18–19. All told, the riot caused millions of dollars in damage to the Capitol, and approximately 140 law enforcement officers were injured in the fighting—the January 6th riot was, in short, "the most significant assault on the Capitol since the War of 1812." Id.

Defendant Sean McHugh is one of the more than 700 individuals charged with federal crimes for his conduct on January 6th. According to the allegations in the Superseding Indictment [ECF No. 39], the Statement of Facts, and the government's opposition brief,[2] McHugh traveled to D.C. on January 5, 2021 from his home in California. Gov't Opp'n at 4. He then attended President Trump's rally on the National Mall before walking with a large crowd towards the Capitol. Id. at 4–5. While on the Mall, McHugh recorded a video of himself in which he narrates:

---

[2] It is appropriate if not necessary to rely on other official documents for the specific factual allegations underlying the Superseding Indictment, as the indictment itself contains few, if any, details about McHugh's alleged conduct. See United States v. Mostofsky, Crim. A. No. 21-138 (JEB), 2021 WL 6049891, at *1–2 (D.D.C. Dec. 21, 2021) (relying on criminal complaint's Statement of Facts in deciding a motion to dismiss an indictment); United States v. Jones, 383 F. Supp. 3d 810, 814 (N.D. Ill. 2019) ("When considering a motion to dismiss an indictment . . . . [a] court may also rely on the facts outlined in the criminal complaint and accompanying affidavit." (citing United States v. Hernandez, 330 F.3d 964, 975 (7th Cir. 2003))).

"Right now we're storming the Capitol.  We're going to Congress and we're gonna let them know that we don't want them to accept the Electoral College votes."  Id. at 5.

McHugh reached the Capitol grounds by approximately 1:30 PM, when body worn camera footage captured him using a megaphone he had brought with him to shout obscenities at the officers manning the western fence line, accusing them of "protecting communists" and taunting them with comments like "I'd be shaking in your little shit boots too."  Statement of Facts ¶ 12; Gov't Opp'n at 6.  McHugh also used his megaphone to exhort and direct other rioters, including encouraging them to engage in violent conduct.  See Statement of Facts ¶¶ 14, 19.  Upon seeing a group of rioters moving a metal sign toward one of the police barricades, he urged the group to "Put it up there! Put it up there!" before joining in the attempt to push the sign into the barricade and the officers standing behind it.  Gov't Opp'n at 7–8; Statement of Facts ¶ 13.

McHugh personally engaged in additional violent conduct during the riot.  At one point, McHugh scuffled with a uniformed police officer, apparently trying to wrest a metal barricade away from the officer.  Statement of Facts ¶ 15.  At another point, he sprayed a line of riot-gear-clad police officers with a yellowish substance from a handheld canister he kept in a holster on his right hip.  See id. at 5–7; Gov't Opp'n at 9–10.  This yellowish substance was later determined to be bear spray: McHugh allegedly texted an acquaintance that he "unloaded a whole can of bear spray on a line of cops," Gov't Opp'n at 11, and, after McHugh's arrest, law enforcement recovered a canister matching the one used against the officers, with a label featuring a drawing of a bear and the name "Frontiersman Bear Attack Deterrent," id. at 10.  This label also warns that the spray is a "[h]azard to [h]umans" and could result in "irreversible eye damage if sprayed in the eye."  Id. at 11.

4

In the following months, federal investigators identified McHugh in several videos of his conduct posted on online, and he was arrested on May 27, 2021.  See Arrest Warrant [ECF No. 5]. He has been detained since that time.  See Min. Entry, June 25, 2021 (denying McHugh's appeal of his detention order and ordering that he be transported to the District of Columbia).  On July 7, 2021, McHugh was indicted by a federal grand jury on ten counts, see Indictment [ECF No. 22], and the government then filed a Superseding Indictment dated November 10, 2021 making the same charges, see Superseding Indictment.  McHugh is charged with two misdemeanor counts under 40 U.S.C. § 5104(e)(2)(D) and (F), Superseding Indictment at 5–6, as well as eight felonies: three counts of assaulting, resisting, or impeding federal officers in violation of 18 U.S.C. § 111(a) (two counts of which allege his use of a dangerous weapon under § 111(b));[3] one count of obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2); one count of civil disorder in violation of 18 U.S.C. § 231(a)(3); and three counts related to conduct on a restricted building or grounds under 18 U.S.C. § 1752.  Superseding Indictment at 2–5.

McHugh now moves to dismiss five of the felony charges against him for failure to state an offense.  See generally Def.'s Mot. to Dismiss Counts Two, Five, Six, Seven, and Eight of the Superseding Indictment [ECF No. 41] ("Def.'s Mot.").  He argues that Count Five, charging him with corruptly obstructing, influencing, and impeding an official proceeding in violation of 18 U.S.C. § 1512(c)(2), is improper because Congress's certification vote on January 6th was not an "official proceeding" for purposes of the statute and because the statute is unconstitutionally vague.  See Def.'s Mot. at  3–17.  He then makes a similar vagueness challenge, as well as a related overbreadth claim, as to Count Two, which charges him with "civil disorder" in violation of 18

---

[3] These counts are premised, respectively, on McHugh's scuffle with an officer over the barricade (Count One), his participation in ramming the metal sign into a group of officers (Count Three), and his spraying the officers with bear spray (Count Four).  See Superseding Indictment at 2–3.

U.S.C. § 231(a)(3).  See id. at 17–23.  Finally, he seeks to dismiss the indictment's three charges under 18 U.S.C. § 1752 (Counts Six, Seven, and Eight) on the grounds that (a) only the U.S. Secret Service (and not, as relevant here, the U.S. Capitol Police) can establish a "restricted building or grounds" under that statute and (b) the Vice President was not "temporarily visiting" the Capitol on January 6th, such that the Capitol was not a "restricted building or grounds" under § 1752(c)(1)(B).  See id. at 23–28.

With the exception of McHugh's very last argument regarding the phrase "temporarily visiting," every one of these contentions has been heard and rejected by at least one judge in this District in the last several months.  See United States v. Griffin, Case No. 21-cr-92, 2021 WL 2778557, at *2–6 (D.D.C. July 2, 2021) (§ 1752); United States v. Sandlin, No. 21-cr-88 (DLF), 2021 WL 5865006, at *3–5, 10–13 (D.D.C. Dec. 10, 2021) (§ 1512(c)(2)); United States v. Caldwell, Case No. 21-cr-28 (APM), 2021 WL 6062718, at *4–12 (D.D.C. Dec. 20, 2021) (same);[4] United States v. Mostofsky, Crim A. No. 21-138 (JEB), 2021 WL 6049891, at *8–13 (D.D.C. Dec. 21, 2021) (all three); United States v. Montgomery, Crim A. No. 21-46 (RDM), 2021 WL 6134591, at *4–10, 18–23 (D.D.C. Dec. 28, 2021) (§ 1512(c)(2)); United States v. Nordean, Crim. A. No. 21-175 (TJK), 2021 WL 6134595, at *4–6, 9–12, 16–19 (D.D.C. Dec. 28, 2021) (all three). Having fully considered the parties' ample briefing in this matter, as well as these other decisions, the Court will deny McHugh's motion to dismiss in full.

## Legal Standard

A defendant in a criminal case may make a pre-trial motion to dismiss the indictment against him for, among other things, "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v). As relevant here, there are two ways in which an indictment can "fail[] to state an offense": the

---

[4] Judge Mehta recently denied a request to reconsider this opinion.  See United States v. Caldwell, Case No. 21-cr-28 (APM), 2022 WL 203456, at *1 (D.D.C. Jan. 24, 2022).

statutory provision at issue does not apply to the charged conduct, e.g., Montgomery, 2021 WL 6134591, at *1, or the statutory provision at issue is unconstitutional, e.g., United States v. Eshetu, 863 F.3d 946, 952 (D.C. Cir. 2017) ("The defense of failure of an indictment to charge an offense includes the claim that the statute apparently creating the offense is unconstitutional." (quoting United States v. Seuss, 474 F.2d 385, 387 n.2 (1st Cir. 1973))), vacated on other grounds, 898 F.3d 36 (D.C. Cir. 2018).  In deciding a motion to dismiss an indictment, "the question before the Court is a narrow one," and the court will neither "review the sufficiency of the evidence against [the] [d]efendant" nor "craft jury instructions on the elements of" the crimes charged.  Montgomery, 2021 WL 6134591, at *1.  Instead, the court determines only the "legal sufficiency of the indictment," id. at *1 (emphasis added), while assuming the truth of the government's proffered facts, see United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015).

## Analysis

### I.   Count Five: Obstruction of an Official Proceeding Under § 1512(c)(2)

McHugh's first and most substantial challenge is to Count Five of the Indictment, which charges him with violating 18 U.S.C. § 1512(c)(2) by "corruptly obstruct[ing], imped[ing], and influenc[ing] an official proceeding, . . . specifically, Congress's certification of the Electoral College vote."  Superseding Indictment at 3.  McHugh first argues that his alleged conduct did not actually violate this provision.  According to McHugh, an "official proceeding," which is defined by 18 U.S.C. §1515(a)(1)(B) as "a proceeding before the Congress," must involve "adjudicative or at least quasi-adjudicative responsibilities," Def.'s Mot. at 6 (internal quotation marks and citation omitted), and since the January 6th Certification was merely a "ceremonial and administrative event," it does not qualify, Def.'s Mot. at 7.[5]   Next, McHugh argues that

---

[5] Importantly, and unlike many other January 6th defendants, McHugh does not appear to argue that the verbs "obstruct, impede, or influence" should be interpreted to apply only to actions with a nexus to evidence or documents.

§ 1512(c)(2), and in particular its use of the word "corruptly," is unconstitutionally vague both on its face and as applied to him, as the provision "uses words . . . that require courts—and anyone reading the statute—to speculate as to their meaning in the context of a defendant's particular actions." Def.'s Mot. at 10.

Following the lead of five other judges in this District, the Court rejects both of McHugh's contentions. His narrow interpretation of "official proceeding" is unsupported by statutory text and makes little sense applied to congressional proceedings. Instead, the Court holds that a "proceeding before the Congress" must merely be a formal assembly of Congress convened for the purpose of conducting official business that involves some other entity as an integral component. Applying this standard to the January 6th Certification, the Court readily concludes that it <u>was</u> an official proceeding. Nor is § 1512(c)(2) unconstitutionally vague: the case law on which McHugh relies for his contrary conclusion is inapposite, and, as interpreted by courts around the country for decades, the law creates an understandable and sufficiently specific standard that provides fair notice of the conduct it punishes.

