```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  21-MJ-436
                                 )  Criminal Action
vs.                              )  No. 21-453
                                 )
SEAN MICHAEL McHUGH,             )  June 25, 2021
                                 )  1:05 p.m.
              Defendant.         )  Washington, D.C.
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

### TRANSCRIPT OF HEARING
#### BEFORE THE HONORABLE BERYL A. HOWELL,
#### UNITED STATES DISTRICT COURT CHIEF JUDGE

***(Parties appearing via videoconference and/or telephonically.)***

**<u>APPEARANCES</u>:**

```
FOR THE UNITED STATES:
                    JACOB STRAIN
                    DOJ-USAO
                    Lrm Atencio, Barbara
                    111 South Main Street
                    Salt Lake City, UT 84111
                    (801) 325-3285
                    Email: jacob.strain@usdoj.gov

FOR THE DEFENDANT:  MARIA JACOB
                    Office of the Federal Public Defender
                    For the District of Columbia
                    625 Indiana Ave, N.W.
                    Washington, DC 20004
                    (202) 208-7500
                    Email: maria_jacob@fd.org


ALSO PRESENT:       JOHN COPES, Pretrial Services


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
```

### *This hearing was held via videoconference and*
### *telephonically and is, therefore, subject to the limitations*
### *associated with the use of technology, static interference, etc.*

