**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

v.

**SEAN MCHUGH,**

**Defendant.**

**Criminal Action No. 21-453 (JDB)**

## MEMORANDUM OPINION

Defendant Sean McHugh is charged by indictment with eight felonies and two misdemeanors in connection with his conduct at the United States Capitol on January 6, 2021.  See Indictment [ECF No. 39].  Before the Court is McHugh's third round of motions in this case.  For the reasons set forth below, the Court will deny his motions for dismissal, venue transfer, pretrial release, and further discovery to support a selective prosecution theory, and it will grant his motion for a protective order.

## BACKGROUND

McHugh is one of more than a thousand people charged with criminal conduct in connection with the riot at the U.S. Capitol on January 6, 2021.  The facts of his involvement in the events at the Capitol are set out in more detail in United States v. McHugh ("McHugh I"), 583 F. Supp. 3d 1, 7–9 (D.D.C. 2022).  Briefly, the government alleges that McHugh arrived at the Capitol by 1:30 p.m., when camera footage captured him shouting obscenities at a police barricade.  Statement of Facts [ECF No. 1-1] ¶ 12.  Shortly after, McHugh joined other rioters in pushing a large metal sign into the line of officers and yelling at the crowd, encouraging them to keep pushing it.  See id. ¶ 13.  Other videos from that day show McHugh "shooting officers with a yellow

spray,"[1] id. ¶ 16, "scuffling with an officer in an attempt to defeat a barricade," id. ¶ 15, and "encouraging the crowd with his megaphone to intimidate officers and approach the police line," id. ¶ 14.

McHugh filed a motion to dismiss a number of counts of the indictment in December 2021, Def.'s Mot. to Dismiss Counts Two, Five, Six, Seven, and Eight of Superseding Indictment [ECF No. 41], which the Court denied, McHugh I, 583 F. Supp. 3d at 35.  He then filed a renewed motion to dismiss one count, Def.'s Mot to Dismiss Count Five of Superseding Indictment [ECF No. 54], and a motion to transfer venue, Def.'s Mot. for Transfer of Venue [ECF No. 55] ("Original Venue Mot.").  The Court denied both motions.  United States v. McHugh ("McHugh II"), Crim. A. No. 21-453 (JDB), 2022 WL 1302880, at *13 (D.D.C. May 2, 2022) (denying motion to dismiss); May 4, 2022 Min. Entry (denying motion to transfer venue).

Following a change of counsel, see Notice of Termination [ECF No. 69], McHugh requested a new briefing schedule to file additional motions, see Sept. 26, 2022 Min. Entry.  He then filed the instant five motions: (1) a motion to dismiss, Def.'s Mot. to Dismiss Superseding Indictment as Defective [ECF No. 70] ("Mot. to Dismiss"), (2) a motion for temporary release, Def.'s Mot. for Temporary Release Pursuant to 18 U.S.C. § 3142(i) [ECF No. 71] ("Mot. for Release"), (3) a motion for protective order, Def.'s Mot. for a Protective Order per Fed. R. Crim. P. 49.1(e) [ECF No. 72] ("Mot. for Protective Order"), (4) a motion to transfer venue, Def.'s Mot. for Change of Venue Pursuant to 18 U.S.C. § 3237(a) [ECF No. 73] ("Venue Mot."), and (5) a motion for discovery in pursuit of a selective prosecution claim, Def.'s Mot. for Discovery & Evidentiary Hearing in Supp. of Claim of Selective Prosecution [ECF No. 82] ("Selective

---

[1] Government filings throughout this case have suggested that this spray was labeled "Frontiersman Bear Attack Deterrent," and carries a label warning that it is a "hazard to humans and could result in irreversible eye damage if sprayed in the eye."  See McHugh I, 583 F. Supp. 3d at 9 (cleaned up).

Prosecution Mot."). The government responded opposing each, and McHugh filed a reply in support of his motion for a protective order and his selective prosecution motion. All five motions are now ripe for decision.

## MOTION TO DISMISS THE INDICTMENT

McHugh filed a motion to dismiss every count of the indictment. The operative indictment contains ten counts: assaulting, resisting, or impeding certain officers and aiding and abetting, in violation of 18 U.S.C. §§ 111(a)(1) and 2 (Count One); civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Two); two counts of assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts Three and Four); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Five); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Six); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Seven); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Eight); disorderly conduct in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Nine); and act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Ten). See Indictment 2–6.

McHugh claims that the counts in the indictment lack specificity, are multiplicitous, and for some, fail to state a claim. Because the Court concludes that the indictment is not deficient for any of the reasons McHugh argues, it will deny the motion to dismiss.

## I.   Lack of Specificity

A criminal defendant may file a motion to dismiss an indictment against him for lack of specificity.  See Fed. R. Crim. P. 12(b)(3)(B)(iii).  The indictment must set forth only "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974).  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'"  Id. (quoting United States v. Carll, 105 U.S. 611, 612 (1882)); see also United States v. Haldeman, 559 F.2d 31, 123 (D.C. Cir. 1976) ("The validity of alleging the elements of an offense in the language of the statute is, of course, well established.").  In limited circumstances, "[w]here guilt depends so crucially upon such a specific identification of fact . . . an indictment must do more than simply repeat the language of the criminal statute."  Russell v. United States, 369 U.S. 749, 764 (1962).