### A.   <u>The January 6th Certification was an "official proceeding."</u>

It is a federal crime to "corruptly . . . obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." 18 U.S.C. § 1512(c)(2). The phrase "official proceeding" is defined by 18 U.S.C. § 1515(a)(1):

[T]he term "official proceeding" means—

---

He adverts to this argument only once in passing. <u>See</u> Def's Mot. at 6 ("Not only must the charged conduct have some reasonable nexus to a record, document or tangible object, or to witness testimony, but the obstruction must concern a proceeding involving adjudicative or at least quasi-adjudicative responsibilities." (internal quotation marks and citation omitted)). To the extent McHugh does mean to make this argument, the Court fully agrees with the decisions of the five other judges in this District rejecting it. <u>See</u> <u>Sandlin</u>, 2021 WL 5865006, at *5–9; <u>Caldwell</u>, 2021 WL 6062718, at *11–21; <u>Mostofsky</u>, 2021 WL 6049891, at *11; <u>Montgomery</u>, 2021 WL 6134591, at *10–18; <u>Nordean</u>, 2021 WL 6134595, at *6–8. Rather than spill more ink on this increasingly settled question, the Court incorporates their analyses by reference here.

(A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B) a proceeding before the Congress;

(C) a proceeding before a Federal Government agency which is authorized by law; or

(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce.

In order to determine whether McHugh's alleged conduct violated § 1512(c)(2), then, the Court must determine what "a proceeding before the Congress" means in § 1515(a)(1)(B).

Several other judges in this District have already interpreted "a proceeding before the Congress" in thoughtful and thorough opinions, and they have coalesced around a few principles with which this Court agrees. First, "proceeding" as it appears in § 1515(a)(1) "should be defined narrowly." Sandlin, 2021 WL 5865006, at *3. Rather than "[t]he carrying on of an action or series of actions," Proceeding, Oxford English Dictionary (3d ed. 2007), § 1515(a)(1) uses the term in its narrower, legal sense: "the business conducted by a court or other official body; a hearing," Proceeding, Black's Law Dictionary (11th ed. 2019). See Sandlin, 2021 WL 5865006, at *3; United States v. Ermoian, 752 F.3d 1165, 1169 (9th Cir. 2013). Second, and relatedly, not every activity undertaken by Congress is a "proceeding before the Congress." See Sandlin, 2021 WL 5865006, at *3 ("An 'official proceeding' under § 1512(c)(2) does not include any and all series of actions before Congress . . . ."); Montgomery, 2021 WL 6134591, at *5 ("[N]ot every event occurring within the walls of Congress constitutes an 'official proceeding.'"). And finally, a key differentiating factor between a "proceeding before the Congress" and un-"official" congressional activity is formality. Judge Friedrich held in Sandlin that an "official proceeding" "must be akin

9

to a formal hearing," 2021 WL 5865006, at *3, while in <u>Montgomery</u>, Judge Moss, relying on the word "before" and the modifier "official," held that "a proceeding before the Congress" "must involve a formal assembly or meeting of Congress for the purpose of conducting official business," 2021 WL 6134591, at *5.

The Court agrees with all three of these principles.  "Proceeding" is properly understood in its legal sense, and courts should give effect to the words Congress used by refraining from reading § 1515(a)(1)(B) to mean, in effect, "a proceeding <u>of</u> the Congress" or "a proceeding <u>by</u> the Congress."  And the Court adopts Judge Moss's conclusion that a "proceeding before the Congress" must "involve a formal assembly or meeting of Congress for the purpose of conducting official business." <u>Montgomery</u>, 2021 WL 6134591, at *5.  However, formality alone does not make a congressional activity a "proceeding before the Congress."  In addition, a second party must be integrally involved in the "proceeding" in order for it to be "before" the Congress.  As explained below, this interpretation is consistent with the meaning of the word "before," the ordinary usage of the phrase "proceeding before," and with common interpretations of § 1515(a)(1)(C)'s parallel phrase "proceeding before a Federal Government agency."  Courts must give effect to Congress's apparently deliberate choice to use the phrase "proceeding before" rather than "proceeding of," and this Court concludes that formal but wholly internal proceedings do not fall within § 1515(a)(1)(B)'s definition.

First, "proceeding before" is a spatial metaphor—an apt synonym would be "a proceeding in front of."  <u>See, e.g.</u>, <u>Before</u>, Oxford English Dictionary (3d ed. 2013) ("In front, in or on the anterior side; in a forward direction.").  And prepositions like "before" and "in front of" require <u>two</u> referents: X, from whose perspective we measure, and Y, whatever X is "in front of."  Even when "before" is combined with a verb, a second referent is still required—thus, a person cannot

walk "before" himself, nor can a court "proceed[] before" itself.  For instance, the judges of this Court from time to time convene in an "Executive Session" in order to make certain decisions regarding the administration of the Court.  Although conducted without robes or a gavel, this Executive Session may fairly be described as a "formal assembly of [the Court] for the purpose of conducting official business."  Yet it would be inaccurate to call the Court's Executive Session "a proceeding <u>before</u> the District Court" as opposed to a proceeding "<u>of</u> the Court," since it is a wholly internal proceeding with only one relevant party.  This suggests that formality is not the only relevant characteristic of a "proceeding before the Congress."

Congress's use of the phrase "proceeding before" in other legislation supports the need for a second entity's involvement.  Fifty-three sections of the U.S. Code use the phrase "a proceeding before," and in every one the phrase describes a proceeding involving more than one entity, usually in a court-like setting where one entity "appears before" another.  <u>See, e.g.</u>, 17 U.S.C. §§ 1501–09 (establishing procedures for an adversarial "proceeding before the Copyright Claims Board"); 18 U.S.C. §§ 6002–05 (establishing procedures governing the exercise of privilege by a witness called "to testify or provide other information in a proceeding before or ancillary to . . . either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House"); 49 U.S.C. §§ 1321–23 (creating procedures for "a proceeding before" the Surface Transportation Board).  And although this does not mean that a "proceeding before" a body must be "court-like" or involve witnesses, as discussed in greater depth below, it does suggest that, in ordinary usage, a "proceeding before" refers to a proceeding that is both formally convened and involves multiple entities.

Finally, it is important to interpret "a proceeding before" consistently between the four sub-paragraphs of § 1515(a)(1).  The parallelism of those four provisions suggests not only that

"proceeding before" was a deliberate drafting choice but also that the phrase describes the same general type of "proceeding," just occurring "before" four different types of bodies.  And a growing consensus of courts of appeals have interpreted § 1515(a)(1)(C)'s "proceeding before a Federal Government agency" to require the involvement of multiple entities in addition to formality.  In <u>United States v. Ramos</u>, 537 F.3d 439 (5th Cir. 2008), the Fifth Circuit held that an internal agency investigation into employee misconduct was not an "official proceeding," and it commented that Congress's use of "before" "implies that an 'official proceeding' involves some formal convocation of the agency <u>in which parties are directed to appear</u>."  537 F.3d at 462–463. And in <u>United States v. Ermoian</u>, 752 F.3d 1165 (9th Cir. 2013), the Ninth Circuit held that an FBI investigation was not an "official proceeding" and specifically distinguished between proceedings "before" and proceedings "by" a body: "The use of the preposition 'before' suggests an appearance in front of the agency sitting as a tribunal. . . . [A] criminal investigation does not occur 'before a Federal Government agency' like a hearing or trial might; it is conducted 'by' the agency in the field."  752 F.3d at 1171.  To be sure, <u>Ramos</u> and <u>Ermoian</u> are not binding here, and the Court does not adopt every comment in those opinions, many of which are either dicta, fact-bound, or both.[6]  But the Court finds the narrower interpretation of the word "before" in <u>Ermoian</u> and <u>Ramos</u> persuasive, and the Court is wary of giving § 1515(a)(1)(B) an interpretation which, if applied to § 1515(a)(1)(C), would conflict with the reasoning, if not the holdings, of those cases.

Thus, drawing on the ordinary meaning and usage of "proceeding before" and other courts' interpretations of § 1515(a)(1)(C)'s parallel definition, while also making sure not to unduly

---

[6] For instance, the Court does not agree that only a proceeding "in which parties are directed to appear" can be an official proceeding under § 1515(a)(1), as suggested in <u>Ramos</u>, 537 F.3d at 462–463.  As Judge Kelly pointed out, such a limitation would be nonsensical in the congressional context: "it is hard to imagine how there would [ever be] 'parties' to a 'proceeding before the Congress' . . . save for maybe an impeachment."  <u>Nordean</u>, 2021 WL 6134595, at *5 n.1.

narrow what Congress clearly meant to be a broad definition, the Court concludes that "a proceeding before the Congress" must be a formal assembly of the Congress for the purpose of conducting official business <u>and</u> must involve some other entity as an integral component.  No matter how formal its convocation, a "proceeding" involving Congress by itself is not "a proceeding <u>before</u> the Congress."

The next step, then, is to apply this definition to the allegations of the Superseding Indictment: the Court concludes that the January 6th Certification was indeed a "proceeding before the Congress" for purposes of 18 U.S.C. § 1512(c)(2).  First, the Court agrees fully with the reasoning of the other opinions holding that the January 6th Certification is sufficiently formal. As Judge Friedrich put it, the certification "has the trappings of a formal hearing before an official body," including "a presiding officer, a process by which objections can be heard, debated, and ruled upon, and a decision—the certification of the results—that must be reached before the session can be adjourned."  <u>Sandlin</u>, 2021 WL 5865006, at *4; <u>accord</u> <u>Montgomery</u>, 2021 WL 6134591, at *9–10.  That no less an authority than the Constitution of the United States mandates the proceeding's occurrence, <u>see</u> U.S. Const. amend. XII, and that everything from the specific date to the seating arrangements to the time allotted for debate is prescribed by statute, <u>see</u> 3 U.S.C. §§ 15–17, only confirms that this was a formal assembly of the Congress for the purpose of conducting official business.

The Court also concludes that the January 6th Certification was not just a proceeding <u>of</u> the Congress but a proceeding <u>before</u> the Congress.  Rather than a wholly internal proceeding, the certification involves a second entity as an integral component: the Electoral College.  Pursuant to the Twelfth Amendment and Title 3 of the U.S. Code, the electors in each of the fifty states meet, vote, and then "transmit [the results] sealed to the seat of the government of the United States,

directed to the President of the Senate." U.S. Const. amend. XII.  The Vice President then opens
the sealed results and announces them to Congress, which, after debate if necessary, then certifies
the votes.  <u>See</u> 3 U.S.C. § 15.  Thus, the certification proceeding sees Congress formally convene
to hear, debate, and decide any disputes arising from the proceedings of a second entity.  Although
the electors are neither physically present in front of Congress nor "parties" to the proceeding <u>per
se</u>, they and their ballots are in a very real sense integral components of the event.  As Judge
Friedrich noted in <u>Sandlin</u>, "the certificates of electoral results are akin to records or documents
that are produced during judicial proceedings, and any objections to these certificates can be
analogized to evidentiary objections." <u>Sandlin</u>, 2021 WL 5865006, * 4.  The Court agrees that this
analogy is apt, and it underscores that the electors and their votes are just as much "before"
Congress as litigants are "before" a court or regulated parties are "before" an agency.  The January
6th Certification was a "proceeding before the Congress."[7]

McHugh urges a different interpretation, not only of "official proceeding" but of the
certification vote itself.  His primary argument is that, as used in § 1515 and applied in § 1512(c)(2),
the phrase "proceeding before the Congress" is "logically limited to the same type of 'adversarial
nature' as court proceedings where there is a potential for witnesses to be influenced or documents
destroyed."  Def.'s Mot. at 6.  Thus, he argues, in order to violate § 1512(c)(2), "the obstruction
must concern a proceeding involving adjudicative or at least 'quasi-adjudicative responsibilities.'"