```
        Proceedings reported by machine shorthand, transcript
            produced by computer-aided transcription.
```

1          **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Matter before the Court,

3     Magistrate Case No. 21-436, United States of America versus

4     Sean Michael McHugh.

5              Your Honor, for the record, Pretrial Agent John

6     Copes is present via telephone.

7              Counsel, please state your names for the record,

8     starting with the government.

9              MR. STRAIN:  Jacob Strain for the United States.

10             THE COURT:  Good afternoon.

11             MS. JACOB:  Good afternoon, Your Honor.

12    Maria Jacob from the Office of the Federal Public Defender

13    on behalf of Mr. McHugh.

14             THE COURT:  All right.  Good afternoon.

15             Mr. McHugh, are you able to hear and see

16    everything okay?

17             THE DEFENDANT:  Sorry, Your Honor.  We lost you

18    for a second.

19             THE COURT:  Yes.

20             Are you able to see everything well?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Good.  All right.  So this hearing is

23    being held remotely, with counsel and Mr. McHugh

24    participating via videoconference.

25             Mr. McHugh, do you agree, after consultation with

1    your counsel, to participate in this hearing this afternoon

2    using videoconference technology rather than being

3    physically here in the courtroom in Washington, D.C.?

4              THE DEFENDANT:  Yes.  Absolutely, Your Honor.

5    I do.

6              THE COURT:  All right.  I would like to remind

7    anyone listening to this hearing over the public

8    teleconference line that, under my standing order 20-20,

9    recording and rebroadcasting of court proceedings, including

10   those held by videoconference is strictly prohibited.

11             Violation of these prohibitions may result in

12   sanctions, including removal of court-issued media

13   credentials, restricted or denial of entry to future

14   hearings, or other sanctions deemed necessary by the

15   presiding judge.

16             So we're here on the defendant's request or motion

17   for review of the magistrate judge's detention order.  So I

18   would like to begin just by talking about all of the things

19   that I have reviewed in connection with the hearing this

20   afternoon before I turn to the question of public access to

21   the videotapes that have been presented.

22             So I have reviewed, of course, the defendant's

23   motion docketed at ECF 15; the government's response at ECF

24   16; the defendant's reply at ECF 17.  I have also reviewed

25   the transcript of the June 1 -- June -- whatever date that

1    was -- detention hearing before the Eastern District of

2    California magistrate judge, docketed at ECF 15-1; the

3    letters of support submitted by the defendant's girlfriend,

4    and one from the defendant -- mother of defendant's son

5    docketed at ECF 15-2; the three pretrial services reports

6    dated May 28, June 1, and June 14th, 2021; the 12 video

7    exhibits submitted to the Court electronically on June 21,

8    2021; and the government's notice filed -- docketed at

9    ECF 18, filed at the Court's request, describing those

10   exhibits and also noting the government's consent to prompt

11   release of those videotapes.  I've also reviewed the

12   criminal complaint in the case; and the government's notice

13   filed yesterday -- docketed at ECF 19 -- of the

14   D.C. Circuit's affirmance of this Court's pretrial detention

15   order in *U.S. v Quaglin*, which was another case involving

16   charges arising from attack on the Capitol on January 6.

17           So let me just begin.  Ms. Jacob, I have received

18   from the government, as I mentioned -- the government's

19   position that it agrees to the release of the videotape

20   exhibits to the public.

21           Does the defendant have any objection to release

22   of those video clips?

23           MS. JACOB:  No, Your Honor.

24           I have discussed that with Mr. McHugh, and he does

25   consent in this matter to the prompt release of the video

1        exhibits.

2                THE COURT:  Okay.  I will enter a minute order to

3        that effect.

4                All right.  So now let's turn to the substance of

5        your motion, Ms. Jacob.  I will hear from you about anything

6        you would like to tell me to supplement your papers in the

7        case.

8                MS. JACOB:  Thank you, Your Honor.

9                The Bail Reform Act has mandated that detention

10       should be reserved for cases where no conditions or

11       combinations of conditions can assure the safety of the

12       community or the appearance of the defendant.

13               Your Honor, this is not the case that we have

14       here.  The government has not identified a concrete threat

15       that Mr. McHugh poses now that January 6th is over.  Even if

16       the Court --

17               THE COURT:  Well, let me just stop you right there

18       because you do say in your motion that the screenshot that

19       the government provided in the Statement of Facts showing an

20       individual releasing spray into the air does not show what

21       was sprayed or whether the spray, in fact, reached or hurt

22       anyone.  So let me just drill down on that.

23               Are you disputing that Mr. McHugh is the person in

24       the screenshot that's spraying a substance towards the

25       police line?

1          MS. JACOB:  Your Honor, I am not -- the purpose of

2     what I said in the motion was -- basically, I had not

3     received the videos at that point.  And --

4          THE COURT:  Well, now I understand that.  It's an

5     evolving situation.  So -- but I want to be clear in my mind

6     that I am understanding precisely what arguments you are

7     now making as, in these fast-moving cases, I really

8     appreciate it that -- how much information is flowing into

9     the prosecutor's office from investigators in an ongoing

10    investigation, how much they're releasing -- you know, I

11    get it.

12         So I am not asking you to challenge that.  I just

13    want to know, basically, what your position is now so I can

14    understand what is disputed.

15         And after looking at the government's video

16    Exhibit 12, I want to make sure that I understand your

17    argument correctly.  Are you now disputing, having seen the

18    video evidence, that it's Mr. McHugh who is spraying the

19    substance?

20         MS. JACOB:  Your Honor, we don't dispute that that

21    is Mr. McHugh in the photograph.  What we do dispute, after

22    reviewing that video, is that Mr. -- that the officers, as

23    the government claim, turned away or were hit by that spray.

24         THE COURT:  Okay.  Well, let me slow you down for

25    just a second.

1          So you are not disputing it was him who was

2   discharging the spray.

3          Are you disputing that what he was discharging was

4   the bear spray he was carrying around in his holster within

5   arm's reach on his hip?

6          MS. JACOB:  Your Honor, now that the government

7   has provided evidence of the search warrant finding that

8   spray in his residence, I don't have a basis to dispute

9   that; that might have been the spray that he was carrying --

10         THE COURT:  Okay.  So really what you are

11   disputing, to put a fine point on it, is that you dispute

12   whether a finding of dangerousness can be made if there was

13   no actual injury from the defendant discharging the bear

14   spray towards the police line; is that your argument?

15         MS. JACOB:  Yes.  Yes, Your Honor.

16         THE COURT:  Okay.  So that's what I wanted to get

17   to, to focus in on the gravamen of what you are arguing.

18         MS. JACOB:  Yes, Your Honor.

19         THE COURT:  Okay.  So does that mean the defendant

20   is a poor shot when he is spraying bear spray towards a

21   police line, that no finding of dangerousness can be found?

22         MS. JACOB:  No, Your Honor; so that was not what I

23   was suggesting.  I think that in -- taken with his other

24   actions, it appears as though Mr. McHugh did not have much

25   confidence behind the actions that he was taking -- and if I

1    could explain just a little bit.

2         The videos -- the videos that the government

3    provided, they show that he was far away when he took out

4    that bear spray.  He could have easily, when he was right at

5    the front of the line making comments towards the

6    officers -- he could have easily taken out that bear spray

7    at that time and sprayed it directly in -- as many other

8    defendants have been alleged of doing; he did not do that.

9         And, similarly, when he was up at the barricade --

10   you know, attempting to pull back that barricade -- he could

11   have also pulled out the spray and sprayed the officers,

12   however, that's not what he did.  In fact, he backed away

13   immediately at the first sense of resistance that the

14   officer's gave at that barricade, he backed away

15   immediately.  So that attempt at the bear spray when he was

16   in the midst of a crowd -- I don't see that as enough for a

17   finding of dangerousness, especially in light --

18         THE COURT:  And that's because he -- when he had

19   closer opportunities at police -- to use the bear spray and

20   to discharge the bear spray closer to their faces, he didn't

21   do it then.  He waited until --

22         MS. JACOB:  Yes.

23         THE COURT:  He waited until it looked like he

24   had -- he was a little bit further away from the police

25   officers to do that.

1          MS. JACOB:  Yes.  Yes, Your Honor.

2          THE COURT:  And so that should make him less

3   dangerous?

4          MS. JACOB:  It should make him less dangerous

5   because it shows that when taken with all of the actions

6   that day -- especially the fact that he did not go into the