McHugh alleges that each of the ten counts in the superseding indictment is impermissibly vague.  See Mot. to Dismiss at 7–11.  The Court concludes that, while bare-bones, each count sets forth the elements of the offense and fairly informs McHugh of the charge against which he must defend.

Count One, which charges violations of 18 U.S.C. §§ 111(a)(1) and 2, alleges that

[o]n or about January 6, 2021, within the District of Columbia, SEAN MICHAEL MCHUGH did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States, and of any branch of the United States Government . . . while such person was engaged in and on account of the

performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

Indictment at 2. The other nine counts follow a similar format, some with even more specificity. That is, they recite the elements of the offense, specify where and when the charged conduct happened, and—when necessary—further describe the conduct. For example, Counts Three, Four, Six, Seven, and Nine charge violations of statutes involving a deadly or dangerous weapon, and the indictment specifies which weapon McHugh is alleged to have used. See Indictment at 2–5.

McHugh lodges a number of general complaints about the indictment. First, he argues that each count "simply restates the wording of the Statute" and does not clarify "what alleged actions were committed by [him]" that would meet the statutory language, or "how" he engaged in various actions. Mot. to Dismiss at 8–11. But that argument misunderstands the nature of an indictment. As the court in United States v. Verrusio put it,

> The indictment certainly need not allege precisely how [the defendant committed the alleged offense]. Would he do it by himself or ask someone else to do it? Would that someone else be Colonel Mustard or Professor Plum? With a candlestick or a rope, in the library or the study? Answering those questions is not required at the indictment stage.

762 F.3d 1, 14–15 (D.C. Cir. 2014). There is no requirement that the indictment make out the government's case or provide any details as to the logistics of the alleged offense, and thus this criticism falls flat. See United States v. Sargent, Case No. 21-cr-00258, (TFH) 2022 WL 1124817, at *4 (D.D.C. April 4, 2022) ("[N]o factual allegations are required when the statutory language itself allows the defendant to prepare a defense to the charge.").

Similarly, McHugh argues that the government has not "describe[d] or identif[ied] the alleged victim" in a number of counts related to his alleged violent actions against law enforcement officers. See Mot. to Dismiss at 8–11. But to find McHugh guilty, "the government need not

prove the individual identity of" the officer with whom McHugh interacted, only that the person is an officer as described in the statute.  Sargent, 2022 WL 1124817, at *4.

The case on which McHugh relies illustrates the type of indictment that may suffer from lack of specificity.  In United States v. Hillie, the government charged the defendant with an indictment containing only "verbatim recitation[s] of the language of the criminal statute" and the "broadest possible references to time and place": the "District of Columbia" and "periods of time that span two to three years."  227 F. Supp. 3d 57, 72 (D.D.C. 2017).  The defendant there could, with a straight face, assert that he did not know the charges against him.

Not so for McHugh.  Each count specifies a single day: January 6.  See Indictment 2–6. The indictment is peppered with references to the Capitol and the electoral certification, and for many of the counts, the government includes specific details about McHugh's alleged actions. See, e.g., id. at 2 (charging McHugh with use of "a large metal sign" "at or around 1:39 p.m. to 1:41 p.m."); id. at 5 (charging McHugh with violent actions "within the United States Capitol and its grounds" while "us[ing] and carry[ing] . . . bear spray and a metal sign").  The Statement of Facts attached to the criminal complaint sheds light on much of the information that McHugh complains he does not know.  See, e.g., Statement of Facts ¶ 13 ("McHugh is seen pushing the [large metal] sign . . . ."); id. ¶ 15 ("[P]ublicly available video shows McHugh scuffling with an officer in an attempt to defeat a barricade.").  Further, "there has been extensive discovery in this case," and if McHugh has "lingering confusion about the particular facts underlying the charged offense, the remedy would be a request for a bill of particulars, not dismissal."  United States v. Williams, Crim. A. No. 21-0618 (ABJ), 2022 WL 2237301, at *8 (D.D.C. June 22, 2022).  Given the specific descriptions of conduct in the indictment and the context of January 6, "[n]either as a

matter of common sense nor of legal principle" could McHugh be "in any doubt as to the crime with which [he was] charged."  See Haldeman, 559 F.2d at 124.

In sum, the Court agrees with the conclusion reached in Sargent based on very similar language in another January 6 indictment: each count sets forth every element of the charged offense, informs McHugh of the charges against which he must defend, and sufficiently protects against double jeopardy concerns.  See 2022 WL 1124817, at *3–10.  The Court will therefore not grant the motion to dismiss for lack of specificity.

## II.    Failure to State an Offense

McHugh next focuses on the four counts—Counts Three, Four, Seven, and Eight—alleging that he carried or used a deadly or dangerous weapon.  See Mot. to Dismiss at 11–17.  He argues that the indictment fails to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) as to these counts because, as a matter of law, "pepper spray is not a dangerous weapon under the statute[s]."  Id. at 11.