---

[7] In his reply, McHugh suggests that, because 3 U.S.C. § 15 uses the verb "meet," the certification vote is a "meeting" rather than a "proceeding."  Def.'s Reply in Further Supp. of Def.'s Mot. [ECF No. 45] ("Def.'s Reply") at 4–5.  This argument not only relies on the incorrect assumption that "meetings" and "proceedings" are mutually exclusive categories; it also implies that the verb used to describe how a group comes together has some sort of binding effect on the legal characterization of the resulting event.  It does not.  McHugh also argues that a "proceeding" in the congressional context "must refer to a separate and bicameral . . . function[] of the House or the Senate" because "the only time the Constitution mentions 'proceedings' in reference to Congress, the <u>bicameral</u> nature of the Congress is stressed."  <u>Id.</u> at 5 & n.1 (citing U.S. Const. art. I, § 5).  The mere fact that the Constitution happens to use "proceedings" to refer to unicameral activities does not support the conclusion that a statute written nearly two hundred years later must have used the term in exactly the same way.

Id. (quoting United States v. Perez, 575 F.3d 164, 169 (2d Cir. 2009)).  And since the January 6th Certification was merely a "ceremonial and administrative event," it does not qualify.  Id. at 7.  As the Court will explain, neither of these contentions are correct.

McHugh advances several reasons to read "official proceeding" as requiring "adjudicative responsibilities," but they all fail.  He relies on dictionary definitions to argue that the "ordinary legal meaning" of "proceeding" refers to adjudication.  "Proceeding," he claims, means "a hearing," Def.'s Reply at 2, and "a hearing" means "the hearing of the arguments of the counsel for the parties upon the pleadings, or pleadings and proofs; corresponding to the trial of an action at law," id. (citation omitted).  Therefore, an official proceeding must "correspond[] to the trial of an action at law" and constitute "some kind of adjudicative hearing."  Id.  Both steps of this syllogism fail.  McHugh fails to reckon with the remainder of the Black's Law Dictionary definition of "proceeding": "The business conducted by a court or other official body; a hearing." Proceeding, Black's Law Dictionary (11th ed. 2019).  "Proceeding" thus denotes a broader category than "hearing"—the very dictionary on which McHugh relies disproves his purported equivalence between "proceedings" and "hearings."  Nor does his restrictive interpretation of "hearing" hold up.  McHugh's narrow, adjudication-only definition of "hearing" not only comes from a dictionary published in 1910; the definition is also narrowly circumscribed, referring specifically to the use of the word "hearing" "in equity practice."[8]  In reality, it is quite common to call non-adjudicative proceedings "hearings": for example, a congressional committee "hearing," which lacks any sort of adjudicative function.

---

[8] Using an "id." citation, McHugh implied that this definition came from the most recent edition of Black's Law Dictionary, see Def.'s Reply at 2, but in reality, the quoted definition actually appears in the 2nd edition of the work.  See Hearing, Black's Law Dictionary (2d ed. 1910).  As for the limitation to "equity practice," the caveat is clearly marked and accompanied by an explanatory editors' note: "The word 'hearing' has an established meaning as applicable in equity cases.  It means the same thing in those cases that the word 'trial' does in cases at law."  Id.

McHugh's principal argument for his adjudicative gloss on "official proceeding," however, is based on the purpose of § 1512(c)(2) and of the Sarbanes-Oxley Act of 2002:[9] "Section 1512(c)(2)'s legislative history shows that its abiding purpose is protecting the integrity of hearings before tribunals by preventing witness tampering and destruction of evidence."  Def.'s Reply at 2; see also Def.'s Mot. at 4–5.  Interpreting "official proceeding" in light of that purpose, then, means that an "official proceeding" must involve adjudication.  But although a statute's purpose can sometimes clarify what Congress said, "[v]ague notions of a statute's 'basic purpose' are inadequate to overcome the words of its text regarding the specific issue under consideration." Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan, 577 U.S. 136, 150 (2016) (cleaned up) (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 261 (1993)).  The same is true of Congress's subjective expectations for how a statute will be applied: even assuming that Congress anticipated that § 1515 "proceedings" would be court-like proceedings with witnesses, testimony, and evidence, those expectations certainly cannot operate as an extra-textual limitation on what the legislature actually enacted.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

McHugh's adjudicative gloss on § 1515 is not just absent from the text; it is inconsistent with it.  Requiring a § 1515 "proceeding" to be adjudicative would make "a proceeding before the Congress" something close to a null set.  Under our system of separation of powers, "adjudication"

---

[9] It is worth noting that the Sarbanes-Oxley Act neither enacted nor amended § 1515; instead, that section's definition of "official proceeding" dates to the Victim and Witness Protection Act of 1982, Pub. L. No. 92-291, §4(a), 96 Stat. 1248, 1252.  Thus, unless McHugh means to argue that "official proceeding" has one meaning in § 1512(c)(2) and another meaning in the rest of the section 1512—which it does not—Sarbanes-Oxley is almost entirely irrelevant to the interpretation of the phrase "a proceeding before the Congress."

is almost never Congress's job.  See, e.g., Montgomery, 2021 WL 6134591, at *7 ("Defendants' efforts to read 'proceedings before the Congress' to mean proceedings that are 'quasi-judicial' . . . cannot help but bring to mind the aphorism about square pegs and round holes.").  To require that "a proceeding before the Congress" be "adjudicative" would essentially read it out of § 1515, and it beggars belief that Congress would proscribe conduct related to "proceeding[s] before the Congress" while at the same time intending that prohibition to apply solely to functions Congress does not perform.  The Court will not interpret the statute to produce such a bizarre result.[10]

Even if McHugh were correct that an "official proceeding" must be adjudicative, Congress's certification of the electoral college vote would still qualify.  Although McHugh vigorously argues that the January 6th Certification was "ceremonial,"[11] "ministerial,"[12] "administrative,"[13] and "a political performance conducted in order to give the country a feeling of finality over the already final election results,"[14] McHugh is incorrect: ironically, he is charged with obstructing one of the very few congressional proceedings that actually is adjudicative.  In the aftermath of the disastrous election of 1876, Congress "thrashed out the [Electoral Count Act's] specific provisions over fourteen years of sustained debate."  Stephen A. Siegel, The Conscientious

---

[10] In the alternative, McHugh argues that, "[i]f not 'adjudicative,' the term 'a proceeding before the Congress' in §1515(a)(1)(B) requires, at a minimum, some kind of investigative or legislative action or purpose."  Def.'s Reply at 3.  This fallback interpretation also fails.  For one, just as McHugh's "adjudicative" limitation made no sense as applied to Congress, this "investigative or legislative" requirement makes no sense as applied to "proceeding[s] before a judge or court of the United States."  18 U.S.C. § 1515(a)(1)(A).  It is axiomatic that courts do not act with an "investigative or legislative purpose."  Second, as Judge Mehta explained in Caldwell, Congress "had a ready-made template for how to" limit § 1512's reach to investigative proceedings in the form of 18 U.S.C. § 1505.  Caldwell, 2021 WL 6062718, at *5; see 18 U.S.C. § 1505 (criminalizing obstruction of "the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had . . . .").  That Congress "decided to incorporate into section 1512(c) an existing definition of 'official proceeding' that broadly includes 'a proceeding before Congress,' as opposed to one limited to its 'power of inquiry,'" militates against reading such a limitation into the law.  Caldwell, 2021 WL 6062718, at *5; accord Montgomery, 2021 WL 6134591, at *6.

[11] Def.'s Mot. at 7, 8, 9; Def.'s Reply at 1, 3, 4, 6.

[12] Def.'s Reply at 5, 6, 7.

[13] Def.'s Mot. at 7, 9; Def.'s Reply at 1.

[14] Def.'s Reply at 7.

Congressman's Guide to the Electoral Count Act of 1887, 56 Fla. L. Rev. 541, 543 (2004).  The result of this laborious process was not a meaningless dog-and-pony show but a proceeding in which Congress has the power to decide disputes about which electors' votes should be counted.[15] To be sure, Congress does not elect the President on January 6th, nor can it change votes from one candidate to another.  But the fact that Congress's adjudicative domain is limited to procedural disputes, see, e.g., Siegel, supra, at 614–33, does not render the quadrennial certification of the electoral vote "ceremonial."  It is instead unambiguously an occasion on which Congress "adjudicates."  Cf. 3 U.S.C. § 15 (using the word "decide" or "decision" six times in reference to Congress's responsibilities during the certification proceeding).

In sum, the Court holds that the January 6th Certification was an "official proceeding" for the purposes of 18 U.S.C. § 1512(c)(2)'s prohibition on "corruptly . . . obstruct[ing], influenc[ing], and imped[ing] any official proceeding."  It was a formal assembly of the Congress for the purpose of conducting official business, and it involved an entity other than Congress—the Electoral College—as an integral component.  McHugh's contrary interpretations are unavailing.  As a consequence, the Court rejects McHugh's claim that § 1512(c)(2) does not apply to his alleged conduct as a matter of law.[16]

---

[15] See, e.g., Caldwell, 2021 WL 6062718, at *7 ("As we all now know, disputes can arise during the Certification. . . . [I]t is inaccurate to characterize the Certification that occurred on January 6 as a purely ministerial, legislative vote-counting event." (internal quotation marks and citation omitted)); Siegel, supra, at 604 ("When Congress receives an electoral vote, or set of electoral votes, claiming to have section 2 status, Congress decides whether the claim is meritorious."); see also 3 U.S.C. § 15 ("[T]he two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been [properly] certified.").

[16] To be clear, the Court neither holds nor implies that McHugh did indeed violate § 1512(c)(2) or that the jury must or will find him guilty of that crime—indeed, as discussed in the next section, the government must still prove a significant number of facts beyond a reasonable doubt in order to secure a conviction on Count Five.  At this stage, all the Court holds is that Count Five is not insufficient due to an erroneous legal conclusion that the January 6th Certification was an "official proceeding."

**B.  Section 1512(c)(2) is not unconstitutionally vague.**

McHugh also challenges § 1512(c)(2) as void for vagueness.  Def.'s Mot. at 9.  A law is unconstitutionally vague when "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement."  Johnson v. United States, 576 U.S. 591, 595 (2015).  But "[t]his is a 'stringent standard.'"  Sandlin, 2021 WL 5865006, at *10 (quoting United States v. Harmon, Crim. Case No. 19-cr-395 (BAH), 2021 WL 1518344, at *4 (D.D.C. Apr. 16, 2021)).  That each and every possible application of statutory language is not immediately apparent to a layman does not make a statute void for vagueness, and "a statutory term is not rendered unconstitutionally vague because it 'does not mean the same thing to all people, all the time, everywhere,'" United States v. Bronstein, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (cleaned up) (quoting Roth v. United States, 354 U.S. 476, 491 (1957)).  And despite the language of "fair notice," e.g., Johnson, 576 U.S. at 595, the vagueness determination "must be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants," Bouie v. City of Columbia, 378 U.S. 347, 355 n.5 (1964).