7   Capitol Building -- shows, in his heart of hearts, he knew

8   that this was serious and he was not going to be actually

9   trying to injure officers and actually trying to enter the

10   Capitol.

11          THE COURT:  Well, isn't another interpretation of

12   that is that he is not stupid so he didn't pull out bear

13   spray and point it at the police officers when he was in

14   arm's reach of the police officers because they might have

15   reacted quite strongly to him then, when he was within reach

16   of the line of police officers, and waited until he was

17   further away and outside -- further outside the arm's reach

18   of the police for an easier getaway before he discharged the

19   canister of bear spray?

20          MS. JACOB:  I understand what the Court is

21   trying to say.  And I think, you know, Mr. McHugh -- it's

22   interesting that he -- the positioning in the crowd where he

23   was.  He wasn't trying to gain entry to anything.  He was in

24   the midst of a crowd, and the officers were walking away;

25   and there seemed to be really no identified purpose of

1      spraying into the crowd at that point.

2              So I understand that he could have -- the Court is

3      correct in saying that he was closer to the officers; and

4      the officers might have been able to react and detain him,

5      for example.  However -- when looking at a finding of

6      dangerousness, there's many other defendants, who despite

7      that, Your Honor, still -- still took the risk and did come

8      very close to officers, physically contacted them; hit them

9      directly with their closed fists or skateboards or pushed

10     their way through shields.  Mr. McHugh didn't do any of

11     those actions, and so I don't know --

12             THE COURT:  Well, you mentioned him shaking the

13     scaffolding and saying that even though he was shaking the

14     scaffolding -- appearing, from the video, to try and get

15     in -- under the scaffolding to get into the doors underneath

16     the scaffolding in the west terrace; but he was -- he was --

17     there was another member of the mob there that was sort of

18     trying to deescalate that situation, wasn't there?

19             There seemed to be another person pushing him away

20     from the barricade.  So he didn't have a crowd with him

21     helping to encourage him to push harder.

22             MS. JACOB:  That's correct, Your Honor.  There

23     wasn't a crowd helping him at that point --

24             THE COURT:  And, in fact, there was somebody from

25     the mob trying to stop him from his escalating the

1    confrontation with the police at the barricade.

2            MS. JACOB:  Your Honor, I did review the video.

3    And, I apologize, I don't know that I -- perhaps I missed

4    that particular part and assumed it was an officer.

5            However, what's important here is that he backed

6    down immediately, and that he didn't push his way through

7    like many other defendants did.  So I think that's the

8    important point, that he backed down.  He didn't fight back;

9    he didn't use his fists.  He didn't push through.  He didn't

10   use other objects; he uses the bear spray.

11           THE COURT:  Okay.  Well, let's talk about an

12   object beyond the bear spray being targeted at the police

13   line.

14           The defendant -- in your motion, you dispute the

15   government's characterization of defendant -- the incident

16   involving that really huge sign with big metal poles that

17   was rammed into the police line -- breaking up the line,

18   actually.  It was a successful effort to break up the police

19   line at that point, with the mob pushing that huge sign.

20   And the government characterizes -- describes that as

21   ramming the metal -- the sign with the large metal pole into

22   the police line.  And the defendant argues that, instead,

23   all the defendant was doing was grabbing the pole from the

24   bottom, and not towards the officers.

25           So could you just tell me how you interpret that

1    video?  I think it's video Exhibit 9 where the defendant is

2    holding onto the pole and yelling to the other people

3    ramming -- I don't know what other word -- pushing that huge

4    sign with the poles into the police line when he is

5    saying -- you can hear him say, "Yeah, bitch, put it there,"

6    "put it up there" -- basically, encouraging and, also,

7    seemingly giving directions about where to put the sign.

8            So how do you describe that?

9            MS. JACOB:  Yes, Your Honor.

10           So I think this is another attempt Mr. McHugh is

11   making to sort of follow the crowd.  You can see the sign

12   being pushed from far back, far away from where Mr. McHugh

13   is standing.  So the effort has already been initiated, and

14   it's being escalated by other individuals in the crowd to

15   hold the sign, pushing that sign forward.  And Mr. McHugh is

16   joining the crowd.  He is not the leader.  Although he is

17   saying things, so is everybody else; no one is really taking

18   direction from him.

19           You can see him kind of grab the pole at the

20   bottom of the sign; and then he kind of gets pushed away by

21   the crowd, and that's the end of that.  He doesn't come

22   back, and he doesn't do it again.  So that is another

23   example -- and I direct the Court to this in my motion.

24           I characterize the videos of him trying to follow

25   the crowd; he is not a leader, as the government has

1    suggested.  He is saying things, yes.  He is very much -- he

2    very much regrets saying those things, but he is not --

3    nobody is taking direction from him.  He is not the same

4    kind of leader that is seen in the crowd; people using their

5    body language and screaming, jumping up and down.  He is

6    sort of a little bit to the back and just kind of joining in

7    the common phrases that everybody is saying; so I don't

8    agree with the characterization of the government.

9         THE COURT:  And he was saying -- giving the

10   encouragement about the sign, "Yeah, bitch," "put it up

11   there"; "put it up there," directions of where to push the

12   sign.  He was using his bullhorn at the time, right?

13        MS. JACOB:  Yes.  The megaphone that he had, yes,

14   Your Honor.  The megaphone -- a lot of other people had

15   megaphones; it doesn't make it right.  It does not make it

16   right at all.  He is one of many.  And I think the important

17   thing is that although he had a lot of things -- a lot of

18   things that he said he regrets, he decided -- he could have

19   easily gone into the Capitol after the line was breached and

20   he did not do that.  He realized that what he was doing was

21   wrong, and he left.  I think that that is the single most

22   important thing when finding whether or not there is an

23   articulable danger to the community:  He left; he did not

24   continue.  He did not injure anybody, and he clearly was not

25   a leader.  He was not wearing tactical gear or gas masks or

1    body armor --

2              THE COURT:  Okay.  Let me just -- he wasn't -- you

3    know, you've stressed in your motion that he wasn't a member

4    of the Proud Boys or the Oath Keepers or another

5    organization as part of your argument that he didn't take a

6    leadership role, and he wasn't -- he doesn't pose a danger

7    of being part of an organized group to attack the Capitol.

8              But he did travel to D.C. with two other people

9    and he paid for not only his own travel but the travel of

10   two other people, is that right, to D.C.?

11             MS. JACOB:  Yes, Your Honor.

12             I think -- but it appears as though the initial

13   desire was to attend the rally.  And so there is no evidence

14   that there was any preplanning made to actually storm the

15   Capitol; and so that's the most important point that I feel

16   is necessary for the determination of whether there is

17   evidence of preplanning.

18             THE COURT:  And of the two people he went with,

19   one was not his girlfriend who submitted a letter?

20             MS. JACOB:  Correct.  Was not his girlfriend, Your

21   Honor.

22             THE COURT:  Was it his mother who his girlfriend

23   says shares Mr. McHugh's political views?

24             MS. JACOB:  Your Honor, that, I am not exactly

25   sure of.  I haven't received the government's evidence

1    regarding that particular -- the people who went with him.

2    But what I can tell the Court is that in the videos -- he

3    seems to be solo; and so I don't know where these other

4    people were at the time.

5            THE COURT:  Right.  Well, I mean, de facto

6    leadership, even if you are not part of an organization, is

7    one of the factors that I have cited in my *Chrestman*

8    decision.  The Circuit, in *Munchel,* talked about people who

9    were helping to organize the attack on the Capitol and

10   engage in violence that day.

11           I look at these videos and, you know, I see the

12   defendant not only making his way all the way to the front

13   of the mob -- and there was a huge crowd there, lots of

14   people; you had to work at it to get to the front of that

15   crowd.  And then, when he got there, he used his megaphone

16   and, at one point, had the whole crowd doing responsive

17   shouting with him of, "Whose house?" -- the crowd saying

18   "Our house" -- really getting this crowd all to work

19   together; and a mob that's all working together is

20   dangerous.  In fact, it was successful in the attack on the

21   Capitol; they broke in, they got through the police lines.

22           So why isn't that instance of him using the

23   megaphone riling up this crowd so much so, so listened to

24   that he had them responding to him -- why isn't that

25   de facto leadership?

 1                MS. JACOB:  Your Honor, because there were many

 2      people doing the same thing.  And now, at this point in

 3      time, I have watched a lot of that body-worn camera footage