The parties agree that the term "deadly or dangerous weapon" as used in the relevant statutes[2] is not defined.  The D.C. Circuit approved a definition of "deadly or dangerous weapon" in United States v. Arrington: "[f]or an object that is not inherently deadly" the government must prove that "the object must be capable of causing serious bodily injury or death to another person and the defendant must use it in that manner."  309 F.3d 40, 45 (D.C. Cir. 2002); accord United States v. Klein, 533 F. Supp. 3d 1, 10 (D.D.C. 2021) ("[A] 'deadly or dangerous weapon' means 'any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person.'" (quoting United States v. Bullock, 970 F.3d 210, 215 (3d Cir. 2020))).  As

---

[2] 18 U.S.C. § 111(b) provides an enhanced penalty if, as relevant here, "a deadly or dangerous weapon" is used.  Similarly, a violation of 18 U.S.C. § 1752 carries a harsher potential penalty if the person "uses or carries a deadly or dangerous weapon."  § 1752(b)(1)(A).

both parties agree, courts also look to the definitions in the U.S. Sentencing Guidelines, which defines the term as "an instrument capable of inflicting death or serious bodily injury."  U.S.S.G. § 1B1.1 n.1(E).  "Serious bodily injury" is, in turn, defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  Id. § 1B1.1 n.1(M).

McHugh argues that pepper spray, as a matter of law, is not a dangerous weapon.  In support, he relies on the United States Capitol Police ("USCP") guidelines and United States v. Perez, a case from the Eleventh Circuit finding that based on the record before the district court, the pepper spray at issue there did not qualify as a "dangerous weapon."  519 F. App'x 525, 528 (11th Cir. 2013).

Starting with the USCP guidelines, the publicly available website notes that "[p]ursuant to the United States and District of Columbia Criminal Codes, firearms, dangerous weapons, explosives, or incendiary devices are prohibited on U.S. Capitol Grounds."  Prohibited Items, United States Capitol Police, https://www.uscp.gov/visiting-capitol-hill/regulations-prohibitions/prohibited-items (last visited February 14, 2023).  For the Capitol building—but not the Capitol grounds—"[m]ace and pepper spray" are specifically prohibited, id., but metal signs are not expressly prohibited on either the Capitol grounds or in the buildings, Mot. to Dismiss at 12–13.  McHugh appears to argue that mace, pepper spray, and metal signs are thus permitted on the Capitol grounds and, as a result, are not "dangerous weapons" as contemplated by the USCP Capitol grounds guidelines.  See id.

As an initial matter, McHugh offers no reason why the Court should look to the items prohibited by the USCP as a way to define "dangerous weapon."  But even if it did, McHugh's

logic does not hold up.  McHugh appears to argue that items that are "specifically itemize[d]" on the list of items banned from the Capitol building are necessarily permitted on the grounds.  Mot. to Dismiss at 12.  If that is true, then weapons, firearms, and explosives—which are specifically itemized on the Capitol building list—would also be permitted on the grounds and therefore are not "dangerous weapons."  McHugh might argue that those items are different because they are included in the term "dangerous weapon" as used in the Capitol grounds list.  But that logic is circular.  The only support for his argument, then, is his own assertion that mace, pepper spray, and metal signs are not dangerous weapons.

That is not to say, of course, that mace, pepper spray, and metal signs are necessarily included in the term "dangerous weapon" as used in the publicly available website reporting items banned from the Capitol grounds.  But this exercise certainly demonstrates the limits of consulting the USCP website to discern the meaning of the term, particularly as used in the context of a specific statute.

Instead, the proper place to look for the definition of "dangerous weapon" is case law defining it in relevant context.  To that point, McHugh relies on Perez, a case from the Eleventh Circuit examining the term "dangerous weapon" as used in the Sentencing Guidelines.  See 519 F. App'x at 527.  The Perez court concluded that the government had not "produce[d] sufficient evidence on which" the district court could conclude that the pepper spray at issue there was a "dangerous weapon."  Id. at 528.  Because "the evidentiary record [wa]s silent as to the form or nature of the pepper spray, its chemical composition, the strength or concentration of the active agent, the size of the can, whether the spray mechanism was functional, or the distance or velocity the mechanism was designed to achieve," there was no basis for the district court to conclude that in all instances, pepper spray is a dangerous weapon.  Id. at 527–28.

Other courts, faced with different factual records, have come to different conclusions.  In the context of January 6 cases, district courts have consistently agreed that pepper spray or a metal contraption could be a dangerous weapon.  See United States v. Worrell, 848 F. App'x 5, 5–6 (D.C. Cir. 2021) (upholding a "district court's finding that . . . pepper spray gel . . . was a dangerous weapon within the meaning of the Bail Reform Act"); United States v. Gieswein, Crim. A. No. 21-24 (EGS), 2021 WL 3168148, at *10 (D.D.C. July 27, 2021) (finding chemical spray to be a dangerous weapon for bail determination purposes), aff'd, No. 21-3052, 2021 WL 5263635 (D.C. Cir. Oct. 19, 2021); United States v. Padilla, 538 F. Supp. 3d 32, 42 (D.D.C. 2021) (noting that in the context of their use, a metal sign and a flagpole were dangerous weapons).  And in other contexts, courts across the country have closely examined the facts of the cases before them to conclude that pepper spray can qualify as a dangerous weapon.  See, e.g., United States v. Bartolotta, 153 F.3d 875, 879 (8th Cir. 1998) (concluding that "the government's evidence sufficiently established that the mace was used as a dangerous weapon in th[at] case" based on the extreme impact on the victim); United States v. Melton, 233 F. App'x 545, 547 (6th Cir. 2007) (affirming district court's classification of pepper spray as a dangerous weapon based on its known severe side effects on the human body).