Instead, "a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifies' 'no standard of conduct at all.'"  Bronstein, 849 F.3d at 1107 (cleaned up) (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971)).  "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  United States v. Williams, 553 U.S. 285, 306 (2008).  Such situations include "statutes that tie[] criminal culpability to . . . wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."  Id.  Furthermore, "clarity at the requisite level may

19

be supplied by judicial gloss on an otherwise uncertain statute," United States v. Lanier, 520 U.S. 259, 266 (1997), such that a prohibition that might appear vague on its face can survive a constitutional challenge if it "ha[s] been 'made specific' by the text or settled interpretations," id. at 267 (quoting Screws v. United States, 325 U.S. 91, 105 (1945)).

i.  Section 1512(c)'s use of the term "corruptly" does not render it unconstitutionally vague.

McHugh's most substantial vagueness argument centers on §1512(c)(2)'s use of the word "corruptly": "Whoever corruptly . . . obstructs, influences, or impedes any official proceeding . . . ."  In support of this contention, McHugh relies heavily on United States v. Poindexter, 951 F.2d 369 (D.C. Cir. 1991), which he claims "acknowledged that the word 'corruptly' is vague on its face as used in a similar statute," Def.'s Mot. at 11, and held that the term "is only clear when it is applied transitively to circumstances where one individual corrupts another to violate their legal duty," Def.'s Reply at 8.  But as many other judges in this District and around the country have noted, Poindexter held no such thing.

In the aftermath of the Iran-Contra scandal, former National Security Advisor John Poindexter was convicted of, among other things, violating 18 U.S.C. § 1505, Poindexter, 951 F.2d at 371, which prohibits "corruptly, or by threats or force, or by any threatening letter or communication influenc[ing], obstruct[ing], or imped[ing]. . . the due and proper exercise of [Congress's] power of inquiry."  The basis of Poindexter's § 1505 conviction was his having given false and misleading statements to a congressional committee.  Poindexter, 951 F.2d at 372.  The D.C. Circuit reversed the convictions, but not because the term "corruptly" is unconstitutionally vague in every obstruction statute in which it appears.  See id. at 385 ("[W]e need not conclude that the ambiguity of the term 'corruptly' in § 1505 renders that term unconstitutionally vague as applied to all conduct.").  Instead, the Poindexter court analyzed the text and legislative history of

20

18 U.S.C. § 1505 and concluded that, "[a]s used in § 1505, . . . the term "corruptly" is too vague to provide constitutionally adequate notice that it prohibits lying to the Congress." Id. at 379 (emphases added).  Indeed, nearly all of the reasoning underlying the D.C. Circuit's conclusion was specific to either § 1505 or to the allegations against Poindexter, and many of the characteristics highlighted by the Poindexter court are notably absent from § 1512(c).  See, e.g., Nordean, 2021 WL 6134595, at *10 (noting that § 1512(c) uses "corruptly" in a completely different grammatical context from § 1505, thus rendering Poindexter inapposite); Caldwell, 2021 WL 6062718, at *10 ("[T]he concern that animated Poindexter . . . is simply not present in this prosecution under section 1512(c)(2).")

For these reasons, many courts "have since cabined Poindexter's holding to its facts and have not read it 'as a broad indictment of the use of the word "corruptly" in the various obstruction-of-justice statutes.'" Sandlin, 2021 WL 5865006, at *11 (quoting United States v. Shotts, 145 F.3d 1289, 1300 (11th Cir. 1998)); accord, e.g., Caldwell, 2021 WL 6062718, at *9; United States v. Edwards, 869 F.3d 490, 502 (9th Cir. 2017).  McHugh's argument that binding D.C. Circuit precedent compels the dismissal of the § 1512(c)(2) charge is thus unavailing.

But just because Poindexter does not govern here does not mean that "corruptly" is not unconstitutionally vague.  The word is, the Court acknowledges, inherently imprecise, and it even bears some resemblance to words that the Supreme Court has previously struck down for requiring "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." Williams, 553 U.S. at 306 (pointing to the words "annoying" and "indecent" as examples).  But, as used in § 1512(c), "corruptly" has acquired a "settled legal meaning" through numerous, consistent interpretations by courts around the country—it has thus been "'made

specific' by . . . settled interpretations" and is not impermissibly vague.  See Lanier, 520 U.S. at 267 (quoting Screws, 325 U.S. at 105).

In Arthur Andersen LLP v. United States, 544 U.S. 696 (2005), the Supreme Court examined § 1512(b)(2), "focus[ing] on what it means to 'knowingly corruptly persuade' another person with intent to cause that person to withhold documents from, or alter documents for use in, an official proceeding."  544 U.S. at 703 (cleaned up; some internal quotation marks omitted). Positing many situations in which someone could innocently "persuade" someone to withhold documents, id. at 703–04, and relying on the ordinary meanings of both "knowingly" and "corruptly," id. at 705–06, the Court held that "[o]nly persons conscious of wrongdoing can be said to 'knowingly corruptly persuade,'" further reasoning that "limiting criminality to persuaders conscious of their wrongdoing sensibly allows § 1512(b) to reach only those with the level of 'culpability we usually require in order to impose criminal liability,'" id. at 706 (cleaned up) (quoting United States v. Aguilar, 515 U.S. 593, 602 (1995)).  And although the analogy between the mens rea terms in § 1512(b) and § 1512(c) is "inexact," id. at 705 n.9, the courts of appeals, bolstered by Arthur Andersen, have uniformly defined "corruptly" in § 1512(c) to require "consciousness of wrongdoing."[17]  Moreover, it is equally well-settled that the alleged obstructive act must have a "nexus" with the proceeding to be obstructed: "the charged conduct must have the 'natural and probable effect of interfering with' an official proceeding and the accused must have 'known that his actions were likely to affect' a particular proceeding."  Montgomery, 2021 WL

---

[17] See, e.g., United States v. Delgado, 984 F.3d 435, 452 (5th Cir. 2021) ("[A] person acts 'corruptly' under the statute when they act 'knowingly and dishonestly, with specific intent to subvert or undermine the due administration of justice.'" (quoting United States v. Coppin, 569 F. App'x 326, 334 (5th Cir. 2014))); United States v. Friske, 640 F.3d 1288, 1291 (11th Cir. 2011) (defining acting "corruptly" as acting "with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct the [official proceeding]" (quoting United States v. Mintmire, 507 F.3d 1273, 1289 (11th Cir. 2007))); United States v. Gordon, 710 F.3d 1124, 1151 (10th Cir. 2013) (adopting the 11th Circuit's definition).

6134591, at *20 (cleaned up) (quoting <u>Aguilar</u>, 515 U.S. at 599).  This interpretation too is widespread among the courts of appeals.[18]

The judges of this District have adopted both of these positions,[19] and so does this Court. Between the nexus requirement and the need to show a defendant's "consciousness of wrongdoing"—requirements well-established on January 6, 2021—§ 1512(c)(2) is a specific intent statute: in the government's own words, it "requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding."  Gov't Opp'n at 29.  Accordingly, in order to be convicted of obstruction under § 1512(c)(2), a defendant must have been "aware that what he does is precisely that which the statute forbids," such that "[h]e is under no necessity of guessing whether the statute applies to him."  <u>Screws</u>, 325 U.S. at 104.  In such a situation, a defendant "cannot complain that [the statute] does not supply fair notice if it is construed to require proof that [he] acted with a specific intent to do what the statute prohibits."  <u>Caldwell</u>, 2021 WL 6062718, at *11.  Notwithstanding the apparent imprecision of its mens rea term, then, § 1512(c)(2) has been uniformly interpreted to create a well-defined and narrow criminal prohibition that provides constitutionally sufficient warning to potential defendants.  See <u>Sandlin</u>, 2021 WL 5865006, at *12; <u>Caldwell</u>, 2021 WL 6062718, at *11; <u>Montgomery</u>, 2021 WL 6134591, at *20.

> ii.   <u>Other aspects of § 1512(c)(2) do not render it unconstitutionally vague.</u>

McHugh raises several other reasons why § 1512(c)(2) is unconstitutionally vague, but none succeed.  First, pointing to "the confusion . . . among jurisdictions as to what does or does

---

[18] <u>E.g.</u>, <u>Delgado</u>, 984 F.3d at 452; <u>United States v. Pugh</u>, 945 F.3d 9, 21–22 (2d Cir. 2019); <u>United States v. Young</u>, 916 F.3d 368, 386 (4th Cir. 2019) (collecting cases); <u>Flores v. Att'y Gen. of U.S.</u>, 856 F.3d 280, 294 & n.72 (3d Cir. 2017) (collecting cases).

[19] <u>Sandlin</u>, 2021 WL 5865006, at *12; <u>Caldwell</u>, 2021 WL 6062718, at *10–11, 20; <u>Montgomery</u>, 2021 WL 6134591 at *20–22; <u>Mostofsky</u>, 2021 WL 6049891, at *11; <u>Nordean</u>, 2021 WL 6134595, at *10.

not qualify," McHugh argues that the phrase "official proceeding" is unconstitutionally vague because "courts have had to speculate" in order to "distinguish 'official proceedings' from other proceedings or investigations." Def.'s Mot. at 11. At the outset, the Court agrees with Judge Boasberg that "it is difficult to fathom that a reasonable person would not believe the Electoral College certification was an official proceeding . . . ; indeed, this is precisely the reason why the January 6 rioters wished to stop it." Mostofsky, 2021 WL 6049891, at *11. More importantly, McHugh's contention disregards the fundamental principle that "a statutory term is not rendered unconstitutionally vague because it 'does not mean the same thing to all people, all the time, everywhere.'" Bronstein, 849 F.3d at 1107 (cleaned up) (quoting Roth, 354 U.S. at 491). Although determining the exact boundaries of the term "official proceeding" has required careful judicial analysis, McHugh confuses speculation with interpretation. The need to examine statutory language, determine its meaning, and apply it to a specific factual situation is not evidence of a constitutionally defective statute—it is the ordinary work of judging in the age of statutes. See Williams, 553 U.S. at 306 ("Close cases can be imagined under virtually any statute. . . . What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). Indeed, that rational interpretation of "official proceeding" is even possible is as clear a sign as any that the term is not impermissibly vague.

McHugh then contends that "influence" is "another vague word that may mean many things," and he further expresses concern that the word's breadth may cause § 1512(c)(2) to criminalize ordinary, lawful conduct. Def.'s Mot at 12–13. But these arguments skip a necessary first step: actually interpreting the word in question. For instance, in Bronstein, the D.C. Circuit rejected a vagueness challenge to a prohibition on "mak[ing] a harangue or oration . . . in the

24

Supreme Court building or grounds," 40 U.S.C. § 6134, by first interpreting "harangue or oration" in light of the other conduct prohibited by the provision—"discharg[ing] a firearm, firework or explosive," "set[ting] fire to a combustible," and "utter[ing] loud, threatening, or abusive language"—and then concluding that only "public speeches that tend to disrupt the Court's operations" constituted unlawful harangues or orations.  Bronstein, 849 F.3d at 1108–09; see also Agnew v. Gov't of D.C., 920 F.3d 49, 56 (D.C. Cir. 2019) (rejecting a vagueness challenge to a prohibition on "crowd[ing], obstruct[ing] or incommod[ing]" public spaces by interpreting "incommode" in light of its neighboring words).