 4      from many cases; and it was not difficult to get responses

 5      from people who were already riled up.  It wasn't as though

 6      these people were responding, you know, just to Mr. McHugh.

 7      Anybody who would shout anything there was a response to.

 8                And so I understand --

 9                THE COURT:  So putting aside the response, he also

10      said things like, "Come on you guys," "Come on you guys,"

11      "Bring it in," and "Let's go," with his megaphone --

12      encouraging the crowd to advance on the police.  Why isn't

13      that exercising a form of de facto leadership of this mob,

14      rather than being just somebody who was hanging out and got

15      caught up in the mob?  This was a guy who was using his

16      megaphone for a good purpose, in his mind, right?

17                MS. JACOB:  Your Honor, I would stress that there

18      were other individuals around him who were being much more

19      aggressive and loud and intimidating.  And it doesn't appear

20      from the videos that the crowd even knew that Mr. McHugh --

21      besides responding to those common chants that everybody was

22      chanting, it didn't appear as though Mr. McHugh was of any

23      importance or anybody was following him; that anybody was

24      seriously taking direction from him.  That's just what I

25      would stress because there were so many people shouting the

 1        same thing.

 2             I understand that takes him out of -- into a

 3        different category from others who were not saying anything

 4        at all, but I do not think that that justifies a finding of

 5        danger because his words ultimately led to no action.  He

 6        did not go in.

 7             THE COURT:  So the defendant makes a statement in

 8        the motion that there is no evidence the spray used by

 9        defendant was dangerous; and this may have been before you

10        saw the warrant return where they found the bear spray --

11        located two bottles of the bear spray in the execution of

12        the search warrant of Mr. McHugh's house.

13             So is the defendant disputing that bear spray is a

14        dangerous weapon for purposes of Section 111(b)(1) or

15        1752(b)(1)?

16             MS. JACOB:  Your Honor, I understand the recent

17        decision that came down from the D.C. Circuit, and I know

18        the Court is bound by that.  So just for the record, I do

19        not concede that; however, that is just for the record.

20             I think I would just stress that even if the Court

21        agrees that it is a dangerous weapon, I do think that it's a

22        factor to be considered among many.  But I also think that

23        in -- taken with the totality of the circumstances that day

24        and Mr. McHugh's actions and his inactions -- I do not think

25        that there is a clear and articulable danger.

1          Your Honor, even if the Court is concerned, the

2     Court has the ability, through conditions, to disable any

3     potential threat.  And so I suggested conditions --

4          THE COURT:  Well, I think -- we haven't really

5     gotten into some of the other factors and dangerousness that

6     I wanted to talk about.  And that -- and let me just say

7     that, you know, based on the bear spray that the government

8     seized from the defendant's apartment, it has on the label

9     that -- a warning of irreversible eye damage if sprayed in

10    the eye, and it is a hazard to humans.  So I don't think

11    there's much dispute that the bear spray qualifies as an

12    inherently dangerous -- as a dangerous weapon under the

13    applicable statutes.

14         But before we talk about conditions that you may

15    suggest, one important consideration for any judge

16    considering the in-out decision, detention release decision,

17    is criminal history.

18         And correct me if I'm wrong but, from my reading

19    of the different pieces of the pretrial services report, and

20    it comes in three -- it's been updated twice from the

21    original one; he has, by my count, ten convictions dating

22    from 2006 through 2018.  One in 2006 for a vehicle theft,

23    and driving with a suspended license; one in 2007 for petty

24    theft, receiving stolen, and obstruction of an officer after

25    a failure to appear; one in January 2010 for battery

1    domestic violence, which resulted also in a failure to

2    appear in 2010; and a more recent failure to comply, I

3    believe.

4           The fourth one is a September 2010 conviction for

5    DUI and obstruction of a public officer after a failure to

6    appear, and three probation violations in a two-year period.

7           The fifth one is a September 2010 conviction when

8    he was 23.  And it looks like a conviction -- it looks like

9    a statutory sex crime because -- contribution to the

10   delinquency of a minor -- that was in 2010; and that

11   resulted in multiple probation violations, including one in

12   2014.

13          The sixth is an October 2010 conviction of a DUI

14   and refusing a test, which resulted in probation violations

15   leading to reinstatement of a probationary sentence.

16          And then seven is a June 2011 conviction of

17   vandalism and trespass, which also led to two probation

18   violations in 2013 and 2014.

19          A March 2014 conviction of entering a

20   noncommercial dwelling; I am not sure what that is.

21          A March 2014 DUI conviction, which also resulted

22   in a probation revocation and a short jail term.

23          And then a December 2018 conviction of driving

24   with a suspended license and another DUI.

25          So am I right that those are the ten convictions

1    that he has on his record, putting aside all of the other

2    arrests on his record?

3              MS. JACOB:  Yes, Your Honor.  That is how I read

4    the pretrial report as well.

5              THE COURT:  Okay.  So, in addition to that, he has

6    been arrested about 11 times in the last ten years for a

7    variety of other offenses.

8              And let me just say that what is most troubling --

9    any criminal offense is, to me, something to pay attention

10   to.  But for purposes of the detention release decision, one

11   wants to know whether a defendant has been successful on

12   supervision before or not; and that's reflective of respect

13   for court orders that would be imposed to protect the safety

14   of the community and deter criminal conduct by the

15   defendant.  And when I see a number of failures to appear,

16   failures to comply, probation violations, I think you can

17   appreciate that that gives some pause, just as it did to the

18   Eastern District of California magistrate judge who cited

19   that also as one of the reasons for a finding of detention.

20             So I want to give you an opportunity -- I will

21   sort of put my cards on the table, I find it very

22   troubling -- to let you make any arguments you want that

23   could persuade me that that -- that criminal history is so

24   troubling that the government seeking detention, basically,

25   due to risk of flight, which is also nonappearance, and not

1   appearing in court when required is warranted and justified

2   here.

3          MS. JACOB:  Your Honor, what I would say is that

4   that is why -- that is precisely why Mr. McHugh is not

5   asking the Court to simply release him into the community.

6   He is actually asking and recognizing that he is not done

7   with his rehabilitation.  He needs assistance, he needs

8   supervision.

9          He has come a long way, Your Honor, from the

10  person he was ten years ago.  Most of those misdemeanor

11  convictions are very old.

12         And, yes, he has had some failures to appear,

13  failures to comply; but if the Court also considers what

14  he's done in the past several years to rehabilitate himself,

15  it's very promising.  He's obtained employment, which is

16  something -- he didn't have steady employment before.  He is

17  taking his classes.  In fact, a probation officer in one of

18  the pretrial reports reported that he was almost done, had

19  one class left to take.  He also has --

20         THE COURT:  Yes.  But let me just pause you on

21  that because, you know, as of February 21 he was

22  completing -- in the process of completing the classes

23  required to close that case.  And when I wanted to find out

24  what was that case, it was a charge from 2010 -- a decade.

25  So does that mean that he was out of compliance with a court

1    order from 2010 for almost a decade?

2         MS. JACOB:  Your Honor, I do believe that.  But

3    it's actually Mr. McHugh -- because he even made an effort

4    in the past few months to get back on track.  He is the one

5    who actually reached out and started that process going to

6    get that class.  He has been completing those classes; so I

7    do think that's commendable.  It does -- I think it's

8    important that it relates to a more than ten-year old

9    conviction; this isn't something recent -- completing.  And

10   he took it upon himself to get into compliance.

11        So I think that's important.  He has been taking

12   classes.  He has been doing treatment.  He has been honest

13   with his probation officer about his alcohol abuse.  And he

14   has reconnected with his son, which was a huge source of

15   contention for many years, and he has finally built a

16   relationship with him.  He has finally provided financial

17   support for him, along with his girlfriend and her son who

18   he considers as his own.  He has a steady residence, a

19   supportive family.

20        So, Your Honor, he is asking for treatment; so

21   that's why I would recommend that the Court consider

22   inpatient drug treatment.  There is a bed available, if the

23   Court releases him, on Monday, June 28.  It is a long

24   program, it's a 90-day program.  So if the Court has any

25   concerns, the Court could perhaps try to see how he does