Thus, McHugh's argument that pepper spray and metal signs, as a matter of law, cannot be dangerous weapons falls short.  At most, McHugh's cited authority demonstrate that one court in another Circuit found that prosecutors failed to meet their burden at sentencing to prove that a specific can of pepper spray qualified as a dangerous weapon—which has no bearing on whether the indictment here states an offense.  McHugh himself acknowledges that "[f]inding pepper spray to be a dangerous weapon requires a case-specific factual showing by the Government."  Mot. to Dismiss at 14 (citing Perez, 519 F. App'x at 529).  Here, the government has not yet had an

opportunity to make that case-specific factual showing. But it certainly could present evidence demonstrating that both items are "capable of causing serious bodily injury" and that McHugh[3] "use[d] [them] in that manner," Arrington, 309 F.3d at 45, and thus are "dangerous weapons." Accordingly, the Court will not dismiss any counts for failure to state an offense.

### III.    Multiplicitous Charges

McHugh's final argument in his motion to dismiss is that the charges are multiplicitous, which "threaten[s] to improperly bias the jury and can also implicate double jeopardy concerns." Mot. to Dismiss at 17–18.

The double jeopardy clause "protects against multiple punishments for the same offense," but that specific protection "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." United States v. McLaughlin, 164 F.3d 1, 7–8 (D.C. Cir. 1998). Thus, "analysis of prosecutions under multiple statutes under the Double Jeopardy Clause is limited to considering whether the legislature intended to allow simultaneous convictions," and "[i]f the legislature intends to impose multiple punishments, imposition of such sentences does not violate Double Jeopardy." Id. In determining whether the legislature intended to impose multiple punishments, "courts generally apply the Blockburger test: [w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one[] is whether each provision requires proof of a fact which the other does not, i.e., whether either is a lesser included offense of the other." United States v. Mahdi, 598 F.3d 883, 888 (D.C. Cir. 2010) (cleaned up).

---

[3] Indeed, as noted above, the government alleges that the spray label warning stated it was dangerous to humans. See McHugh I, 583 F. Supp. 3d at 9.

McHugh alleges that Counts Five, Seven, and Nine "seemingly refer to the same offense" and are therefore multiplicitous.  Mot. to Dismiss at 18.  As the government explains in detail, however, none is a lesser included offense of another, as each requires proof of an element distinct from the others.  See Gov't's Opp'n to Mot. to Dismiss [ECF No. 76] ("Opp'n to Mot. to Dismiss") at 17–23.  Specifically, Count Five requires that McHugh act "corruptly," Indictment at 3, which is a distinct mens rea requirement from the other counts.  Further, while Counts Five and Seven both require some form of obstruction, Count Five refers to obstruction of an "official proceeding" and Count Seven refers to disruption of "the orderly conduct of Government business and official functions."  Id. at 3–4.  Although in this case, the obstructed proceeding is the same, "the test for multiplicity is not whether two counts are based on the same set of facts; rather, it is whether the statutory elements of the two offenses are the same."  United States v. Manafort, 313 F. Supp. 3d 311, 314 (D.D.C. 2018).  Counts Seven and Nine also require that McHugh engaged in "disorderly or disruptive conduct," which Count Five does not.  See Indictment at 3–5.  And Counts Seven and Nine differ in a few ways, including that Count Seven applies only to a "restricted building or grounds" and Count Nine applies "in any of the Capitol Buildings."  Id. at 4–5.  The Capitol is not always a "restricted building or grounds" within the meaning of Count Seven, and the term "restricted building or grounds" covers far more than the Capitol building.  See 18 U.S.C. § 1752(c)(1).

The same is true for Counts One, Three, Four, Eight, and Ten, which McHugh also claims "refer to the same alleged conduct."  Mot. to Dismiss at 18.  Specifically,

- Counts One, Three, and Four charge violations of 18 U.S.C. § 111(a)(1).  These three counts differ from Counts Eight and Ten in that they require conduct to have been "forcibly" directed against "an officer and employee of the United States."  Indictment at

2–3.  And although the three Counts charge a violation of the same statute, they refer to "separate and distinct attacks on law enforcement by McHugh."[4]  Opp'n to Mot. to Dismiss at 22 (citing <u>United States v. Wesley</u>, 798 F.2d 1155 (8th Cir. 1986)).

- Count Eight covers conduct "in a restricted building and grounds," Indictment at 5, which Counts One, Three, Four, and Ten do not.

- Count Ten covers conduct "within the United States Capitol Grounds and any of the Capitol Buildings," Indictment at 6, which Counts One, Three, Four, and Eight do not.

While it is true that McHugh is charged with several offenses stemming from the same conduct, that alone is not enough to justify dismissal of any of the counts, as each is sufficiently distinct to withstand McHugh's challenge based on concerns that the charges are multiplicitous or implicate double jeopardy concerns.  The Court will accordingly deny McHugh's motion to dismiss.