The same reasoning applies here.  Reading "influence" in light of its neighbors "obstruct" and "interfere" makes it clear that § 1512(c)(2) only prohibits "influencing" an official proceeding in an obstructive or disruptive manner—the statute does not impose criminal penalties for merely "hav[ing] an effect on . . . the condition of" an official proceeding.  See Def.'s Mot. at 13 & n.5. Moreover, and contrary to McHugh's contention, the combination of "corruptly" and "influence" negates rather than "heightens" whatever vagueness may be left in the term "influence."  Def.'s Reply at 9.  McHugh's concern that § 1512(c)(2) authorizes felony charges for perpetrators of a letter-writing campaign because they sought to "influence" a "proceeding before the Congress," is thus unjustified, as only one who acts with "consciousness of wrongdoing" may be convicted under § 1512(c)(2).  See Montgomery, 2021 WL 6134591, at *20 (noting that § 1512(c)'s specific intent element "draws the line between lawful and criminal obstruction or influence of a congressional proceeding").

Next, McHugh suggests that the government has been inconsistent in its charging decisions by charging some January 6th rioters but not others with obstruction under § 1512(c)(2), and he contends that this purported inconsistency "illustrates how vague and arbitrary the enforcement of

this statute can be." Def.'s Mot. at 13. But this Court "declines [McHugh's] invitation to compare the charges that the government has brought in each of the January 6 cases." Montgomery, 2021 WL 6134591, at *23; see also Sandlin, 2021 WL 5865006, at *9; Caldwell, 2021 WL 6062718, at *8; Nordean, 2021 WL 6134595, at *12. "'[J]udicial authority is . . . at its most limited' when reviewing the Executive's exercise of discretion over charging determinations." United States v. Fokker Servs. B.V., 818 F.3d 733, 741 (D.C. Cir. 2016) (quoting Cmty. for Creative Non-Violence v. Pierce, 786 F.2d 1199, 1201 (D.C. Cir. 1986)). And although a criminal prohibition that is so standardless as to place "unfettered discretion . . . in the hands of the . . . police" violates the Due Process Clause, Papachristou v. City of Jacksonville, 405 U.S. 156, 168 (1972) (emphasis added), the mere existence of enforcement discretion "does not render a statutory scheme unconstitutionally vague," Kincaid v. Gov't of D.C., 854 F.3d 721, 729 (D.C. Cir. 2017). As described above, § 1512(c)(2)'s terms are specific enough to provide meaningful notice to potential defendants, and "[d]iscretionary prosecutorial decisions cannot render vague . . . a statute that by its plain terms provides fair notice." Caldwell, 2021 WL 6062718, at *8.

Finally, the Court rejects McHugh's argument that §1512(c)(2) is vague as applied to him; that is, that although some conduct may be clearly within the scope of the statute, the law's application to his conduct is so unclear that it cannot justify the imposition of criminal penalties. See Poindexter, 951 F.2d at 378 ("The question in [an as-applied vagueness challenge] is whether the meaning [the statute] does have is sufficiently definite, as applied to the conduct at issue . . . , to be the basis of a criminal conviction."). That McHugh is "squarely within the core coverage of 'corruptly' as used in § 1512(c)(2)" is evident from the face of the Superseding Indictment. Sandlin, 2021 WL 5865006, at *13. As Judges Friedrich and Kelly have noted, whatever gray area may exist at the outskirts of "corrupt" obstruction, it is clear that independently unlawful

26

action is at its center.  See id. at *13; Nordean, 2021 WL 6134595, at *11.  And McHugh is charged

with nine other crimes in relation to his conduct on January 6th, many of which could and did

contribute to his alleged obstruction of an official proceeding.  See Nordean, 2021 WL 6134595,

*12 (rejecting as-applied vagueness challenge because the defendants had been charged with

several other independently criminal acts in relation to their alleged obstruction).  So although the

allegations in other January 6th cases are arguably more serious than those against McHugh, see,

e.g., Sandlin, 2021 WL 5865006, at *1–2; Caldwell, 2021 WL 6062718, at *1–2, McHugh's

alleged conduct on January 6th was just as independently unlawful and thus just as obviously

covered by § 1512(c)(2).  See Sandlin, 2021 WL 5865006, at *13 n.14 ("[Although] difficult

questions arise when lawful means are used with a corrupt purpose," a case "which allegedly

involves unlawful means engaged in with the intent to obstruct[] does not raise these challenging

questions").  As to vagueness, the cases are indistinguishable.

Under the guise of his as-applied challenge, McHugh makes a variety of factual arguments,

which are improper at this threshold stage.  He contests the government's characterization of his

conduct, Def.'s Reply at 10 (accusing the government of "desperately resort[ing] to

misrepresenting [McHugh's] conduct"), essentially arguing that he is being prosecuted for

wielding a megaphone at a political protest, Def.'s Mot. at 14–15.  He claims that the government's

allegations do not establish the required "logical nexus . . . between the conscious wrongdoing and

the intent to halt the vote."  Def.'s Reply at 12.  And he repeatedly asserts that he did not possess

any obstructive intent, see Def.'s Mot. at 15–16; Def.'s Reply at 10–11, at times openly disputing

what the government's evidence shows, Def.'s Mot. at 15 n.8; Def.'s Reply at 13.  But what

McHugh did, what nexus his conduct had with the certification vote, and certainly what his mental

state might have been are all questions for the jury at trial, not for the Court on a motion to dismiss.

See, e.g., United States v. Campbell, 798 F. Supp. 2d 293, 309 (D.D.C. 2011) ("[A]t the pretrial stage, the indictment ordinarily should be tested solely by its sufficiency to charge an offense, regardless of the strength or weakness of the government's case." (quoting United States v. Risk, 843 F.2d 1059, 1061 (7th Cir. 1988)).   McHugh will have an opportunity to make these arguments—but the instant motion is not it.

## II.   Count Two: Civil Disorder Under § 231(a)(3)

McHugh's second set of arguments challenges Count Two of the Superseding Indictment, which charges McHugh with civil disorder in violation of 18 U.S.C. § 231(a)(3).   That statute provides:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function . . . [s]hall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3).   As with § 1512(c)(2), McHugh argues that § 231(a)(3) is unconstitutionally vague, as it is "replete with vague and imprecise terms," Def.'s Mot. at 18, "impermissibly requires individuals to predict how others will react to their conduct," id. at 21, and lacks any scienter requirement separating culpable conduct from innocent actions, id. at 22.   In addition, he argues that § 231(a)(3) "reaches a substantial amount of expressive conduct" and is thus overbroad in violation of the First Amendment.   Def.'s Mot. at 20.

### A. **Section 231(a)(3) is not unconstitutionally vague.**

The Court will address McHugh's vagueness challenge to § 231(a)(3) first,[20] and it will begin with his final contention: that the statute lacks a mens rea element.  After all, as McHugh himself acknowledges, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."  Def.'s Mot. at 22 (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982)).  To the Court's knowledge, no court in this Circuit has yet decided whether § 231(a)(3) includes a scienter element, but the Seventh and Eighth Circuits have both held that the statute requires the defendant to have acted with obstructive intent.  See Nat'l Mobilization Comm. to End War in Viet. v. Foran, 411 F.2d 934, 937 (7th Cir. 1969); United States v. Mechanic, 454 F.2d 849, 854 (8th Cir. 1971); United States v. Casper, 541 F.2d 1275, 1276 (8th Cir. 1976) (per curiam).  This Court agrees:  § 231(a)(3) is a specific intent statute, criminalizing only acts performed with the intent to obstruct, impede, or interfere with a law enforcement officer.  Indeed, the government not only concedes but repeatedly argues in favor of this construction of the statute.

---

[20] The government argues that "[a] defendant 'who engages in some conduct that is clearly proscribed . . . cannot complain of the vagueness of the law as applied to the conduct of others.'" Gov't Opp'n at 34 (quoting Holder v. Humanitarian Law Project, 561 U.S. 1, 20 (2010)).  And since McHugh's alleged conduct is "clearly proscribed" by § 231(a)(3), it contends, his vagueness challenge must fail.  But it is far from clear that Holder applies to this case.  In Johnson v. United States, five years after Holder, the Supreme Court denied "that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp," Johnson, 576 U.S. at 602; see U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n, 825 F.3d 674, 735–36 (D.C. Cir. 2016) (noting the apparent tension between Johnson and Holder), and the D.C. Circuit has noted that the Supreme Court itself had previously "engaged with a fair-notice vagueness claim . . . even though the claim was premised on the scope of the law's applicability to hypothetical persons not before the Court," Hodge v. Talkin, 799 F.3d 1145, 1172 (D.C. Cir. 2015).  Given this, the D.C. Circuit has twice declined to decide a vagueness challenge on the grounds that the defendant's conduct was "clearly proscribed" by the challenged statute.  U.S. Telecom Ass'n, 825 F.3d at 736; Hodge, 799 F.3d at 1172–73 (noting that the plaintiff's claims "seemingly come within the rule generally barring the assertion of a Fifth Amendment vagueness claim by someone to whom the challenged statute unambiguously applies" but declining to resolve the challenge on that basis); cf. Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia, 846 F.3d 391, 409–10 (D.C. Cir. 2017) (declining to extend Holder to apply to a different kind of vagueness challenge).  Following the D.C. Circuit's lead, this Court will also address the merits of McHugh's claims rather than short-circuiting his challenge by deciding that § 231(a)(3) "clearly proscribe[d]" his conduct.

See Gov't Opp'n at 35 ("The civil disorder statute punishes only concrete, intentional acts that are performed with the specific purpose to obstruct, impede, or interfere with firefighters or law enforcement." (cleaned up)); accord id. at 34, 36.

The text of § 231 itself points to a requirement of obstructive intent. The provision prohibits only "act[s] to obstruct, impede, or interfere"—the best and most natural interpretation of the word "to" in that phrase is as an indication of purpose: "acts [performed in order] to obstruct." Although it is conceivable that "to" could refer not to the actor's purpose but to the ultimate result of the conduct (e.g., "commit an act accomplishing obstruction"), such a reading would be unnatural at best. Furthermore, if Congress wished only to specify the result of the act, it had many better options for doing so, including by omitting "to" altogether: it simply could have said "whoever obstructs, impedes or interferes." Courts must strive to give effect to every word in a statute no matter how short—in § 231(a)(3), that effort results in the conclusion that the statute includes a scienter requirement.