1       with his treatment.  And that will inform the Court -- maybe

2       perhaps we can set a status hearing in 30 days, 60 days --

3       that will inform the Court about how serious he is about

4       abiding by --

5               THE COURT:  Well, let me just ask you a couple of

6       other questions.  Because of his DUIs, does Mr. McHugh have

7       an operational driver's license?

8               MS. JACOB:  No.  He does not, Your Honor.

9               THE COURT:  And before his arrest the FBI was

10      conducting surveillance on him.  And, as I understand it,

11      they saw him in the days leading up to his arrest, which was

12      the end of May, driving to and from his residence multiple

13      times.  So has he been driving without a license?  And for

14      what period of time?

15              MS. JACOB:  Your Honor, I did read that.  And I

16      just don't think there is enough information, especially in

17      light of the fact that he was not violated for that.  So I

18      just don't think there is enough information on the record

19      to really know whether or not that happened or what the

20      circumstances were.  I think the important fact is that he

21      was not violated on that.  And, Your Honor --

22              THE COURT:  Well, I mean, I think, if he doesn't

23      have a driver's license because of his record of DUIs -- I

24      can imagine that might be the case.  And even when the FBI

25      was conducting surveillance, he was just driving illegally

1   without a license -- not complying with, you know, the most

2   basic of all rules.

3           I appreciate that you're suggesting that his

4   girlfriend serve as a third-party custodian.  And I know the

5   magistrate judge in California had some concern about

6   Ms. Hunt being an appropriate custodian given the fact that

7   she has a felony conviction in her record.  And beyond that,

8   she, in her interview with pretrial services, initially

9   misrepresented her own criminal history saying, first, that

10  she had never been arrested; and then, only upon learning

11  the agency would do a background check, admitted that she

12  had been arrested for fraud.

13          So I have read Ms. Hunt's letter.  And, you know,

14  it's very commendable; she's made enormous progress in her

15  life to get herself up on her feet.  But usually people

16  convicted of fraud who also have an instance of lying to

17  pretrial services when interviewed are not particularly

18  viewed as appropriate third-party custodians.

19          Do you want to address that concern?

20          MS. JACOB:  Yes, Your Honor.

21          In speaking with Ms. Hunt, it was clear to me that

22  she was not trying to lie to probation, that she simply had

23  a moment of lapse where she didn't quite understand -- she

24  wasn't detained -- she wasn't detained pending trial; so, in

25  her mind, she was a little bit confused by the question.

1    However, Your Honor, I do understand that concern.

2            She did eventually say that she had a conviction.

3    It happened a long time ago, and she's moved on from that.

4    And she is the reason why Mr. McHugh has changed over the

5    past several years.  So I do think her living with him,

6    having the opportunity to supervise him, having been that

7    good influence on him -- she was the one that tried to stop

8    him from going to D.C.; I think that shows that she will

9    keep him in line.  And --

10           THE COURT:  Well, why do you think that?

11    Because -- I mean, it's very interesting because, in her

12    letter, she talks about how Mr. McHugh was consumed --

13    that's her word -- by his political beliefs; and in her

14    view -- and I quote her again:  Way too emotionally involved

15    in wanting to go to D.C. because of his political beliefs.

16           She counseled him against it, advised him not to

17    go, that he had better things to do with his time.  And she

18    had no control over him; he went anyway, and now sits before

19    us in a federal court facing serious charges.  So she

20    didn't -- he didn't listen to her before, so why is he going

21    to listen to her now?

22           MS. JACOB:  Because he has disengaged from those

23    political emotions and beliefs.  He does not want anything

24    to do with politics and wishes to focus on his career and

25    his family.  He is regretful of going to D.C.  If he had the

1    chance to do it all over again, he would not dream of it.

2         So, Your Honor, Ms. Hunt -- although she couldn't

3    physically stop him from going, she would have the

4    responsibility in the future to notify the Court if he did

5    violate any conditions.  And I think that's --

6         THE COURT:  What's interesting is -- I mean, it

7    doesn't -- you have to understand, her letter doesn't

8    instill much confidence that she's -- she was unsuccessful

9    before.  I mean -- and I appreciate that, you know, in your

10   papers you argue that his conduct on January 6 -- and I

11   quote you, the briefing -- was a one-off, with the

12   explanation that the defendant was encouraged by the

13   then-President of the United States to engage in the

14   behavior he did.  And you say there is little likelihood of

15   such an occurrence again, but you just have to look at the

16   news.

17        I mean, just yesterday the former President,

18   according to news reports from what I've read -- he

19   continues to speak out and claim that the 2020 presidential

20   election was rigged in some way or stolen in some way.  So

21   given the fact that the former President who was part of the

22   inspiration, I guess, for Mr. McHugh coming to D.C. to

23   attack the Capitol and stop a constitutionally mandated

24   process, what's the basis for which you can say there is

25   little likelihood of such an occurrence again when the

 1    former President is still out there talking; the same stuff

 2    he was talking at the rally.

 3              Is this just wishful thinking on your part or -- I

 4    mean --

 5              MS. JACOB:  But also -- (speakers overlapping.)

 6              THE COURT:  -- why is there a likelihood that such

 7    an occurrence will not happen again?

 8              MS. JACOB:  I think because he was the President

 9    at the time, Your Honor; and now that there has been a

10    transition of power, there is a difference.

11              But more than that, Your Honor, I do think that

12    there was a unique set of circumstances surrounding that

13    rally and the words that he said while he was at the rally

14    saying that we were going to go to the Capitol together and

15    everybody thought that that's what -- he was going to go

16    with them.  So I think it was a very unique set of

17    circumstances.

18              And most importantly, Your Honor --

19              THE COURT:  Well, the former President never told

20    him to spray police officers with bear spray.  I am sure he

21    never said that; that was all on Mr. McHugh.

22              MS. JACOB:  That is true, Your Honor.

23              And I think that the most important thing is that

24    the Court can set a condition that he not travel and that he

25    has GPS monitoring.  And I believe that that will alleviate

1    the Court's concerns about his movements and his ability to

2    carry out any other actions or go to any other planned

3    protests that may exist in the future.  But I do think that

4    January 6th was a very, very unique set of circumstances

5    that were present, Your Honor.

6         THE COURT:  Okay.  Is there anything else you want

7    to present before I turn to hear from the government?

8         MS. JACOB:  Your Honor, just that -- if the Court

9    feels that this is even a close call, I believe it should

10   err on the side of caution in favor of Mr. McHugh.  And I

11   think he has shown he can rehabilitate.  He has made

12   improvements.  And based on those reasons, Your Honor, I

13   would ask the Court to set stringent conditions including

14   (indiscernible) --

15        THE COURT:  Well, I am confident -- because I have

16   seen it many times before -- this has been a wake-up call.

17   Being brought before a federal judge on federal criminal

18   charges, this is a wake-up call.  But he has had many years

19   of an extensive criminal history and notably failing to

20   appear or comply with court orders, violations of probation.

21        And this was not an incident that happened even a

22   year ago; this is fresh in the minds of the American people,

23   January 6, 2021.  So this defendant has had a huge

24   turnaround in just a few short months -- it does strain

25   credulity a bit, even with the wake-up call of being hauled

1    into federal court.

2            I am going to turn now to the government.

3            So, in the search of the defendant's home, did the

4    government recover the bullhorn or megaphone -- or whatever

5    you want to call it -- or any of the articles he wore on

6    January 6th, or just the bear spray?

7            MR. STRAIN:  Your Honor, we recovered the

8    megaphone; the hat he was wearing; the shirt he was wearing;

9    the pants he was wearing; the shoes he was wearing; the

10   holster for the bear spray; and the megaphone -- if I

11   haven't already said that.

12           THE COURT:  All right.

13           MR. STRAIN:  And I apologize, Your Honor.  We also

14   recovered the green backpack that he is seen in the videos

15   with.

16           THE COURT:  Okay.  And is it the government's

17   position that not only the bear spray but also the large

18   metal sign amounted to dangerous weapons and how they were

19   used on January 6th?

20           MR. STRAIN:  That's correct, Judge.  That is our

21   position.

22           THE COURT:  All right.  And the government moves

23   for detention under Section 3142(f)(1)(A).  There is a

24   Section 111(b) charge; and, also, under Section

25   3142(f)(2)(A); and, also, under 3142(f)(2)(B), which relates