## <u>MOTION TO TRANSFER VENUE</u>

McHugh has already filed one motion to transfer venue, <u>see</u> Original Venue Mot., which the Court denied, <u>see</u> May 4, 2022 Min. Entry.  That motion argued that he could not be tried by a fair and impartial jury in Washington, D.C.  <u>See</u> Original Venue Mot. at 3–16.  The venue motion now before the Court argues that "the alleged offenses Mr. McHugh has been charged with began and were concluded in Auburn[,] California," and thus "venue in the Eastern District Federal Court of California is proper."  Venue Mot. at 3.  McHugh devotes his entire motion to explaining why venue would be proper in California.  But that is legally irrelevant here: even if venue were proper

---

[4] Notably, the Statement of Facts describes numerous interactions between McHugh and officers, including an incident with "a yellow spray," Statement of Facts ¶ 16, an incident with "a large metal sign," <u>id.</u> ¶ 13, and other incidents not involving either of those items, <u>see, e.g.,</u> <u>id.</u> ¶ 15 ("[V]ideo shows McHugh scuffling with an officer in an attempt to defeat a barricade.").

in California, it would not mandate a transfer, because venue is also proper here in Washington, D.C.

Venue is proper "in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237; see also United States v. Morgan, 393 F.3d 192, 196 (D.C. Cir. 2004) ("In performing [the venue] inquiry, a court[] must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." (quoting United States v. Rodriguez-Moreno, 526 U.S. 275, 279 (1999))).   Although "[v]enue may be proper in more than one district," United States v. Lam Kwong-Wah, 924 F.2d 298, 301 (D.C. Cir. 1991), "[t]he Government has a choice of forum in which to prosecute," so long as its chosen forum is proper, United States v. Han, 280 F. Supp. 3d 144, 149 (D.D.C. 2017).

The charges all relate to conduct that took place at the Capitol, which is in Washington, D.C.  See Statement of Facts.  And each count of the indictment explicitly charges McHugh with an offense that took place in Washington, D.C.  See Indictment at 2–6 (describing each count as taking place "within the District of Columbia").  There is no serious argument that "the conduct constituting the offense," Morgan, 393 F.3d at 196, took place entirely outside of D.C. such that venue is improper here.  The Court will accordingly deny this second motion to transfer venue.

## MOTION FOR TEMPORARY RELEASE

A court may temporarily release a defendant under 18 U.S.C. § 3142(i) to the custody of an "appropriate person" if the court "determines such release to be necessary for preparation of the person's defense or for another compelling reason."  "Regardless of the basis for a § 3142(i) motion, the defendant bears the burden of demonstrating that his temporary release is warranted." United States v. Thomas, 456 F. Supp. 3d 69, 72 (D.D.C. 2020).

McHugh argues that three "compelling" reasons necessitate his release: (1) the preparation of his defense, see Mot. for Release at 2–5, (2) the poor conditions at the Correctional Treatment Facility ("CTF"), where McHugh is detained, id. at 5–9, and (3) the length and consequences of his incarceration, id. at 9–10.

## I.    Preparation of Defense

"Courts considering whether pretrial release is 'necessary' under § 3142(i) have considered: (1) the time and opportunity the defendant had to prepare for the trial and participate in his defense, (2) the complexity of the case and volume of information, and (3) the expense and inconvenience associated with preparing while incarcerated." United States v. Krol, Crim. A. No. 22-110 (RC), 2022 WL 16948611, at *11 (D.D.C. Nov. 15, 2022) (quoting United States v. Bothra, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020)).

A defendant's showing that detention makes trial preparation merely "inconvenient" is insufficient to show that release "would be necessary for [him] to participate in the defense." Krol, 2022 WL 16948611, at *12; see also Thomas, 456 F. Supp. 3d at 78 ("Although his counsel did tell the Court that the process of conferring with her client by telephone can be difficult to navigate, she did not explain how that difficulty makes his release necessary for the preparation of his defense.").

Starting with the first factor—the time and opportunity McHugh has been afforded for trial preparation—the government began providing discovery in mid-2021. See United States' Mem. Regarding the Status of Disc. [ECF No. 24] at 1 (noting in July 2021 that "substantial discovery has already been provided in this case"). It has continued to provide discovery over the past 18 months. While review of discovery is important for the preparation of a defense, it does not warrant release here. "Temporary release is not warranted when a defendant has had ample time

to prepare his defense, even given the practical limitations on his access to telephones and the Attorney Conference Room." Bothra, 2020 WL 2611545, at *2 (internal quotation marks omitted).

Skipping ahead to the third factor, the Court must consider "the expense and inconvenience associated with preparing [his defense] while incarcerated." Krol, 2022 WL 16948611, at *11. McHugh complains that, to review discovery materials, he is "placed on a waiting list and must wait his turn to be provided a laptop." Mot. for Release at 3. Further, "there is usually some issue or delay," and the laptops are "provided without a charger," so he is only able to review "an hour or so worth of discovery before the laptop must be returned and the whole waiting period begins again." Id. And this difficultly is compounded by the lockdowns which prevent him from being able to review the video evidence. Id. All this delay, McHugh argues, prevents him from "meaningfully review[ing] the discovery in this case" and "meaningfully assist[ing] in his own defense." Id.