Even if the provision was truly silent on the question of mens rea, the Court would still construe it to include a scienter requirement. "'[M]ere omission from a criminal enactment of any mention of criminal intent' should not be read 'as dispensing with it,'" and courts should usually interpret "criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." Elonis v. United States, 575 U.S. 723, 734 (2015) (first quoting Morissette v. United States, 342 U.S. 246, 250 (1952); then quoting United States v. X–Citement Video, Inc., 513 U.S. 64, 70 (1994)). The Court agrees with the Seventh Circuit that "[u]nder such phraseology [as in § 231(a)(3)], it will not be presumed that Congress intended strict liability for inadvertent or accidental occurrences where, as here, the crime is grounded on the common law." Foran, 411 F.2d at 937 (citing Morissette, 342 U.S. at 262–63). Thus, the Court

30

concludes that 18 U.S.C. § 231(a)(3) punishes only acts "performed with the specific purpose to 'obstruct, impede, or interfere with' firefighters or law enforcement."  Gov't Opp'n at 35.

McHugh counters that, even with a mens rea element, § 231(a)(3) is still unconstitutional. He argues that reading an intent requirement into the statute "merely leaves police, prosecutors, and judges to decide after the fact whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what)."  Def.'s Mot. at 22–23.  But once again, McHugh mistakes ordinary interpretation of legal language for something sinister.  In reality, § 231(a)(3)'s specific intent requirement cures much of the purported vagueness in the statute.  A law forbidding only acts done with a criminal intent almost by definition gives a potential defendant fair notice of the law's requirements.  See, e.g., Screws, 325 U.S. at 104; Caldwell, 2021 WL 6062718, at *11 ("Defendants cannot complain that [a statute] does not supply fair notice if it is construed to require proof that [they] acted with a specific intent to do what the statute prohibits[.]").

McHugh also objects to the fact that § 231(a)(3)'s scienter requirement does not apply to every element of the crime, thereby "allow[ing] for police officers[] and the government to subjectively determine what does, or does not, constitute improper conduct by a defendant."  Def.'s Reply at 13.  This objection, too, is meritless.  It is well-settled that a defendant charged under § 231(a)(3) need not have known that the victim of his obstructive act was a covered law enforcement officer, Foran, 411 F.2d at 937 & n.7 (citing United States v. Lombardozzi, 335 F.2d 414, 415–16 (2d Cir. 1964), and collecting cases), nor, contrary to McHugh's suggestion, Def.'s Mot. at 19; Def.'s Reply at 13–14, must the government prove that a defendant knew that the civil disorder in question affected interstate commerce.[21]

---

[21] E.g., United States v. Buck, 847 F.3d 267, 276 & n.36 (5th Cir. 2017) ("Courts have routinely held that a criminal defendant need not know of a federal crime's connection to interstate commerce to be found guilty."); see also, e.g., United States v. Rodriguez, 360 F.3d 949, 957 (9th Cir. 2004) (conviction under Hobbs Act, 18 U.S.C. § 1951, did not require defendant "to have been subjectively aware that his actions affect interstate commerce");

Nonetheless, McHugh argues that nearly every operative phrase in the statute—"civil disorder," "incident to," and "obstruct, impede, or interfere"—is still too vague.  See Def.'s Mot. at 18–19; Def.'s Reply at 13–14.  McHugh is wrong.  Even if "civil disorder" on its own were close to the constitutional line, it has a fulsome statutory definition: "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."  18 U.S.C. § 232(1).[22]  And "incident to" likewise has an easily comprehensible meaning.  See, e.g., Incident, Merriam-webster.com Dictionary (last accessed January 31, 2022) ("occurring or likely to occur especially as a minor consequence or accompaniment").  While it may not provide a "clearly articulated nexus between the act and the 'civil disorder,'" Def.'s Mot. at 19–20, "incident to" does create a nexus by requiring that the obstructed officer be operating in relation to rather than merely "during" a civil disorder.[23]  That one can hypothesize close cases does not mean that "incident to" lacks "any ascertainable standard for inclusion and exclusion," Smith v. Goguen, 415 U.S. 566, 578 (1974).

---

United States v. Staszcuk, 517 F.2d 53, 59 (7th Cir. 1975) (en banc) (same); United States v. Garcia-Hernandez, 803 F.3d 994, 997 (8th Cir. 2015) (same for possession of a firearm in violation of 18 U.S.C. § 922(g)(1)).

[22] McHugh acknowledges the existence of this definition but claims it "could apply to virtually any tumultuous public gathering involving more than two people."  Def.'s Mot. at 20.  But to constitute a "civil disorder," the "gathering" must "involve acts of violence" and either cause or "immediate[ly]" threaten bodily injury or property damage.  This is a specific definition that limits the application of "civil disorder" to a small (obviously unlawful) subset of "public gatherings."  Suffice it to say, the Court disagrees that the statute's definition of "civil disorder" describes "virtually any" public gathering, even one that could be described as "tumultuous."

[23] McHugh suggests that "incident to" requires some sort of physical proximity, and that whether an action is "incident to" a civil disorder will depend on how close the actor is to the disorder.  See Def.'s Mot. at 19.  This understanding is not supported by the ordinary meaning or dictionary definitions of the word.  McHugh further misreads the statute as requiring that the defendant's act be "incident to" the disorder.  Id.  On the contrary, "incident to" modifies "performance of [the law enforcement officer's] duties" rather than "act to obstruct, impede or interfere," 18 U.S.C. § 231(a)(3), such that the relevant question is whether the officer's actions were "incident to" the disorder, which certainly was the case here.  See, e.g., Casper, 541 F.2d at 1276 (listing as an element of the crime "[t]hat one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties incident to and during the commission of such civil disorder").

Nor is the phrase "obstruct, impede, or interfere" unconstitutionally vague.  An ordinary person would have an intuitive understanding of what is proscribed by a ban on obstructing, impeding, or interfering with law enforcement.[24]   And the phrase does not "impermissibly require[] individuals to predict how others will react to their conduct" or guess whether a given officer will feel "interfered with."  Def.'s Mot. at 21.  As opposed to words like "annoying," "indecent," or "unreasonable," which condition criminal liability on individualized, subjective judgments, "there are specific fact-based ways to determine whether a defendant's conduct interferes with or impedes others."  Nordean, 2021 WL 6134595, at *16 (internal quotation marks omitted).  In short, none of the phrases McHugh challenges as impermissibly vague "tie[] criminal culpability to . . . wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."  Williams, 553 U.S. at 306.

Running throughout McHugh's briefing is a fundamental—if understandable— misunderstanding of the vagueness doctrine.  There is a crucial difference between reasonable people differing over the meaning of a word and reasonable people differing over its application to a given situation—the latter is perfectly normal, while the former is indicative of constitutional difficulty.  See Williams, 553 U.S. at 306 ("Close cases can be imagined under virtually any statute. . . . What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.").  So while many of the terms in § 231(a)(3) and § 1512(c)(2) may "not mean the same thing to all people, all the time, everywhere" or may "call

---

[24] McHugh points the Court to McCoy v. City of Columbia, 929 F. Supp. 2d 541 (D.S.C. 2013), which invalidated a local ordinance making it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties."  Id. at 546.  But unlike § 231(a)(3), the ordinance at issue in McCoy did not include a scienter requirement, and its use of only two operative verbs ("interfere and molest") prevented interpreters from utilizing the noscitur a sociis canon to give those words "more precise content by the neighboring words with which it is associated," McCoy, 929 F. Supp. 2d at 553 (quoting United States v. Stevens, 559 U.S. 460, 474 (2010)).

for the application of a qualitative standard . . . to real-world conduct," Bronstein, 849 F.3d at

1107–08 (first quoting Roth, 354 U.S. at 491; then quoting Johnson, 576 U.S. at 604), that does

not render them unconstitutional.

At bottom, McHugh's standards for linguistic precision are higher than the Constitution's.

The Due Process Clause accounts for the unavoidable imprecision inherent in all language.  As

James Madison put it:

> [N]o language is so copious as to supply words and phrases for every complex idea,
> or so correct as not to include many equivocally denoting different ideas. Hence it
> must happen that however accurately objects may be discriminated in themselves,
> and however accurately the discrimination may be considered, the definition of
> them may be rendered inaccurate by the inaccuracy of the terms in which it is
> delivered. . . . When the Almighty himself condescends to address mankind in their
> own language, his meaning, luminous as it must be, is rendered dim and doubtful
> by the cloudy medium through which it is communicated.

The Federalist No. 37, at 229 (James Madison) (Clinton Rossiter ed., 1961).  To borrow Madison's

hypothetical, then, even a criminal code written by God could not satisfy McHugh's test for

vagueness.  The Constitution's test is designed for mere mortals, and § 231(a)(3) passes.

**B.  Section 231(a)(3) is not overbroad.**

In addition to his vagueness challenge, McHugh appears to argue that § 231(a)(3) is

overbroad.[25]  Under the First Amendment, "a statute is facially invalid if it prohibits a substantial

amount of protected speech."  Williams, 553 U.S. at 292.  This is so "even if [it] also ha[s]

legitimate application."  City of Houston v. Hill, 482 U.S. 451, 459 (1987).  But "the mere fact

that one can conceive of some impermissible applications of a statute is not sufficient to render it

---

[25] McHugh seems to have made the frequent (and, frankly, understandable) error of conflating the
overbreadth doctrine with the vagueness doctrine.  But "overbreadth and vagueness doctrines are related but distinct":
"[a] vague law denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain
just what will result in sanctions; in contrast, a law that is overbroad may be perfectly clear but impermissibly purport
to penalize protected First Amendment activity."  Hastings v. Jud. Conf. of the U.S., 829 F.2d 91, 105 (D.C. Cir.
1987).  McHugh's repeated references to protected expression and his frequent citation of the Supreme Court's
overbreadth cases suggest to the Court that, in addition to a vagueness argument, McHugh also challenges § 231(a)(3)
for overbreadth.  See Def.'s Mot. at 20.

susceptible to an overbreadth challenge," <u>Members of the City Council of L.A. v. Taxpayers for Vincent</u>, 466 U.S. 789, 800 (1984), and "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech," <u>Virginia v. Hicks</u>, 539 U.S. 113, 124 (2003).

McHugh argues that § 231(a)(3)'s prohibition on "any act" "can include anything from protected free speech and expressive conduct to an egregious assault" and that the statute's broad language "does not weed out those acts with protected expressive content or those that occur in a traditional public forum." Def.'s Mot. at 20. As a consequence, he argues, it "reaches a substantial amount of expressive conduct, and . . . chills free speech." <u>Id.</u> But this exact argument has been heard and rejected by at least five different federal judges all within the last year. <u>See</u> <u>Mostofsky</u>, 2021 WL 6049891, at *8–9; <u>Nordean</u>, 2021 WL 6134595, at *17; <u>United States v. Howard</u>, No. 21-cr-28-pp, 2021 WL 3856290, at *11–12 (E.D. Wis. Aug. 30, 2021); <u>United States v. Phomma</u>, No. 3:20-cr-00465-JO, 2021 WL 4199961, at *4–5 (D. Or. Sept. 15, 2021); <u>United States v. Wood</u>, Crim. A. No. 20-56 MN, 2021 WL 3048448, at *7–8 (D. Del. July 20, 2021). This Court joins them in concluding that § 231(a)(3) is not unconstitutionally overbroad.