```
 1          to obstruction.

 2                   And I don't think you raised the obstruction basis

 3          for detention before the magistrate judge; is that right?

 4                   MR. STRAIN:  I believe that is correct, Judge.

 5                   THE COURT:  But that's a new one here, a new basis

 6          here.

 7                   Do I understand that correctly?

 8                   MR. STRAIN:  That's correct.  Yes.

 9                   THE COURT:  So I just wanted to find out was there

10          something -- was there new information that came to you that

11          you have now added 3142(f)(2)(B) relating to obstruction for

12          the argument in front of this Court?

13                   MR. STRAIN:  No, Your Honor.  It was probably

14          just -- I would guess that the reason why the AUSA in

15          California did not request detention under that basis is

16          because she felt that she had stronger bases under the other

17          options --

18                   THE COURT:  And what is the basis for asserting

19          obstruction?

20                   MR. STRAIN:  Well, Mr. McHugh is charged with an

21          obstruction offense, obstruction of the certification of the

22          Electoral College -- the Electoral College votes.  And the

23          basis essentially --

24                   THE COURT:  That's what I was -- that is what I

25          thought you were going to answer; that since he is charged
```

1    with obstructing law enforcement during a civil disorder

2    under Section 231(a)(3) and, also, obstruction of Congress

3    under 1512(c)(2), it just seemed natural to say he should be

4    detained under the obstruction prong of 3142(f)(2).  But if

5    that were a basis for detention, wouldn't all the members of

6    the mob on January 6th be subject to detention?

7              MR. STRAIN:  Potentially, yes; but realistically,

8    no.  So I would just say of the three prongs that's probably

9    the weakest of our arguments.

10             THE COURT:  I see.  Okay.  I have had a number of

11   these cases where there has been sort of very traditional

12   obstructionist conduct, hiding evidence, destroying

13   evidence, et cetera -- threats; so I just wanted to make

14   sure that something had not evolved since the magistrate

15   judge hearing in this case that would warrant that

16   additional basis for detention.

17             So has the government identified the people that

18   Mr. McHugh traveled with to Washington, D.C., and paid for

19   their trip?

20             MR. STRAIN:  Yes, we have.

21             THE COURT:  And who are they?

22             MR. STRAIN:  Your Honor, I am happy to answer that

23   question in a sealed hearing.  The investigation against

24   those individuals is ongoing.

25             THE COURT:  Okay.  No, that's all right.

1          And does the government contend that any of the

2     defendant's prior convictions are for violent crimes?  And,

3     if so, which ones?

4          MR. STRAIN:  Your Honor, I would characterize

5     Mr. McHugh's past criminal history as violent.

6          And maybe I am taking a broad definition of what

7     "violence" means; but I would consider convictions for

8     vandalism, destruction of private property, domestic

9     violence, resisting arrest -- even rape; all of those are

10    violent crimes -- at least that's how I would characterize

11    them.  So I do believe Mr. McHugh is a violent criminal.

12         THE COURT:  And the defendant proposes conditions

13    of release that would include no travel, no use of social

14    media, GPS monitoring, and other conditions.

15         Do you know whether any of those conditions that

16    are suggested have been imposed on Mr. McHugh before without

17    success, since he does have a number of violations of both

18    pretrial release and probation violations?

19         MR. STRAIN:  Your Honor, unfortunately, I do not

20    have the answer to that question.

21         I did reach out to Sacramento County and tried to

22    find out what the exact conditions were Mr. McHugh was on

23    when he went to the Capitol; they never called me back.

24         THE COURT:  I see.

25         MR. STRAIN:  I have left multiple messages, sent

1    some emails; I did not get a response.

2              THE COURT:  I see.  So the government also

3    included an undated Facebook photo of Mr. McHugh holding a

4    firearm.  What am I supposed to make of that picture?

5              MR. STRAIN:  The government concedes that that

6    photograph is of limited evidentiary value for purposes of

7    our detention hearing.

8              Essentially, I included it in the papers because

9    it was one of the only things that was public on

10   Mr. McHugh's Facebook page that we were able to extract

11   before it went down.  I think it might have gone down now; I

12   am not sure.

13             But we have preserved the Facebook page; and I

14   think we are awaiting the warrant return to do a deeper dive

15   into exactly what he was posting on Facebook.  But,

16   essentially, it shows Mr. McHugh with the firearm.

17             There was a period of time when Mr. McHugh was a

18   prohibited person.  It appears that California does allow

19   felonies to be reduced to misdemeanors and even be

20   dismissed, removed from the record; so it's possible that he

21   was a prohibited person when that picture was taken, I don't

22   know.  But I included it because it was on his Facebook

23   page, and that was the section I was talking about, sort of

24   the Facebook page.

25             THE COURT:  And is there anything else that -- any

1    other arguments you want to make in connection -- to

2    supplement the papers you have already submitted in the

3    case?

4              MR. STRAIN:  Your Honor, before I forget --

5    before I forget, I would like to move to admit all of the

6    government exhibits into evidence -- not only the 12 video

7    exhibits but, also, the photographs that are in the

8    government's response.

9              THE COURT:  Is there any objection?

10              MS. JACOB:  Your Honor, not to the video exhibits

11    or the still shots that were provided in the government's

12    response.  However, I do object to the video -- I'm sorry --

13    the photograph of the firearm because there is absolutely no

14    foundation for when it was taken, where it was taken; so I

15    would object to that, that particular photograph.

16              THE COURT:  All right.

17              MR. STRAIN:  Your Honor --

18              THE COURT:  All of the exhibits are going to be

19    introduced.  I have already seen the picture with the

20    firearm.  I didn't understand that it had any evidentiary

21    basis, and I am not going to be relying on that anyway.  I

22    will admit it; it is in the record.

23              Anything further from the government?

24              MR. STRAIN:  No, Your Honor.  Thank you.

25              THE COURT:  All right.  Ms. Jacob, anything else

```
 1    that you want to add before I rule?

 2              MS. JACOB:  Yes, Your Honor.

 3              The last thing I wanted to say -- that I forgot to

 4    point out is that Mr. McHugh did not resist arrest in the

 5    instance matter.  He cooperated; he did not conceal

 6    evidence.  And there was no evidence that he was involved in

 7    politics or any other further discussions regarding --

 8    surrounding politics, or his involvement on January 6th

 9    after January 6.

10              THE COURT:  After what?

11              MS. JACOB:  I'm sorry, Your Honor.  That was a

12    confusing way to phrase it.