The government disputes McHugh's description of his access to evidence. As it describes the situation, "laptops are issued to inmates at CTF on a two-week basis," and if a laptop runs out of battery, "a Department of Corrections officer will charge the laptop and immediately return it." Gov't's Opp'n to Mot. for Release [ECF No. 78] ("Opp'n to Mot. for Release") at 13. Inmates may keep the laptop for up to two weeks, or may return it when they complete their review of discovery, which the government states is normally "within five days." Id. at 14. CTF evidently "reports that there have not been frequent, long-lasting lockdowns affecting prison operations," and even during lockdowns, detained people have access to certain discovery on tablets. Id. Given competing reports from the two parties, it is difficult to discern exactly how hard is it for McHugh to watch hours of video footage.

But McHugh has not shown that reviewing the "hundreds, if not thousands of hours of material," Mot. for Release at 3, is necessary for his defense.  Discovery in January 6 cases is unique: there is a huge "global discovery" repository, but only a fraction of this discovery is relevant to each defendant's case.  See United States' Mem. Regarding Status of Disc. as of Feb. 9, 2022 [ECF No. 52] (describing the government's "plan for producing or making accessible to all defense teams voluminous data collected by the government in relation to the Capitol Siege investigation, so they may identify information they deem relevant").  The Court is not concerned with McHugh's ability to view every video in the global discovery but rather with his ability to prepare his defense, which may require that he review some of the evidence, but certainly not all or even most of it.  Cf. United States v. Celis, 608 F.3d 818, 840 (D.C. Cir. 2010) (holding that defendant was not herself entitled to effective review of all discovery produced given that her counsel could review discovery and discuss it with her). [5]

Thus, the second factor—the complexity of the case and volume of discovery—also does not meaningfully weigh in McHugh's favor.  He has not made any effort to describe his inability to view the critical, or even relevant, evidence.  Given the many months during which McHugh has had access to the discovery, and the various methods through which he can access it, the Court is unpersuaded that the system in place at CTF has prevented him, and will continue to prevent him, from viewing the evidence critical to his defense.

---

[5] The government cites a number of cases holding that a defendant represented by counsel has no general right to personally review all evidence.  Opp'n to Mot. for Release at 12–13; see, e.g., Carillo v. United States, 995 F. Supp. 587, 591 (D.V.I. 1998) ("[T]here is no constitutional duty to share discovery documents with petitioner. Petitioner cites no case law for this proposition, and this court finds none."); United States v. Thompson, No. 2:10-CR-200-DBH, 2013 WL 1809659, at *6 (D. Me. Apr. 29, 2013) (rejecting argument that defendant personally needed to review all discovery to enter guilty plea as defendant "was not representing himself, such that he needed to assess on his own what evidence was admissible and how persuasive it was"), aff'd, 851 F.3d 129 (1st Cir. 2017).

Beyond access to the discovery materials, McHugh also alleges that his communication with his attorney is "at the mercy of the scheduling of the CTF," which has "prevent[ed] timely communication." Mot. for Release at 4. But without more detail or explanation, that assertion alone is insufficient. Further, as the government describes, counsel may visit McHugh in person "almost anytime of the day," "CTF has set aside every Friday for video visits with defense counsel," and "an inmate can make free, unmonitored telephone calls" during a daily five-hour period. Opp'n to Mot. for Release at 14. McHugh has not disputed those facts. And "CTF reports that the Defendant and counsel successfully conducted video visits every Friday during the month of September, but that the Defendant's counsel did not request a video visit once during the entire month of October." Id.

Because these factors weigh against temporary release, McHugh's preparation-of-defense argument fails as a ground for release.

## II.   Conditions at CTF

McHugh next argues that a variety of conditions at CTF form a "compelling reason" to grant him temporary release. See Mot. for Release at 5–8. Under 18 U.S.C. § 3142(i), courts may temporarily release a defendant for a "compelling reason" other than the need to prepare a defense, but "courts typically order release on that ground only 'sparingly.'" Thomas, 456 F. Supp. 3d at 78.

McHugh first points to the investigation into the treatment and conditions at the Central Detention Facility ("CDF"). See Mot. for Release at 5. Although McHugh acknowledges that this report does not address conditions at CTF, where McHugh is held, and that, in fact, a subsequent report "found conditions at CTF to be 'largely appropriate and consistent with federal prisoner detention standards,'" id., he nonetheless suggests that the CDF report is somehow evidence of poor conditions at CTF, id. at 5–6. Because the investigation uncovered that CDF staff "appeared

unaware or uninterested in any of the[] issues" identified, Letter from Lamont Ruffin [ECF No. 71-1] at 2, McHugh argues that "[i]t is not difficult to imagine that staff hired by the same agency would also have the same corrupt and 'uninterested' culture," Mot. for Release at 5–6.

But if the Court were to accept that argument, then anyone detained at any facility run by the District of Columbia Department of Corrections would be able to show a compelling reason for temporary release.  And in fact, evidence from both parties suggests that the conditions at CTF are, by all accounts, entirely ordinary.  See Mot. for Release at 5; Opp'n to Mot. for Release at 18 (describing report from Federal Detention Monitor finding "no systemic issues at CTF and that the conditions at CTF appear to conform to the federal prisoner detention standards").  McHugh simply has no evidence that CTF suffers from the same systemic issues that CDF once did, and the Court declines to credit his unsupported assertions.