First, the plain text of § 231(a)(3) demonstrates that "the statute is directed towards conduct, not speech," <u>Nordean</u>, 2021 WL 6134595, at *17 (quoting <u>Phomma</u>, 2021 WL 4199961, at *5): it prohibits "<u>act[s]</u> to obstruct, impede, or interfere." 18 U.S.C. § 231(a)(3) (emphasis added). Some courts have even suggested that § 231(a)(3) "has no application to speech, but applies only to violent physical acts." <u>Mechanic</u>, 454 F.2d at 852; <u>see also</u> <u>Wood</u>, 2021 WL 3048448, at *7 ("agree[ing] with <u>Mechanic</u> that § 231(a)(3) applies to conduct, not speech," but disagreeing that it applies only to <u>violent</u> conduct). The Court disagrees with so limited a

construction of the statute,[26] but it is nonetheless clear that the core behavior criminalized by § 231(a)(3) is conduct rather than speech.  Although "there could be limited instances in which speaking constitutes the 'act' of interfering with a law-enforcement officer," those instances will be rare.  Mostofsky, 2021 WL 6049891, at *8; see also id. (explaining that "[m]any more potential applications would fall within the 'statute's plainly legitimate sweep,'" since it applies to both violent conduct and non-violent, non-expressive conduct (quoting Hicks, 539 U.S. at 118–19)). Section 231(a)(3) thus does not prohibit a substantial amount of protected speech, and "[t]he fact that there could be a circumstance in which the government could charge someone whose act constituted a form of speech or expression does not render § 231(a)(3) unconstitutional on its face."  Howard, 2021 WL 3856290, at *11; see also Taxpayers for Vincent, 466 U.S. at 800.

Contrary to McHugh's suggestion, see Def.'s Mot. at 20, § 231(a)(3) is not analogous to the ordinance invalidated as overbroad in City of Houston v. Hill, 482 U.S. 451 (1987).  That law forbade "in any manner oppos[ing], molest[ing], abus[ing] or interrupt[ing] any policeman in the execution of his duty," which the Court understood to "prohibit[] verbal interruptions of police officers."  Hill, 482 U.S. at 461.  The ordinance thus "deal[t] not with core criminal conduct, but with speech," id. at 460, and the Court struck it down for "criminaliz[ing] a substantial amount of constitutionally protected speech," id. at 466.  It is obvious that a prohibition on "commit[ting] an act to obstruct, impede or interfere with" law enforcement does not cover anywhere near the amount of protected speech as a law imposing criminal penalties for cutting a police officer off mid-sentence.  To the contrary, and especially in light of § 231(a)(3)'s specific-intent element and

---

[26] In the Court's view, such a reading is neither warranted by the text nor necessary to save the law from unconstitutionality.  See Nordean, 2021 WL 6134595, at *17 n.15 (holding that "there is no basis in the text of the statute for such a limitation [to violent acts]"); Mostofsky, 2021 WL 6049891, at *9 (stating that "the Court need not adopt a limiting construction such that § 231(a)(3) reaches only violent conduct" and "agree[ing] with the district courts outside the Eighth Circuit that such a reading is not required").

its several limitations, there is nothing "alarming" about the breadth of this statute. Def.'s Mot. at 20 (quoting United States v. Stevens, 559 U.S. 460, 474 (2010)). Accordingly, the Court rejects McHugh's First Amendment overbreadth challenge to § 231(a)(3).

### III.   Counts Six, Seven, and Eight: Conduct in a "Restricted Building or Grounds" Under § 1752(a)

McHugh's third and final challenge is to Counts Six, Seven, and Eight of the Superseding Indictment, which allege violations of 18 U.S.C. § 1752(a)(1), (a)(2), and (a)(4) respectively. Section 1752, in relevant part, makes it unlawful to "knowingly enter[] or remain[] in any restricted building or grounds," to "knowingly . . . engage[] in disorderly or disruptive conduct in . . . any restricted building or grounds" with the "intent to impede or disrupt the orderly conduct of Government business," or to "knowingly engage[] in any act of physical violence against any person or property in any restricted building or grounds." 18 U.S.C. § 1752(a)(1), (2), (4).[27] The shared term "restricted building or grounds" is then defined to mean:

> [A]ny posted, cordoned off, or otherwise restricted area--
>
>> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>>
>> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>>
>> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance[.]

18 U.S.C. § 1752(c)(1). The government has charged McHugh (and many other January 6th defendants) with violating § 1752 because then-Vice President Mike Pence, a "person protected

---

[27] Section 1752(b)(1) then establishes that a violation of subsection (a) is a felony punishable by up to ten years imprisonment if the defendant "uses or carries a deadly or dangerous weapon or firearm" "during and in relation to the offense." McHugh is alleged to have used a dangerous weapon during and in relation to two of his offenses and so has been charged under subsection (b)(1).

by the Secret Service," see 18 U.S.C. § 3056(a)(1), was "temporarily visiting" the Capitol during the riot on January 6th.

McHugh argues that Counts Six, Seven, and Eight fail to state an offense because the U.S. Capitol was not a "restricted building or grounds" for purposes of § 1752 on January 6, 2021.  He offers two bases for this conclusion.  First, McHugh argues that only the U.S. Secret Service may create restricted areas under this statute, and because the indictment does not allege that the Secret Service "restrict[ed]" the Capitol on January 6th, McHugh's alleged conduct falls outside the ambit of § 1752.  See id. at 23–26.  Second, he argues that the Vice President was not "temporarily visiting" the Capitol within the terms of § 1752(c)(1)(B).  See id. at 26–28.  The Court will address—and ultimately reject—each of these contentions in turn.

### A.  A "restricted building or grounds" under § 1752 does not need to be established by the Secret Service.

McHugh first contends that only an area which has been restricted by the Secret Service constitutes a "restricted building or grounds" within the meaning of § 1752(c).  See Def.'s Mot. at 23–26.  This argument has been heard and rejected twice by judges in this District, including in a thoughtful and persuasive opinion by Judge McFadden in United States v. Griffin.  See 2021 WL 2778557, at *2–6; see also Omnibus Order [ECF No. 415] at 3–4, United States v. Caldwell, Case No. 21-cr-28 (APM) (D.D.C. Sept. 14, 2021).  This Court agrees with Judge McFadden's analysis and conclusion: an area does not need to be established by the U.S. Secret Service in order to qualify as a "restricted building or grounds" under § 1752(c)(1).

As always, the Court starts with the text, and the text of § 1752 offers no support for McHugh's position.  Section 1752 criminalizes conduct on "any posted, cordoned off, or otherwise restricted area," and put simply, it "says nothing about who must do the restricting," Griffin, 2021 WL 2778557, at *4.  And that fact does not, as McHugh contends, see Def.'s Reply at 14, mean

38

that the provision is ambiguous or unclear.  See Griffin, 2021 WL 2778557, at *4 ("Just because Congress left this part of the statute open-ended does not mean any word or phrase is ambiguous . . . .").  Congress's failure to specify how an area becomes "restricted" just means that the statute does not require any particular method for restricting a building or grounds.

McHugh's only textual argument in favor of his interpretation is that "[s]ince it is the Secret Service who protects the President or 'other person,' it is the Secret Service who must designate the area 'restricted.'"  Def.'s Mot. at 24–25.  But this argument conflates Congress's designation of whose presence can trigger the application of the statute (a "person protected by the Secret Service") with a (hypothetical) designation of who must "restrict" that area.  At most, the statute's reference to the Secret Service suggests an assumption that, as a factual matter, it usually would be the Secret Service who "post[s], cordon[s] off, or otherwise restrict[s]" the area around a protectee.  But the path from this unremarkable assumption to a statutory command that only a cordon set up by the Secret Service is a "restricted building or grounds," is, frankly, unclear.

McHugh also contends that 18 U.S.C. § 3056(e)(1)'s authorization of the Secret Service to "participate . . . in the planning, coordination, and implementation of security operations at special events of national significance" means (1) that only the Secret Service may "designate[]" a "special event of national significance" for purposes of § 1752(c)(1)(C), and (2) that only an area "posted, cordoned off or otherwise restricted" by the Secret Service is a restricted building or ground under § 1752(c)(1)(B).  See Def.'s Mot. at 23–24.  Neither contention is correct.  Neither § 3056 nor § 1752 states that only the Secret Service may designate "special event[s] of national significance";

even if they did, there would be no reason, textual or otherwise, to carry that grant of exclusive authority over to sub-paragraph (c)(1)(B).[28]

In addition to the utter lack of support for his interpretation in the text of the U.S. Code, McHugh's proposed limitation would contravene the statute's manifest purpose: to ensure that federal law criminalizes (and thereby deters) misconduct that may threaten a Secret Service protectee. McHugh's proposed reading—that a protective perimeter implicates § 1752 only if a particular agency set it up—would mean that the exact conduct targeted by the statute is subject to a potentially massive procedural loophole created by silence.[29] Especially given the lack of any textual basis for this conclusion, the Court declines to limit the statute so counter-intuitively. See also Griffin, 2021 WL 2778557, at *6 ("If Congress intended a statute designed to safeguard the President and other Secret Service protectees to hinge on who outlined the safety perimeter around the principal, surely it would have said so."). McHugh's reading also ignores the realities of Secret Service protection. As Judge McFadden observed, the Secret Service "invariably relies on other law enforcement agencies for support," including "the U.S. Park Police who share responsibility for the parklands surrounding the White House; state and local police who assist when protectees travel outside of the District; and the [U.S. Capitol Police] when, as here, the Vice President executes his duties as President of the Senate." Id. at *3 (internal citations omitted).

---

[28] McHugh also argues that § 3056(g) supports his interpretation, see Def.'s Mot. at 24, but he is again mistaken. That sub-section states that the Secret Service must be maintained as a distinct agency and not merged with any other law enforcement agency. It grants no authority—let alone exclusive authority—to do anything.

[29] It is unclear how McHugh imagines his rule would work in practice. Must Secret Service personnel set up the barriers personally? Or can they direct groundskeepers to do so? And must it be Secret Service agents who patrol the restricted perimeter? What if the Secret Service collaborates with another federal agency to outline a protective perimeter, which is then manned by local law enforcement? The Court will not substitute the statute's clear rule focusing on the existence of a restricted area for a vague, atextual rule focusing on who was responsible for the restriction.

Instead of the current text of § 1752, McHugh principally focuses on a prior version of the statute authorizing the Secretary of the Treasury to issue regulations designating certain restricted areas subject to § 1752's prohibitions.  See Def.'s Mot. at 23, 25 n.11.  Even passing over McHugh's misinterpretation of that version of the statute, McHugh fails to reckon with the fact that the language on which he bases his argument is no longer in the statute.  In 2006, Congress deleted all references to the Secretary of the Treasury and to regulations of any kind.  See USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 602, 120 Stat. 192, 252 (2006); see also Griffin, 2021 WL 2778557, at *4.  McHugh's position instead appears to be that, when Congress removes certain language from a statute, the Court should pretend it is still there unless Congress says otherwise.  See Def.'s Reply at 15.  This reverses basic tenets of statutory interpretation.  Repealed statutory language cannot haunt its former provision like some semantic ghost, and "the Court cannot reconstitute provisions that Congress has jettisoned." Griffin, 2021 WL 2778557, at *5.