13              What I am trying to say is that after January 6th,

14    when he returned home for the last several months, there was

15    no evidence that the government provided that he was engaged

16    in any further discussion of politics.  He had not concealed

17    evidence.  They found everything in his residence, and he

18    was cooperative with his arrest.

19              THE COURT:  All right.  Well, I think, as the

20    government says, their investigation is still continuing.

21    The Facebook account was taken down; so who knows what

22    they're going to find, in terms of post January 6th

23    information on the -- from the -- from Facebook.  But I take

24    your point, there is nothing in the record right now.

25              MS. JACOB:  Thank you, Your Honor.
```

1          THE COURT:  All right.  Anything further?

2          MR. STRAIN:  Your Honor, I do have the FBI agents

3     standing by in the waiting room.  If you have any questions

4     for them, they're available to testify if you would like.

5     Especially with the surveillance that was conducted, they're

6     ready to testify that Mr. McHugh was seen driving a vehicle

7     many times leading up to his arrests.  If, for any reason,

8     the Court wanted to speak to them, I just wanted to make

9     that available.

10          THE COURT:  Okay.  Thank you.

11          Ms. Jacob, are you disputing that?

12          MS. JACOB:  Your Honor, yes.  I mean, I am not

13    conceding that he was -- there is no violation before us.

14          I am not disputing the fact that the government

15    has presented an FBI statement regarding such, but I am

16    disputing that it occurred because there is no violation

17    before us.

18          THE COURT:  Okay.  Well, let me just --

19    Mr. Strain, the defendant doesn't have a license to drive a

20    vehicle.  And has the government ascertained that he had no

21    license to drive a vehicle in May 2021 when he was under

22    surveillance?

23          MR. STRAIN:  Yes, Your Honor.

24          THE COURT:  Well -- and I guess Ms. Jacob is

25    disputing what the FBI saw as a factual matter; so, yes, put

1    the agent on.

2              We'll have a little evidentiary hearing.  If there

3    is a factual dispute, that's how we resolve them.

4              MR. STRAIN:  Okay.  I think the Clerk of the Court

5    has -- maybe your deputy clerk has Special Agent Pena [sic]

6    and Special Agent Walker --

7              THE COURT:  Okay.  Ms. Gumiel.

8              Do we have to hear from two agents about that?

9              MR. STRAIN:  I think Special Agent Pena is the one

10   who conducted the surveillance or was available.

11             THE COURT:  All right.  So that's the factual

12   dispute we have got.  So we don't need to hear from the

13   agents, for example, who executed the search warrant; there

14   doesn't seem to be a dispute about what they found, but

15   about whether he was driving without a license and done on

16   many occasions.

17             So why don't you -- Agent, could you give me your

18   name, please?

19             SPECIAL AGENT WALKER:  Yeah.  My name is Special

20   Agent Ashley Walker.

21             THE COURT:  Okay.  And, Agent Walker, I am going

22   to ask my courtroom deputy to administer the oath to you.

23   Please raise your right hand.

24             (ASHLEY WALKER, Government witness, sworn.)

25             THE COURT:  Proceed, Mr. Strain.

 1              We don't have to take more than a few minutes.

 2              MR. STRAIN:  Yes.  And, Your Honor, just to be

 3    clear, Ms. Walker was not the one that conducted the

 4    surveillance; I think that was overseen by Special Agent

 5    Pena, and he is not available.  But Special Agent Walker can

 6    share with the Court hearsay discussions about what the FBI

 7    saw.

 8              THE COURT:  Yes.  Proceed.

 9              MR. STRAIN:  Okay.  We'll proceed.

10                        DIRECT EXAMINATION

11    BY MR. STRAIN:

12    Q.  Special Agent Walker, can you spell your last name for

13    the Court.

14    A.  Yes.  W-A-L-K-E-R.

15    Q.  And how long have you been a special agent with the FBI?

16    A.  Approximately five years.

17    Q.  And are you the main case agent assigned to this case

18    against Sean Michael McHugh?

19    A.  Yes, I am.

20    Q.  Did the FBI conduct surveillance of Mr. McHugh's

21    residence leading up to his arrest --

22    A.  Yes, they did.

23    Q.  -- at the end of May?

24    A.  Yes, they did.

25    Q.  Do you know from -- the approximate periods of

1   surveillance, the period of time?

2   A.  My recollection is -- I believe they did some

3   surveillance in the beginning of May and then closer to

4   leading up to his arrest.  But, again, Agent Pena would have

5   a better idea of that.

6          THE COURT:  Where is Agent Pena, then?  Is Agent

7   Pena right there with you available to testify?

8          SPECIAL AGENT WALKER:  Unfortunately, Agent Pena

9   is in a different office; I can give him a call.

10         I believe he was on the line at one point.

11         THE COURT:  Well, I mean, it's one thing to use

12  hearsay; but the person repeating the hearsay has to know

13  what she's talking about.  So, Mr. Strain.

14         MR. STRAIN:  Yes, Your Honor.

15         If the Court would like, we can take a brief break

16  and try to get Special Agent Pena on the line; if not, I am

17  ready to submit.  I don't want to inconvenience the Court.

18  There is certainly a lot that the Court has to make its

19  detention decision.  If this is a critical piece, then we

20  can certainly get that to Your Honor.  But, maybe, if it's

21  not --

22         THE COURT:  It's not a critical piece.

23         MR. STRAIN:  Right.  Then we will just submit,

24  Your Honor.  Thank you.

25         THE COURT:  Okay.  Thank you.

1         Agent Walker, you are excused.

2         SPECIAL AGENT WALKER:  Okay.  Thank you.

3         THE COURT:  All right.  Unless anybody else has

4    anything to add to the papers before I rule -- from the

5    government?

6         MR. STRAIN:  No, Your Honor.

7         THE COURT:  And, Ms. Jacob?

8         MS. JACOB:  No.  Nothing further.

9         Thank you, Your Honor.

10        THE COURT:  All right.  Okay.  The Court is ready

11   to rule on the defendant's motion to review the Eastern

12   District of California magistrate judge's decision to detain

13   the defendant, Mr. McHugh, pending trial on an appeal from a

14   magistrate judge's order of pretrial detention.

15        The district court must conduct a *de novo* review,

16   and must do so promptly, under 18 U.S.C. Section 3145.

17   Neither Section 3142 nor Section 3145 specifies the standard

18   of review to be applied by a district court reviewing a

19   magistrate judge's release or detention order.

20        Recently, in the D.C. Circuit's decision in

21   *Munchel*, the Court of Appeals declined to decide the

22   standard applicable to the district court's review of a

23   magistrate judge's release order or whether the magistrate

24   judge's factual or other findings are entitled to any

25   deference.  Nonetheless, for years, this Court has exercised

1    *de novo* review based on the text and the structure of the

2    Bail Reform Act, and the weight of authority from every

3    other circuit to consider and resolve this critical issue,

4    holding that *de novo* review applies.

5              These decisions are all collected in *U.S. v*

6    *Chrestman*, 2021 Westlaw 765662, Footnote 5.

7              The Court will apply *de novo* review here.

8              The Bail Reform Act requires release of a

9    defendant prior to trial unless a judicial officer

10   determines, after a hearing, that -- and I quote, "No

11   condition or combination of conditions will reasonably

12   assure the appearance of the person as required, and the

13   safety of any other person and the community."  See 18

14   U.S.C. Section 3142(e)(1).

15             The government bears the burden to establish, by a

16   preponderance of the evidence, that the defendant poses a

17   serious risk of flight or a serious risk of obstruction or

18   attempt to obstruct justice, or intimidate or threaten a

19   prospective witness; and/or show, by clear and convincing

20   evidence, that no conditions of release will assure the

21   safety of any other person or the community.  See 18 U.S.C.

22   Section 3142(f)(2).

23             In determining whether any conditions of release

24   will reasonably assure the appearance of the person as

25   required and the safety of others, the Court must take into

1    account the available information concerning the four

2    factors set out in 18 U.S.C. Section 3142(g).  These factors

3    are:  The nature and circumstances of the offense charged;

4    the weight of the evidence against the person; the history

5    and characteristics of the person; the nature and

6    seriousness of the danger to any person or the community

7    that would be posed by the person's release.

8            Under the D.C. Circuit's decision in *Munchel,* to

9    detain an individual for dangerousness, the Court must:

10   Identify an articulable threat posed by the defendant to an

11   individual or the community outside the context of

12   January 6th.  See *Munchel,* at 991 F.3d at 1283.

13           I am going to address each of the factors --

14   relevant factors -- starting with the nature and

15   circumstances of the offense charged.  This first factor

16   weighs strongly in favor of pretrial detention here, and I

17   agree with the magistrate judge in California on that.

18           In a nutshell, on January 6th, with both houses of

19   Congress and the Vice President of the United States meeting

20   inside of the Capitol to carry out their constitutionally

21   mandated duty to count Electoral College votes for the

22   President, this defendant breached the security perimeter of

23   the Capitol grounds.  He did so with many other rioters, or

24   the mob.  And if he had done that, pretrial detention might

25   not be warranted here; but he did so much more than that.

1          This defendant made his way to the front of this

2     mob of angry people while carrying a hazardous and toxic

3     canister of bear spray holstered on his hip within easy

4     reach; and he is captured on videotape discharging that

5     substance not just once but twice in the direction of police

6     officers as they were trying to control the crowd of rioters

7     to keep them out of the Capitol so that elected

8     representatives could do their work on behalf of the

9     country.

10          Leading up to this assault on the officers with

11    the bear spray, the defendant riled up the mob using a call

12    and response chant, "Whose house?" -- with the crowd

13    responding "Our house," again and again, through his large

14    megaphone that he brought to the Capitol for this occasion.

15    And he spent much time taunting officers, hurling vitriolic

16    accusations at U.S. Capitol Police and Metropolitan Police

17    officers, accusing them of protecting pedophiles, fucking

18    homos, Antifa, and people who sell out the American people

19    to communist China; threatening officers that they should be

20    scared, and that they better get out of the way --

21    presumably of the rioters -- when they choose to exercise

22    their Second Amendment rights -- suggesting with reference

23    to Second Amendment rights, suggesting an armed

24    confrontation with police.

25          And not just satisfied with leading the chant and

1    taunting the officers, Mr. McHugh also encouraged the crowd

2    to advance on the police line, which was separating the

3    rioters from the doors to the Capitol, shouting:  "Come on

4    you guys," "Bring it in!"  "Let's go!"  As this crowd,

5    already angry and riled up -- perhaps from the rally

6    beforehand -- but as they were getting more of this kind of

7    encouragement, the defendant physically helped other rioters

8    to guide a huge sign framed by long metal poles to ram into

9    the police line; again, using his megaphone to give

10    directions and more encouragement, yelling:  "Yeah, bitch!"

11    "Put it up there!" "Put it up there!" -- giving these

12    directions.

13          All of this illegal conduct was successful; it

14    contributed to the delay of the certification of the

15    Electoral College vote count in the 2020 election.  It made

16    all of the elected representatives flee for their lives, out

17    of fear, to be evacuated.  It was a dangerous situation, and

18    the defendant was at the front line of it.

19          In its proffer describing Mr. McHugh's conduct,

20    the government has identified the defendant in 12 different

21    videos and numerous pictures taken outside the Capitol

22    Building during the riot to stop the electoral vote count on

23    January 6, 2021.

24          The government has shown the defendant assumed a

25    de facto leadership role in the assault by encouraging other

1   rioters' misconduct, with the defendant at the front of the

2   crowd of rioters taunting the police officers, encouraging

3   the rioters with call-and-response chants and exclamations

4   to move toward the Capitol Building.

5           He also threatened and confronted law enforcement,

6   and then really crossed the line by discharging bear spray

7   on officers who were trying to protect the Capitol from

8   intrusions unsuccessfully because the people on the west --

9   in that area were able to break in to the Capitol.

10          And, in fact, when the defendant discharged his

11  bear spray on the video, one -- you can see that at least

12  one of the officers was hit by a cloud of bear spray, had to

13  fall back and recoil from this cloud of chemical spray that

14  was discharged by the defendant.

15          His possession of the bear spray and this bullhorn

16  that he brought to the riot demonstrates prior planning; he

17  was prepared to engage in some disruption and potentially

18  violent behavior.

19          So based on these proffered facts he has been

20  charged with six serious felony offenses, with felonies

21  ranging from 5 to 20 years' imprisonment -- up to 5 to 20

22  years' imprisonment, including knowingly entering or

23  remaining in a restricted building or grounds without lawful

24  authority while using or carrying a dangerous weapon, in

25  violation of 18 U.S.C. Section 1752(a)(1) and (b)(1)(A),

1    which offense carries up to 10 years' imprisonment; and I do

2    find that the use of the bear spray was -- and carrying of

3    that is a dangerous weapon.

4          In addition, he is charged with knowingly and with