McHugh also argues that his experience at CTF in particular warrants release.  He attached to his motion grievances he filed describing "a chemical irritant" and "mold," staff members suggesting they wished "he could be taught a lesson" and "be stabbed and beat," and general "indifference" by staff.  Mot. for Release at 6–7.  McHugh also describes a decline in his mental health, partially based on "fear and conspiracy driven retaliation" from other January 6 defendants in the jail.  Id. at 7–8.  Some of McHugh's issues, the government notes, have been addressed.  See Opp'n to Mot. for Release at 19 (noting that "a sample of the alleged contamination was revealed to be black mastic, not mold").  But more fundamentally, these grievances—while concerning if true—are not compelling reasons for temporary release, particularly in light of the initial reasons for his pretrial detention.

Courts have acknowledged that in some instances, medical issues may serve as a "compelling reason" under § 3142(i), but they have done so only in limited circumstances.

Thomas, 456 F. Supp. 3d at 78.  None of the issues described in McHugh's grievances constitute

an ongoing "serious medical condition that cannot be adequately treated in custody."  See Krol,

2022 WL 16948611, at *8 & n.8.

McHugh's argument related to his mental health fares no better.  As an initial matter, he

has not provided documentation or evidence of his decline in mental health, its causes, or any

proposed treatment if released.  See id. at *8.  Further, a review of the types of compelling medical

issues that may justify release suggests that the alleged decline in his mental health does not rise

to the level of a "serious medical condition" that requires release, particularly in light of "the

original grounds for the detention" and "the proposed release plan."  Thomas, 456 F. Supp. 3d at

78 (internal quotation marks omitted); see also Bothra, 2020 WL 2611545, at *2 ("[C]ourts granted

relief under this provision only 'sparingly to permit a defendant's release where, for example, he

is suffering from a terminal illness or serious injuries.'").

Courts have found sufficiently compelling situations where there was "zero confidence that

the D.C. Jail w[ould] provide" chemotherapy to treat defendant's cancer, see Tr. of Nov. 3, 2021

Hr'g at 16:12–21, United States v. Worrell, Case No. 21-292 (D.D.C. Nov. 3, 2021), ECF No. 127,

or where a defendant's two documented lung diseases made it "difficult to breathe" at the height

of the COVID-19 pandemic, Thomas, 456 F. Supp. 3d at 79.  The situation here is not so extreme.

Nor has McHugh proposed a release plan that would accommodate his condition while ensuring

that he is neither a flight risk nor a danger to the public.  All he states in his motion is that either

his life partner or his father are "prepared to accept the responsibility as his third-party custodian(s)

and ensure Mr. McHugh honors any conditions of release and appears before the Court as

required."  Mot. for Release at 2.  But the government notes that his life partner "has been

considered and been found lacking by both Chief Judge Howell and the Pretrial Office," and his

father is in "declining health due to multiple back and knee surgeries and a macular degeneration diagnosis." Opp'n to Mot. for Release at 11 n.5 (internal quotation marks omitted). McHugh did not contest those assertions and has not offered any specific reasons for the Court to believe that either third party custodian could ensure he remains in compliance.

Finally, McHugh barely reckons with the "original grounds for [his] detention," Thomas, 456 F. Supp. 3d at 78. McHugh has unsuccessfully challenged his detention once before, see Mot. to Review Magistrate Judge's Detention Decision [ECF No. 15], and presents no reason why the factors weighing in favor of detention have changed since then. As the government describes in depth, McHugh is charged with multiple violent felonies, including assaults on law enforcement; the weight of the evidence is strong (there is video evidence of his violent and disruptive behavior); and he "has a remarkably long and disturbing criminal history" including offenses that "occurred while he was on probation and being supervised." Opp'n to Mot. for Release at 5–11. Those factors continue to weigh heavily in favor of pretrial detention.

Hence, the Court concludes that conditions at CDF are not a reason for temporary release here.

## III.   Length of Detention and Impact on Family

Finally, McHugh cites the length of his detention—a year and a half—and the impact his detention has had on his family as reasons for temporary release. See Mot. for Release at 9–10. But he does not describe why those are compelling reasons warranting release, and the Court does not believe that they are. The length of McHugh's confinement is in large part due to his own requests to continue his trial date, see, e.g., Aug. 10, 2022 Min. Entry, and in any event is not an extraordinary period of time, see Opp'n to Mot. for Release at 16 (collecting cases where courts concluded that much longer detentions did not violate due process). And as this Court noted recently, "[e]very defendant's family suffers in some way or another due to that defendant's

incarceration," but "the Court certainly cannot grant every such defendant pretrial release from custody." United States v. Padilla, Crim. A. No. 21-214 (JDB), 2023 WL 1964214, at *8 n.4 (D.D.C. Feb. 13, 2023).

McHugh has thus not set forth any compelling reason warranting pretrial release, and the Court will accordingly deny his motion.

## MOTION FOR PROTECTIVE ORDER

McHugh seeks a protective order removing certain references to his criminal history from a document filed on the public docket by the government on June 17, 2021. See Mot. for Protective Order at 1. In that filing, the government cited McHugh's criminal history in discussing his "history and characteristics" weighing in favor of pretrial detention. See Gov't Resp. in Opp'n to Def.'s Mot. to Review Magistrate Judge's Detention Order [ECF No. 16] ("Gov't Detention Resp.") at 19–20. Specifically, the government asserted that his "criminal history includes . . . three prior rape offenses," and referenced a 2010 arrest that culminated in a misdemeanor plea as well as a 2015 arrest. Id. at 20. These characterizations were based on a pretrial services report stating that McHugh had been arrested for three rape offenses. See Opp'n to Mot. for Protective Order at 4. In his reply to the government's detention response back in 2021, McHugh clarified that he had been arrested only twice for rape-related charges—once in 2003 and once in 2010— and that the 2015 arrest was related to his 2010 offense and thus was not an arrest for a separate incident. See Reply to Gov't's Detention Resp. [ECF No. 17] at 5.

The second time McHugh's criminal history became relevant was in spring 2022 when the parties began to engage in plea negotiations. At that time, the parties jointly requested that the Court order pretrial services to "prepare a criminal history category analysis to inform further negotiations." Joint Mot. for Pre-Plea Probation Criminal History Category Analysis & to

Continue Status Conf. [ECF No. 65].  The parties noted that they were missing some information about McHugh's criminal history and needed the most accurate dispositions to give McHugh a realistic sense of his sentencing guidelines range.  Id.  The United States Probation Office prepared a criminal history memorandum.  See Probation Mem. [ECF No. 66].  Based on that, the government no longer takes the position that there was a 2015 rape-related arrest, and the parties appear to agree that the 2015 incident was instead an unspecified probation violation.  See Opp'n to Mot. for Protective Order at 4 (noting that the government "agrees that the Defendant's third arrest in 2015 likely related to his 2009 offense").  Thus, the parties agree that there are only two instances in which McHugh was arrested for a rape offense: one in 2003 and one in 2009 (resulting in the 2010 conviction).  See Reply to Gov't Detention Resp. at 5.

Turning to the instant motion, McHugh does not clarify exactly which pieces of information he would like removed from the record, but from the motion and the referenced document, it appears that he primarily challenges the government's reporting of his rape-related offenses.  The government opposes his attempts to remove those references from the record.  It asserts that there is a "presumption of openness" in criminal proceedings and that "a defendant's numerous interactions with the criminal justice system is relevant in considering a Defendant's danger to the community, even when some of those interactions don't ultimately result in charges or convictions."  Opp'n to Mot. for Protective Order at 3.  The Court agrees that arrests not resulting in a conviction can properly be matters of concern and will accordingly not disturb the accurate reference to the 2003 arrest that did not result in a conviction.

However, the now-debunked claim that McHugh was arrested in 2015 for a separate rape-related incident is a different story.  The government argues that there is no harm from that reference, as the record has been "correct[ed]" by McHugh's subsequent reply clarifying that there

were only two rape-related arrests.  See Opp'n to Mot. for Protective Order at 5.  But as it stands, the government's filing is not accurate.  And as McHugh points out, the government's reliance on later filings that cast doubt on the veracity of that statement assumes an unrealistic level of understanding and sophistication from the public—that people will "read the entirety of the subsequent filings so as to educate themselves to the facts" and then have "the legal and technical knowledge to understand what they have read."  Reply to Opp'n to Mot. for Protective Order [ECF No. 79] at 2.

The Court does not understand what interest the government has in keeping admittedly inaccurate statements on the record in any form.  Even if the information has been received by the public already, allowing it to stay on the record—particularly in light of a motion to remove it—may give the misleading and harmful impression that the information is accurate.  Accordingly, the Court will seal the unredacted filing and order the government to file a redacted version omitting reference to "three" prior rape offenses and the description of the 2015 arrest.

**MOTION FOR DISCOVERY TO SUPPORT SELECTIVE PROSECUTION CLAIM**

McHugh's final motion requests discovery and an evidentiary hearing related to a selective prosecution claim.  See Selective Prosecution Mot.  Although he acknowledges that "no selective prosecution claims by January 6th Defendants have been sustained to date," he argues that "his prosecution, at least in part, demonstrates a colorable case of selective prosecution."  Id. at 1.

His motion, however, does not focus on his prosecution, but on the broader context of January 6 prosecutions.  And it is nearly identical to motions filed in United States v. Brock and United States v. Padilla, which this Court denied.  See Brock, Crim. A. No. 21-140 (JDB), 2022 WL 3910549, at *11–12 (D.D.C. Aug. 31, 2022); Padilla, 2023 WL 1964214, at *4–7. Because McHugh offers no new facts or arguments in support of his selective prosecution claim,

the Court incorporates the reasoning and conclusions in <u>Brock</u> and <u>Padilla</u> in full and will deny McHugh's motion on that same basis.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court will deny McHugh's motions to dismiss the indictment, transfer venue, for temporary release, and for discovery to support a selective prosecution claim.  It will, however, grant McHugh's motion for a protective order and order the government to file a redacted version of [16] its response to McHugh's detention review motion. A separate Order consistent with this Opinion will issue.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>March 6, 2023</u>