Finally, McHugh tries to argue that interpreting § 1752 according to its terms will lead to absurd results.  For instance, he claims that "anyone claiming to be a part of law enforcement could post a sign designating an area as restricted and a criminal defendant could then be penalized for trespassing because they 'willfully' ignored the sign." Def.'s Mot. at 25–26.  But there is nothing absurd about criminalizing the breach of any barrier around a Secret Service protectee, and the Court will not create its own atextual absurdity based on a fringe hypothetical that does not even remotely resemble the facts before the Court.  See also Griffin, 2021 WL 2778557, at *6 (describing the "other, more pressing absurdities" created by McHugh's proposed interpretation). The Court therefore rejects McHugh's interpretation of § 1752(c) and holds that an area need not

be "restricted" by the Secret Service in order to constitute a "restricted building or grounds" under 18 U.S.C. § 1752.

### B. Vice President Pence was "temporarily visiting" the Capitol on January 6, 2021.

McHugh's final argument is that the U.S. Capitol was not a "restricted building or grounds" on January 6, 2021, because Vice President Pence was not, in fact, "temporarily visiting" the Capitol.  See Def.'s Mot. at 26–28.  So far as the Court can tell, this argument is novel—no court has ever been asked to interpret the phrase "temporarily visiting" in § 1752(c)(1)(B).   "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."  Perrin v. United States, 444 U.S. 37, 42 (1979).  More particularly, a court's "job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute."  Wisconsin Cent. Ltd. v. United States, 138 S. Ct. 2067, 2070 (2018) (quoting Perrin, 444 U.S. at 42).   And although dictionary definitions are but "brief and acontextual approximations of concepts that are nuanced and context-dependent," consulting a dictionary when interpreting even a run-of-the-mill phrase like "temporarily visiting" can nonetheless "help judges organize their thoughts about the word, check that those thoughts are not idiosyncratic, and even recognize ambiguities that they would otherwise have overlooked."  Caleb Nelson, Statutory Interpretation 126 (2011).  In that spirit, the Court turns to dictionaries roughly contemporary with the original enactment of § 1752 in 1971.

The Oxford English Dictionary defines "temporarily" as "for a time (only); during a limited time," Temporarily, Oxford English Dictionary (2d ed. 1989), and Webster's Third New International Dictionary gives an almost identical definition: "for a brief period: during a limited time: briefly," Temporarily, Webster's Third New International Dictionary Unabridged (1961) ("Webster's Third"); accord Temporary, Black's Law Dictionary (11th ed. 2019) ("Lasting for a

time only; existing or continuing for a limited (usu[ally] short) time; transitory."). To "visit," then, is defined as "to go to see or sojourn at (a place) for a particular purpose (as for business, pleasure, or sight-seeing)," Visit, Webster's Third, while the noun "visit" is either "a short stay . . . that is usu[ally] longer than a social call" or "an extended but temporary stay," Visit (noun), Webster's Third. Synthesizing these definitions, one arrives at a meaning in line with the intuitions of English speakers: someone is "temporarily visiting" a location if they have gone there for a particular purpose, be it "business, pleasure, or sight-seeing," and for a limited time, which could be "brief" or "extended" while nonetheless remaining "temporary."

This definition also accords with judicial interpretations of similar phrases. For instance, a lawful permanent resident is permitted to re-enter the United States after traveling abroad without showing immigration documents "so long as he is returning to an unrelinquished lawful permanent residence after a temporary visit abroad." Mahmoud v. Barr, 981 F.3d 122, 126 (1st Cir. 2020) (emphasis added) (quoting Katebi v. Ashcroft, 396 F.3d 463, 466 (1st Cir. 2005)). The courts of appeals have settled on a definition of "temporary visit abroad" quite similar to the one suggested by the Court's review of dictionaries:

> "[A] permanent resident returns from a temporary visit abroad only when (a) the permanent resident's visit is for a period relatively short, fixed by some early event, or (b) the permanent resident's visit will terminate upon the occurrence of an event having a reasonable possibility of occurring within a short period of time."

Id. (quoting Katebi, 396 F.3d at 466); accord, e.g., Khoshfahm v. Holder, 655 F.3d 1147, 1151 (9th Cir. 2011); Hana v. Gonzales, 400 F.3d 472, 476 (6th Cir. 2005); see also Singh v. Reno, 113 F.3d 1512, 1514 (9th Cir. 1997) (noting that "'[t]emporary' in this context is not merely an antonym of 'permanent'" and giving same definition). These cases thus bolster the Court's conclusion that one can be "temporarily visiting" a place for any reason, so long as the visit is (or is intended to be) "relatively short."

Applying this commonsense definition to Vice President Pence's activities on January 6, 2021, the Court reaches a commonsense conclusion: the Vice President was "temporarily visiting" the Capitol. He woke up at his residence, got ready for the day, and then traveled to the Capitol for the purpose of presiding over the January 6th Certification. He intended to stay there for only a few hours until the certification vote was complete, and when that event occurred in the wee hours of the morning on January 7, he left the Capitol. Put another way, the Vice President went to the Capitol for a particular purpose—in this case, an official business purpose—and stayed there for only a brief time; his sojourn at the Capitol was "for a period relatively short" and set to "terminate upon the occurrence of an event having a reasonable possibility of occurring within a short period of time," namely the completion of the certification vote. He was therefore "temporarily visiting" the Capitol when McHugh's alleged unlawful conduct occurred.

McHugh resists this conclusion by proposing several purported limitations on the ordinary meaning of "temporarily visiting."[30] He argues that Vice President Pence could not "temporarily visit[]" the Capitol because it "is a federal government building in the District of Columbia," Pence's city of residence. Def.'s Mot. at 27. But obviously one can "temporarily visit" the house next door, a neighborhood church, or a restaurant across town—simply being in the visitor's hometown does not mean a place cannot be "visited." McHugh then argues that Vice President Pence did not "temporarily visit" the Capitol because he was there to "carry[] out his sworn official duties." Def.'s Mot. at 27; accord id. at 28 ("[Vice President Pence] was meeting with other government officials in a federal government building . . . as part of fulfilling his official duties as

---

[30] McHugh also purports to rely on case law, claiming that because prior convictions under § 1752 have involved Presidential or Vice Presidential trips to other states in order to speak at political rallies or other such events, only those kinds of events are covered by § 1752(c)(1)(B). See Def.'s Mot. at 27–28. But none of those cases even commented on the meaning of "temporarily visiting" and the mere fact that three prior cases have involved a certain type of "visit" does not mean that the statute only covers that form of "visit."

Vice President/President of the Senate.").  But the definitions discussed above include no such limitation based on a trip's purpose; to the contrary, a "visit" can be for many purposes, including for "business."  See Visit, Webster's Third.  And again, McHugh's argument flies in the face of the ordinary usage of these words.  By his logic, an individual sent to a foreign country for a week on a business trip cannot be described as "temporarily visiting" his destination, nor could a federal appeals court judge who travels to an out-of-town courthouse to hear oral argument—that is, to "meet[] with other government officials in a federal government building . . . as part of fulfilling [her] official duties," Def.'s Mot. at 28—be said to be "temporarily visiting," even if she is only there for a day.  Describing either of these situations as a "temporary visit" would be perfectly natural; hence, McHugh's purported "official duties" exception is unpersuasive.

McHugh makes one final contention that cannot be dismissed out of hand: "[T]he phrase 'temporarily visiting' connotes temporary travel to a location where the person does not normally live or work on a regular basis."  Def.'s Mot at 27.  This exception applies here, McHugh argues, because the Vice President has a permanent office at the Capitol and sometimes must go there (as on January 6, 2021) to serve as President of the Senate—the Capitol thus "was his place of employment," such that he "was not 'visiting' the Capitol Building, he was working there."  Id.  The Court cannot deny that it would be somewhat awkward—though still well within the scope of the definitions discussed above—to describe an ordinary commute from home to one's regular workplace as "temporarily visiting" the office.  More importantly, the Court agrees with McHugh that interpreters should heed the language of the statute and be wary of reading "temporarily visiting" to mean, in effect, "physically present."  See Def.'s Reply at 18.

But the Court need not explore the outer bounds of the phrase "temporarily visiting" any further, because regardless of whether McHugh's normally-live-or-work loophole exists, it does

not apply here.  The U.S. Capitol is not the Vice President's regular workplace, nor was Vice President Pence's trip to the Capitol on January 6, 2021 analogous to a regular commute to the office.  McHugh makes much of the fact that the Vice President has a "permanent office" at the Capitol, see Def.'s Mot. at 27–28; Def.'s Reply at 16, but calling the Vice President's Room at the Capitol her "permanent office" is more than a little misleading.  Although the room was "the only space in the city assigned to the vice president" in the 19th century, the Vice President has had other spaces from which to do his or her job since 1909.  Office of the Senate Curator, The Vice President's Room, S. Pub. 106-7, https://www.senate.gov/artandhistory/art/resources/pdf/Vice_President_s_Room.pdf ("The Vice President's Room").  At present, the Vice President's working office is in the West Wing of the White House, and she also maintains a ceremonial office in the Eisenhower Executive Office Building.  See The Vice President's Residence & Office, https://www.whitehouse.gov/about-the-white-house/the-grounds/the-vice-presidents-residence-office/ (last accessed Jan. 31, 2022).

This state of affairs reflects what anyone with a working knowledge of modern American government intuitively understands: the Vice President is principally an executive officer who spends little time at the Capitol and likely even less in her "office" there.  So although there is a well-appointed room at the Capitol "formally set aside . . . for the vice president's exclusive use," The Vice President's Room at 2, that fact in its proper context does not transform the Capitol into the Vice President's "place of employment."  Even if there is some carveout in § 1752 for where a protectee normally lives or works, it does not apply to Vice President Pence's trip to the Capitol on January 6, 2021.

None of McHugh's arguments about the meaning of "temporarily visiting" sway the Court from the commonsense conclusion, founded on ordinary usage, dictionary definitions, and judicial

interpretations, that Vice President Pence was "temporarily visiting" the Capitol on January 6, 2021.  The Capitol was therefore a "restricted building or grounds" under § 1752(c)(1)(B), and Counts Six, Seven, and Eight of the Superseding Indictment properly state an offense.

## Conclusion

In sum, the Court will deny McHugh's motion to dismiss Counts Two, Five, Six, Seven, and Eight of the Superseding Indictment in full.  The January 6th Certification was an "official proceeding" for purposes of § 1512(c)(2), as it was a formal assembly of the Congress for the purpose of conducting official business and it involved a second entity as an integral component.  Neither § 1512(c)(2) nor § 231(a)(3) is unconstitutionally vague, nor is § 231(a)(3) overbroad in violation of the First Amendment.  And finally, an area may qualify as a "restricted building or grounds" for purposes of § 1752 without being restricted by the Secret Service, and Vice President Pence was indeed "temporarily visiting" the Capitol on January 6, 2021.  McHugh's challenges to the sufficiency of these five counts therefore fail.  An accompanying Order will issue on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>February 1, 2022</u>