5    intent to impede or disrupt the orderly conduct of

6    government business or official functions, engaging in

7    disorderly or disruptive conduct in a restricted building or

8    grounds when or so that such conduct, in fact, impedes or

9    disrupts the orderly conduct of government business and

10   official functions, in violation of 18 U.S.C. Section

11   1752(a)(2) and (b)(1)(A), which also carries up to 10 years'

12   imprisonment.

13         He's also charged with committing or attempting to

14   commit an act to obstruct, impede, or interfere with law

15   enforcement officers who are lawfully engaged in the lawful

16   performance of his official duties incident to and during

17   the commission of a civil disorder which, in some degree,

18   obstructs, delays, or adversely affects the performance of

19   any federally protected function, in violation of 18 U.S.C.

20   Section 231(a)(3) which carries up to 5 years' imprisonment.

21         Also, he is charged with corruptly obstructing,

22   influencing, or impeding any official proceeding, or

23   attempting to do so, in violation of 18 U.S.C. Section

24   1512(c)(2), which carries up to 20 years' imprisonment;

25   knowingly engaging in any act of physical violence against

1    any person or property in a restricted building or grounds,

2    in violation of 18 U.S.C. Section 1752(a)(2) and (b)(1)(A),

3    which carries up to 10 years' imprisonment; and forcibly

4    assaulting, resisting, opposing, impeding, intimidating, or

5    interfering with any person designated in Section 1114 while

6    engaged in or on account of the performance of official

7    duties while using or carrying a deadly or dangerous weapon,

8    in violation of Sections 111(a)(1) and (b)(1)(A), which also

9    carries up to 20 years' imprisonment.

10          He is also charged with two misdemeanor offenses

11   which stem from the same conduct which I will not address

12   here.

13          So these serious felony charges arising out of the

14   defendant's conduct on January 6th express the significance

15   of the danger -- not just to our local community here in

16   D.C., but to the country -- posed by the criminal steps

17   taken to stop a critical constitutional step in the process

18   by which our democracy, for over 200 years, has peacefully

19   transferred power to a new president.

20          The government does not have evidence of the

21   defendant entering the Capitol Building; that the defendant

22   coordinated with anyone else to attend the riot, or that he

23   entered the Capitol Building himself -- I said that; but the

24   evidence proffered about his de facto leadership, especially

25   the clear evidence of his discharge of a dangerous weapon in

1    the direction of law enforcement officer weighs strongly in

2    favor of pretrial detention.

3            As to the weight of the evidence -- as I have just

4    detailed, the weight of the evidence is strong, and strongly

5    favors detention.

6            The government has 12 different video clips from a

7    variety of different angles showing his actions at the

8    Capitol on that day, January 6th; the statements that he

9    made; the bullhorn trying to rile up the crowd, instruct the

10   crowd where to put a sign; a videotape of him shaking a

11   barricade in an effort to try to intimidate the police, I

12   believe, as he was yelling at them to do so that they could

13   enter the Capitol.  But also then, most troubling, spraying

14   bear spray at the police line.  All of these actions

15   contributed to the mob actually successfully breaking in to

16   the Capitol Building, requiring, as I said, evacuation of

17   elected members of Congress, their staff, the Vice

18   President, and others, and requiring a halt to the

19   proceedings to count Electoral College votes for the

20   presidency.

21           The government has also bolstered these charges;

22   it goes to the weight of the evidence with the results of

23   the execution of the search warrant at his house where they

24   found all of his clothing from that date depicted on the

25   videotapes, as well as the bear spray he used -- as well as

1    confirming the fact that he took all of these -- the flights

2    to and from D.C. that he paid for himself and two other

3    people.

4            As to the history and characteristics of

5    Mr. McHugh, he has very close ties to the Sacramento area

6    and has many family members living in close proximity to

7    him.  He himself lives with his girlfriend of five years.

8    He has his GED; he's working on his associate's degree.  He

9    says he has been gainfully employed in construction for the

10   past six years and financially supports his family.

11           The pretrial services report, at page 4, indicates

12   that he is far behind in paying child support payments, and

13   he owes about $40,000 that he is trying to pay down each

14   month.  The defendant's papers say he is current on his

15   child support payments.  And I appreciate that his son's

16   mother has submitted a letter crediting him with maintaining

17   a consistent schedule to pay down his arrears of $40,000 in

18   child support for his son.  But what I see is that despite

19   this huge amount of $40,000 worth of back child support

20   payments, the defendant -- perhaps due to his passionate

21   consuming political views -- was able to find the funds to

22   miss work, travel to D.C. on January 6th, and pay -- not

23   only for himself, but two other people to join him --

24   instead of making further arrears -- paying off further

25   arrears of his child support.

1          Getting consumed with politics -- to use his

2     girlfriend's word, "consumed" -- was what brought Mr. McHugh

3     to D.C. and compelled him to engage in this criminal

4     conduct, those political forces remain at play in this

5     country; and that's something that this Court has to

6     consider as well.

7          Very troubling, as I have already discussed during

8     my discussion with defense counsel, is that unlike a number

9     of defendants charged as a result of their misconduct on

10    January 6th who have had no contact with the criminal

11    justice system, the defendant here has a long criminal

12    history; and most troubling, it reflects a pattern of not

13    abiding by court orders.

14         Indeed, when he traveled to D.C., I believe he was

15    on probation for a DUI and driving with a suspended license.

16    He has also been convicted of at least ten offenses between

17    2006, when he was 19 years old, and 2018, when he was 30

18    years old, running the gamut of vehicle theft -- what looks

19    like statutory rape, domestic violence, vandalism, DUIs.

20         But what is even more troubling is that this

21    history of convictions is punctuated by not only an

22    additional dozen arrests, but a flurry of probation

23    violations and failures to appear.  These are red flags for

24    courts deciding on whether to detain or release a defendant

25    because failures to appear, violations of probation, show a

1    disregard for the law and for following court orders, and it

2    undermines confidence that compliance with any conditions of

3    release can be expected.  So taken together, the

4    considerations relevant to this factor of his history and

5    characteristics favor detention.

6          As to the nature and seriousness of the danger to

7    the community posed by the defendant's release, the Eastern

8    District of California magistrate judge said it in a quite

9    pithy manner:  This isn't a situation where the defendant

10    had a few beers and went out and did something stupid.  He

11    flew across the country and was involved in this incident,

12    and involved bear spray and firing up the crowd.  That's

13    from the magistrate judge detention hearing, at page 17.

14          Indeed, the defendant enthusiastically

15    participated in a violent assault on the Capitol and

16    encouraged this lawlessness with abandon leading up to the

17    mob's breach of the law enforcement line on the lower West

18    Terrace of the Capitol grounds.  His conduct that day shows

19    clear disregard for the safety of others, particularly law

20    enforcement.  He sprayed a highly toxic chemical irritant at

21    advancing police officers who were trying to hold off the

22    mob and prevent them from breaching the Capitol doors

23    unsuccessfully; and it wasn't just dangerous to the police

24    officers, it was dangerous to everybody in the crowd.

25          The D.C. Circuit has instructed in *Munchel* that

1      those who actually assaulted police officers and broke

2      through windows, doors, and barricades, and those who aided,

3      conspired with, planned, or coordinated such actions are in

4      a different category of dangerousness than those who cheered

5      on the violence or entered the Capitol after others cleared

6      the way.  Even for this different category of January 6th

7      defendants, the district court must proffer an explanation

8      of how a defendant would be capable of acting dangerously

9      against the community again now that the specific

10     circumstances of January 6th have passed.

11            In *Munchel*, which the D.C. Circuit remanded for

12     the district court to consider the detention decision and

13     the government then just agreed to release -- there was no

14     evidence that the defendants who had entered all the way

15     into the Capitol with tasers and zip ties had actually

16     vandalized any property other than stealing the zip ties or

17     physically harmed any person.  In other words, although

18     these defendants carried a weapon, they didn't use it.

19            Here, this defendant falls within the different

20     category of January 6th defendants identified in *Munchel* by

21     virtue of having actually discharged -- not only carried a

22     dangerous weapon, which is the bear spray, but actually

23     using it, and using it in a crowd where it was particularly

24     dangerous to other people in the crowd, and targeted at law

25     enforcement.

1        I must still assess whether he poses a danger to

2   the community now that the specific circumstances of

3   January 6th have passed.

4        As Ms. Jacob pointed out, even if he was dangerous

5   that day, it doesn't mean he is a danger in the future,

6   which is the focus that *Munchel* has instructed district

7   court judges to look at.

8        The facts of this case make clear that the

9   defendant's dangerousness is not limited to the particular

10  circumstances of January 6th, quoting *Munchel*.  Although the

11  *Munchel* panel was critical of the district court's

12  determination that the defendant was willing to use force to

13  promote his political ends, that was because the record

14  contained no evidence indicating that the defendants in that

15  case vandalized any property or physically harmed any

16  person, or otherwise committed any violence on January 6th.

17       Unlike in *Munchel*, this defendant did engage in

18  extremely provocative conduct with the police as shown on

19  the 12 videos and in the photos documenting Mr. McHugh's

20  taunting the police, riling up the mob, assisting the mob in

21  ramming a large metal sign into the police line and then,

22  ultimately, bear-spraying the advancing officers.

23       And just because the defendant may not have

24  entered the Capitol Building provides little relief.  I

25  agree with another judge who is on this court who recently

1    rejected an identical argument as nonsensical because, given

2    the frontline role the defendant played in attempting to

3    break past the police guarding the entry to the Capitol,

4    that the defendant himself remained outside was not for lack

5    of trying.  See *Klein*.

6          Defendant's efforts to break the police line

7    helped the rioters break in to the Capitol worked.  These

8    rioters stopped, for hours, the count of the Electoral

9    College votes, sending shock waves through the majority of

10   Americans who watched this unfold on TV and, as we have seen

11   recently, giving fodder to unfriendly nations to criticize

12   this country's democracy.

13         Together, these considerations, particularly the

14   defendant's long criminal history, including violent

15   conduct, and the fact that he committed this offense while

16   on probation, and his history of noncompliance with court

17   orders, probation violations, and failures to appear raise

18   serious concerns about the danger he poses if released

19   pending trial and makes plain that the danger he presents is

20   not isolated to the context of January 6th; so this weighs

21   heavily in favor of detention.

22         So upon consideration of the proffered evidence

23   presented, the factors set forth in Section 3142(g), the

24   Court finds all four statutory factors weigh in favor of

25   pretrial detention.  The government has met its burden in

1    establishing that no condition or combination of conditions

2    will reasonably assure the safety of any other person and

3    the community.

4           The magistrate judge's pretrial detention ruling

5    is, therefore, affirmed.  The defendant's motion to review

6    the magistrate judge's detention decision is denied; and the

7    defendant will be held without bond pending trial.

8           I will enter a transport order for Mr. McHugh to

9    be brought to this district pending trial.  And I will

10   direct that he appear before a magistrate judge in this

11   district on July 9th, at 10:00 a.m., unless he is indicted

12   before then.  And if he is indicted before then, he will

13   appear when scheduled before the judge to whom this case is

14   randomly assigned.

15          Is there anything further from the government

16   today?

17          MR. STRAIN:  No, Your Honor.  Thank you.

18          THE COURT:  Any further from you, Ms. Jacob?

19          MS. JACOB:  No.  Thank you, Your Honor.

20          THE COURT:  All right.  You are all excused.

21          (Whereupon, the proceeding concludes, 2:34 p.m.)

22                        *  *  *  *  *

23

24

25

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

PLEASE NOTE:  This hearing was held via videoconference and/or telephonically in compliance with the COVID-19 pandemic stay-safer-at-home recommendations and is therefore subject to the limitations associated with the use of technology, including but not limited to telephone signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing capabilities.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 27th day of May, 2022.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter