**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-453 (JDB)** |
| **SEAN MICHAEL McHUGH,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Sean Michael McHugh to 123 months of imprisonment, three years of supervised release, $2,000 in restitution, a fine of $73,000, and a mandatory special assessment of $200.  The government's recommended sentence is in the middle of the applicable guidelines range of 110 to 137 months of imprisonment.

**I.     INTRODUCTION**

The defendant, Sean Michael McHugh was an active participant in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020

1

Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

McHugh prepared for violence beforehand, telling people he was going to Washington, D.C. to "fight" and "storm Congress."  He brought with him a cannister of bear spray, 50 percent stronger than the pepper spray used by police, which he carried in a holster for ready access. Before the riot, McHugh urged people to "march on Congress directly after Trump's speech." Once he arrived at the Capitol, McHugh was part of the initial breach of the Capitol grounds at the Peace Circle.  During the riot, McHugh actively participated in at least four attempts to breach perimeters established by officers during the riot.  First, he was one of the initial rioters to breach a police line and enter the West Plaza.  Second, he wrestled with an officer for control of a barricade protecting access to the Capitol.  Third, he assaulted officers on the West Plaza, hitting them with his bear spray, causing the officers to back away from the line, and preventing them from performing their official duties.  Fourth, he helped other rioters to push a large metal sign into officers.  In between these acts of aggression, McHugh used his megaphone to spew vitriol towards officers and to encourage other rioters to act against the officers.  After the riot, McHugh posted

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.  The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.  However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

multiple messages on Facebook bragging about his actions during the riot, and reveling in the violence against police, boasting "…we stormed them and we took Congress".

The government recommends that the Court sentence McHugh to 123 months of incarceration which is within the advisory Guidelines' range of 110-137 months, and which the government submits is the correct Guidelines calculation.  A 123-month sentence reflects the gravity of McHugh's conduct and his extensive criminal history.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Facts for Stipulated Trial ("SOF") filed in this case, ECF 107, ¶¶ 1 – 9, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**<u>Assault on the West Front of the Capitol</u>**

McHugh's criminal conduct took place largely on the West Front of the Capitol, where assaults against law enforcement made the rioters' entry into the building possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 pm, the first breach of the

outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.





*Image 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location

for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.





*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 p.m., MPD officers responding to USCP officers'

calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.  This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.

7







*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### B.   McHugh's Role in the January 6, 2021 Attack on the Capitol

#### *Planning for Violence before January 6*

McHugh planned for violence on January 6 and followed through on this planning by being an early participant in the attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the MPD, open-source video, surveillance footage from outside of the Capitol, and McHugh's social media posts.

Before coming to Washington, McHugh actively planned to prevent Congress' certification of the Electoral College vote.  In late December 2020, McHugh posted on Facebook "Going to D.C. Jan 5 6 7 to fight. HMU if you wanna join. Reservations made!" and "If this doesn't make you want to get up in storm Congress and rip people out of office then you need to move to China."  *See* ECF 107, SOF ¶ 11.  In the early morning hours of January 6, McHugh updated his

Facebook status with a promise that "1776 will commence again January 6, 2021" and echoed the former President's "will be wild" tweet.

In keeping with his anticipation of violence and intent to "storm the Capitol," McHugh carried with him a cannister of bear spray in a holster on his belt. McHugh agreed that his use of bear spray on the officers constituted a deadly or dangerous weapon. *See* ECF 107, SOF ¶ 25. The spray used by McHugh on January 6, 2021, was SABRE Frontiersman Bear Attack Deterrent spray. The intended use of this spray is to deter bears that are attacking humans. This spray is hazardous to use on humans. This spray is capable of causing irreversible eye damage. Contact with the spray through touching or rubbing a person's eyes could also result in substantial but temporary eye injury. Further, this spray is strongly irritating to the nose and skin. According to the manufacturer's information, this spray has an effective range of 35 feet, and the canister empties in approximately 5 seconds. *See* ECF 107, ¶ 22; Stipulated Trial Exhibit 8. pp. 3-4

The Frontiersman bear spray contains 2.0 percent capsaicinoids. Capsaicinoids are lachrymators (mucous membrane irritants) found in the extracts of oleoresin capsicum (OC). OC is a naturally occurring resin found in various peppers. Two percent capsaicinoids is the strongest formula allowed by the Environmental Protection Agency (EPA) in a bear spray. This level of capsaicinoids is more than 50 percent stronger than police pepper spray. *See* ECF 107, ¶¶ 22-25; Stipulated Trial Exhibits 8, 14, 15. During a search of McHugh's residence on May 27, 2021, officers seized two additional cans of SABRE Frontiersman Bear Attack Deterrent spray (9.2 ounce size) -- the same brand of spray that McHugh used on officers on January 6, 2021. *See* ECF 107, ¶ 32; Stipulated Trial Exhibit 13.

*Approach to Capitol*

McHugh did not passively attend the former President's rally – before the rally was over, he was already urging others to "march on Congress."  Using his megaphone, McHugh spurred them into action, shouting: "We have the power in numbers!  March on Congress directly after Trump's speech!"  *See* Stipulated Trial Exhibit 1.



*Image 5, coming from Stipulated Trial Exhibit 1, at 0:03, McHugh (red circle) "March on Congress"*

As he marched to the Capitol after the rally, McHugh recorded videos expressing his intent to stop the Certification by "storming" the Capitol:

- "Right now, right now, we're storming the Capitol.  We're going to Congress, we're gonna let them know that we don't want them to accept the Electoral College votes.  There are already a couple States that are trying to de-certify as of last night.  They have to listen to us.  There's so many people.  Fuck Antifa. . .[chant with crowd]".  *See* Stipulated Trial Ex. 2, McHugh phone clip 1.sp4, video time 00:05 – 00:36.

- "Yeah we're here.  We're out here.  There's so many people.  The movement is so real.  This is our country, we are not gonna let this happen."  *See* Stipulated Trial Ex. 3, McHugh phone clip 2.mp4, video time 00:00 – 00:13

11

At approximately 12:53 p.m., McHugh was at the site of the first breach of the restricted area of the Capitol Grounds near the Peace Monument.  After the breach at the Peace Circle, police retreated and formed another line with barricades on the Pennsylvania Walkway.  Rioters approached the barricades and shoved them towards the officers, forcing the officers to fall back further towards the Capitol.  McHugh followed the crowd up the Pennsylvania Walkway and passed through the second defensive line shortly after it was breached.  McHugh then went to the north side of the Lower West Plaza and approached a temporary black fence constructed for the inauguration.  McHugh marched back and forth in front of the black fence and encouraged the rioters to press forward, leading chants of "Whose house? Our house!" through his megaphone. The black fencing and officers are shown in the image from Stipulated Trial Exhibit 4, below.



*Image 6, coming from Stipulated Trial Exhibit 4, at time: 00:47.  McHugh (outlined in red) leading crowd in chanting "Who's House? Our House".*

Consistent with McHugh's encouragement, rioters pushed law enforcement back behind the black fencing to a set of stone stairs leading to the West Plaza.  McHugh and other rioters then

breached the black fencing, and McHugh continued to put himself at the front of the rioters, standing face-to-face with police on the top stair. Once again using his bullhorn, McHugh now encouraged rioters to approach these steps, waiving them forward, and shouting: "Come on! Let's go!", and "Come on you guys, come on you guys! Bring it in!". *See* Stipulated Trial Exhibit 5.



*Image 7, coming from Stipulated Trial Exhibit 5, at time 01:03. McHugh (red circle) waiving to rioters to move forward.*

McHugh was still at the front of the crowd of rioters when this police line collapsed at approximately 12:58 p.m. Although McHugh had been directed by a law enforcement officer not to enter the West Plaza, McHugh took advantage of the chaos, becoming one of the first rioters to run through a gap in the police line at approximately 12:58:54. McHugh ran towards Inauguration scaffolding set up on the south end of the West Plaza. *See* Image 8, Stipulated Trial Exhibit 6.



*Image 8, coming from Exhibit 16, USCP CCTV, at time 00:44.   McHugh (red circle) is one of first rioters to breach black metal fence and run across West Plaza.*



*Image 9, coming from Stipulated Trial Exhibit 6, A January 6 DC Riot RAW Video.mp4, at time 00:11, shows McHugh crossing the West Plaza to the South Inaugural Scaffolding*

At approximately 1:00 p.m., McHugh and another rioter pulled on a barricade manned by USCP Officer R.E., who was protecting access to both the Lower West Terrace and Upper West Terrace of the Capitol.  McHugh and the other rioter grabbed onto the barrier and forcibly pulled

14

the barrier several feet away from Officer R.E., creating an opening in the barrier line. *See* Stipulated Trial Exhibit 6. Before rioters could enter through the opening, Officer R.E., with the help of another officer, took back control of the barrier, and McHugh retreated along the west side of the scaffolding.



*Image 10, coming from Stipulated Trial Exhibit 6, A_January 6 DC Riot RAW Video.mp4, at time 01:17 shows McHugh (red circle) pulling bike rack from officer.*

From approximately 1:00 p.m. to 1:11 p.m., McHugh stayed at or near the front line of rioters confronting police at the south end of the West Plaza. McHugh kept up a constant stream of vitriol towards the officers, continuing his verbal attacks on police even as other rioters attacked police.

At approximately 1:11 p.m., McHugh decided to join in the attacks. McHugh pulled his bear spray out of his holster and fired two long, continuous bursts towards the line of law

enforcement officers from a range of a little more than 10 feet.  McHugh directed the spray across a wide area in order to impact the maximum number of officers.  *See* Stipulated Trial Exhibit 7. As a result, McHugh hit multiple officers with the bear spray, causing them pain.  Some officers needed to leave the line to decontaminate from the spray.



*Image 11, coming from Stipulated Trial Exhibit 7, time 00:58 shows McHugh (red circle),
spraying officers to his left.*



*Image 12, coming from Stipulated Trial Exhibit 7, time 00:59, shows McHugh (red circle), spraying to officers to his right.*

As McHugh noted on social media the afternoon of January 6, "…I unloaded a whole can of bear spray on a line of cops I got three of them down really really good." McHugh has agreed that his use of bear spray on the officers constituted a deadly or dangerous weapon. *See* ECF 107, SOF ¶ 25. Several officers were injured or experienced pain when McHugh sprayed them with bear spray. McHugh struck multiple officers with the bear spray, including USCP Officer D.K., who was forced from the line for a few minutes. Specifically, the spray used by McHugh affected Officer D.K.'s eyes, temporarily blinding him and preventing him from performing his official duties. Officer D.K. directly attributed his injury to McHugh, recalling McHugh's distinctive shirt as well as the distinctive cloud of spray used by McHugh. Officer D.K. was eventually able to return to the line.

Other officers in the front line at the West Plaza were also affected by McHugh's use of bear spray. As seen in the USCP CCTV footage, several officers reacted to the spray by turning

from the line or backing away from the spray, and some had to leave the line to decontaminate

from the effects of the spray.   This disrupted a portion of the line of officers and negatively

impacted their ability to protect the Capitol.   Other rioters took advantage of this disorder in the

police line and increased their aggression towards officers.   *See* Exhibits 15, 16, 17, 18.



*Image 13, coming from Stipulated Trial Exhibit 7, time 0:57.   McHugh is in a red circle, Officer
B.S. and others reacting to the spray are in green circles.*



*Image 14, coming from Stipulated Trial Exhibit 7, time 0:59. Officer D. K. is in a dark blue stocking cap, holding his hand up against the spray.*



*Image 15, coming from Stipulated Trial Exhibit 7, time 1:00, shows Inspector T.L. in a hat with gold braid on front, turning away from the spray.*



*Image 16, coming from Stipulated Trial Exhibit 7, time 2:55, shows officers who left the police line to decontaminate from spray.*

From approximately 1:11 p.m. until approximately 1:40 p.m., McHugh remained on the West Plaza, moving back and forth along a defensive perimeter established by police. Once again using his megaphone, McHugh shouted encouragement to the attacking rioters and threats against the police:

- You are fucking cowards!
- I have a job to do and it's to defend the Constitution!
- You are protecting communists!
- We're coming, you can't stop us forever, you can't stop us forever, we are coming!
- You are protecting pedophiles … crooks … communists!
- I'd be shaking in your little shit boots too!
- You guys like protecting pedophiles … … protecting ANTIFA!
- Nazis followed orders!
- You are gonna hear the lion roar!
- You know what's behind us? The Second Amendment, the Second Amendment is behind us!
- Imagine if we protect our country with our Second Amendment – you guys wouldn't be standing there right now… this is a good warning to you…you better heed our warning…cause when we do protect our country, you're not going to like it, you're gonna get the fuck out of our way…..we will be exercising our Second Amendment rights!

- What are you gonna do when we protect the Constitution with the Second Amendment, what are you gonna do then? You ain't gonna hold the line!
- We're coming, you can't stop us forever!

ECF 107, SOF ¶ 26.

During most of the time from 1:11 p.m. until 1:40 p.m., McHugh was in the front line of rioters and directly in front of officers.  He was within a few feet of the officers as they were setting up barricades.  *See* Stipulated Trial Exhibit 9.  After the barricades were set up, McHugh remained in the front of the rioters.  McHugh was within a few feet of officers as he walked back and forth along the barricade, using his bullhorn. *See* Stipulated Trial Exhibits 9, 10.  At one point, McHugh grabbed onto the barricade that was keeping rioters away from the Capitol and tugged on it, saying "hell yeah".  *See* Stipulated Trial Exhibit 11, time 01:00.  Shortly thereafter, other rioters begin to grab onto the bike racks and physically confront officers.  During this time, McHugh used his bullhorn to harass officers with chants of "the Second Amendment is behind us" (Exhibit 11, time 01:44) and "you ain't gonna hold the line." (Exhibit 11, time 2:08).  He encouraged other rioters to approach the fence, saying "come on you guys" to the crowd. (Exhibit 11, time 03:38 – 04:00).  McHugh's his actions led other rioters – by his example -- to approach and challenge the officers.

21



*Image 17, coming from Stipulated Trial Exhibit 9, BWC DC (3).mp4 at time 00:49, BWC time 13:14:53, shows McHugh confronting officers setting up barriers with bike racks on the West Plaza.*



*Image 18, coming from Stipulated Trial Exhibit 10, BWC DC (8) mp4, at time 00:25, BWC Time 13:32:35, shows McHugh (red circle) warning officers that crowd will exercise its Second Amendment Rights.*



*Image 19, coming from Stipulated Trial Exhibit 11, at time 01:00, BWC time 13:35:01 shows McHugh grabbing a bike rack barricade and taunting officers that the "Second Amendment is behind us."*

By approximately 1:40 p.m., rioters on the West Front had repurposed a large Trump sign into a weapon. The billboard sign was 10 to 15 feet wide and several feet high. The entire frame was metal, had sharp edges, and had large wheels that stuck out toward the line of law enforcement officers. *See* Image 20 from USCP CCTV at the Peace Circle. It took fifteen to twenty law enforcement officers to lift and move the billboard behind their line. Given the weight and size of the billboard, a law enforcement officer could have been knocked unconscious or suffered lacerations if hit in the head when rammed by the billboard.



*Image 20, coming from Exhibit 17, USCP CCTV at the Peace Circle.*
*At approximately 1:40 p.m., McHugh, joined the rioters using this sign as a weapon.*



*Image 21, Exhibit 18, time 00:44, USCP CCTV of the West Front of the Capitol.*

McHugh was located at the barricades, directly across from officers. The sign was moved by rioters through the crowd towards the barricades. As the sign was moved towards officers, McHugh joined the other rioters who were shoving the sign like a weapon against the officers. McHugh twice grabbed onto the billboard with his left hand and helped other rioters push it into

24

the officers, using the billboard as a kind of battering ram.  While this was happening, McHugh

encouraged the other rioters, yelling into his megaphone in his right hand, "Put it up there! Put it

up there!"  *See* Stipulated Trial Exhibit 12.



*Image 22, coming from Stipulated Trial Exhibit 12, time 00:32, BWC time 13:40:12 shows
McHugh (red circle) pulling metal sign against officers.*



*Image 23, from Open Source "Just Another Channel", shows McHugh circled in red,
And officers circled in green.*

After the riot, McHugh bragged on social media about his participation in the riot.   On

January 6, McHugh boasted:

- "There was easily over a million people I unloaded a whole can of bear spray on a line of cops I got three of them down really really good"
- "Yeah we made it in I watched some guy get shot in the face with a rubber bullet his face exploded blood everywhere on the steps of Congress a girl got shot in the neck with the live round they were shooting mace out as they were f****** throwing tear gas out of us they were shooting baseballs at us but we stormed them and we took Congress"
- "I was there at the front I was there at the f****** front"
- "I got f***** up and sprayed three times right in the face directly my contacts melted to my f****** eyeballs"

*See* ECF 107, SOF ¶ 31.

## III.   THE CHARGES AND STIPULATED TRIAL

On November 10, 2021, a federal grand jury returned a superseding indictment charging

Sean Michael McHugh with ten counts, including, Count Four: Assaulting, Resisting, or Impeding

Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b) and

Count Five: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18

U.S.C. § 1512(c)(2).   On, April 17, 2023, McHugh was convicted of Counts Four and Five as the

result of a stipulated trial.

## IV.   STATUTORY PENALTIES

McHugh now faces sentencing on two counts:   Assaulting, Resisting, or Impeding Certain

Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b); and Obstruction

of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2).

As noted by the Presentence Report ("PSR") issued by the U.S. Probation Office, ECF 111, the defendant faces, on each count, up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for each count of conviction.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

The government agrees with the Guidelines range calculated by the PSR; however, the PSR does not include a Guidelines analysis for both Counts—Counts Four and Five—on which the defendant was found guilty. *See* PSR ¶¶ 39-55.[2] That Guidelines analysis follows:

---

[2] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (see PSR ¶ 42) that Counts Four and Five group—a conclusion with which the

Count Four: 18 U.S.C. § 111(b)

| U.S.S.G. § 2A2.4(a)[3] | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(1) | More than Minimal Planning | +2 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of a Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under 18 USC 111(b) | +2 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
| | **Total** | **28** |

Count Five: 18 U.S.C. § 1512(c)(2) and § 2

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| U.S.S.G. § 3A1.2(c)(1) | Substantial Risk of Serious Bodily Injury | 6[4] |
| | **Total** | **31** |

| **Combined Offense Level** | | **31** |
|---|---|---|
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **28** |

The U.S. Probation Office calculated the defendant's criminal history as category IV, based on 7 criminal history points (PSR 69X). The government agrees with this criminal history calculation. Accordingly, based on the government's calculation of the defendant's total adjusted

---

government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[4] The enhancement for the substantial risk of serious bodily injury was applied in *United States v. Peter Schwartz*, 1:21-CR-178 (APM) (OC spray), and *United States v. Aiden Henry Bilyard*, 1:22-CR-34 (RBW), ECF 38, p. 3 (pepper spray; parties agreed to enhancement in plea agreement).

offense level, after acceptance of responsibility, at 28, and a criminal history category IV, McHugh's guideline imprisonment range is 110 months' to 137 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, McHugh's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and risking a Constitutional crisis. McHugh was one of the first rioters to break through the police line at the West Plaza.  McHugh assaulted officers on the West Plaza with bear spray at an early, critical juncture in the riot, causing officers pain and disrupting their ability to protect the Capitol. McHugh encouraged other rioters to act against officers and advance on the Capitol at multiple times and places on the West Plaza.  McHugh took other physical acts against officers that included wrestling with an officer for control of a barricade at the South Scaffolding, joining other rioters to use a large metal sign as a battering ram against officers, and crossing police lines on the West Plaza.  McHugh also repeatedly confronted officers on the West Plaza, using his megaphone to spew vitriol at them and encourage the violence of other rioters.  After the riot, McHugh boasted on Facebook about his acts and the violence against officers during the riot.  The nature and circumstances of McHugh's offenses were of the utmost seriousness, and fully support the government's recommended sentence of a term of imprisonment of 123 months.

**B.  The History and Characteristics of the Defendant**

McHugh is a former construction/electrician who owned a business in California until his arrest. PSR ¶¶ 111-112.  McHugh has a significant history of arrests and convictions, including violent offenses and driving offenses which endangered the public, as well as repeated probation violations.  Many of McHugh's crimes were committed while he was serving a sentence of probation, and none of McHugh's prior criminal sentences have deterred him from continuing to engage in criminal conduct.  Thus, his criminal history weighs in favor of a lengthy period of incarceration.

In addition to numerous arrests and traffic offenses (PSR ¶¶ 70-77), McHugh has the following convictions and probation violations:

- In January 2006, McHugh was convicted of misdemeanor Possession of a Stolen Vehicle.  He was sentenced to 30 days jail, suspended, and 36 months' probation. PSR ¶ 57.
- While on this probationary sentence, in May 2006, McHugh was charged and later convicted of Receiving Stolen Property and Petty Theft, both misdemeanors.  He was sentenced in 2007 to 180 days jail and 3 years' probation.  PSR ¶ 58.
- In September 2007, McHugh was convicted of Obstruct or Resist Public Officer. He was sentenced to 3 years' probation.  PSR ¶ 59.
- In January 2009, McHugh was convicted of Driving with Knowledge of Suspension and sentenced to 3 years' probation.  PSR ¶ 60.
- In September 2010, McHugh was convicted of Statutory Rape (charged as felony, reduced to misdemeanor per California statute) and Contribution to the Delinquency of a Minor (misdemeanor).  He was sentenced to 210 days jail (Imposition of Sentence Suspended), followed by 48 months of probation.  While on this probationary term, McHugh violated probation, a bench warrant was issued for his arrest, and he was sentenced to 45 days in jail. PSR ¶ 61.
- Also in September 2010, McHugh was convicted of Driving Under the Influence of Alcohol of .08% or More.  He was sentenced to 30 days jail and 4 years of probation.  He violated this term of probation twice.  PSR ¶ 62
- In August 2010, McHugh was convicted of Battery/Domestic Violence.  Witnesses described McHugh assaulting and punching the victim in the head multiple times and breaking the taillights on her car.  He was sentenced to 48 days' jail and a work

30

program.  He was also required to complete a Domestic Violence Program, but he failed to comply with the terms of that program.  PSR ¶ 63.

- In October 2010, McHugh was convicted of Driving on a Suspended License.  He was sentenced to 60 days jail, suspended; and 36 months of probation.  McHugh violated this term of probation three times.  PSR ¶ 64.

- In June 2011, McHugh was convicted of Vandalism.  The disposition was Imposition of Sentence Suspended and 3 years of probation.  McHugh violated his probation in 2014.  PSR ¶ 65.

- In March 2014, McHugh was convicted of Entering a Non-Commercial Dwelling, a misdemeanor.  He was sentenced to 45 days jail and 3 years' probation.  PSR ¶ 66.

- In March 2014, the defendant was convicted of Driving Under the Influence of Alcohol/0.08%.  A suspended sentence was imposed, and 36 months of probation.  PSR ¶ 67.

- While on probation for his March 2014 DUI, in December 2018, McHugh was convicted of Driving Under the Influence of Alcohol or Drugs (w/2 prior convictions); Driving Under the Influence of Alcohol of 0.08% or more (w/ 2 prior convictions); and Driving While License Suspended/Revoked.  He was sentenced to 180 days' jail, five years of probation, and monetary fines.  The defendant was ordered to enroll in and complete a DUI panel and other special conditions of supervision.  PSR ¶ 68.

McHugh has not filed personal income taxes with the Internal Revenue Service since 2016.  *See* PSR ¶ 118.

McHugh's crimes on January 6 were not an isolated event in an otherwise law-abiding life.  The defendant's criminal history includes crimes involving violence and a carelessness about the safety of others that is concerning.  *See* PSR ¶¶ 56, 61, 63.  The defendant's history and characteristics, including his history of arrest and conviction for violent assaults, and driving under the influence, and violations of probation, weigh heavily in favor of a lengthy term of incarceration.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. McHugh's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, McHugh has an extensive criminal history, resulting in a criminal history category of IV.  His history of arrests and convictions shows that prior sentences have not deterred him from continuing to engage in criminal conduct. *See* Section VI(B) *supra.*

McHugh has also engaged in additional violence while detained at the D.C. Department of Corrections (DCDC), which determined that McHugh committed  an Assault on Another Inmate. PSR ¶ 10.  On July 10, 2023, at approximately 1:05 p.m., DCDC staff saw a large group of inmates

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

fighting within a small TV room in the back portion of the C3A housing unit.  The DCDC staff made an "All-Available Staff" emergency call, and a large group of the inmates abruptly exited the small TV room.  Upon approaching the TV room, the DCDC staff saw that Inmate T.T. had been badly assaulted and Inmate T.B. had also been injured during the assault by the group of inmates.  DCDC staff interviewed Inmates T.T. and T.B., and reviewed footage secured from the DCDC surveillance team.  They identified McHugh as one of the group of inmates that were responsible for the assault.  McHugh and the other responsible inmates were moved to another location within the DCDC.

While McHugh agreed to the Statement of Facts in the Stipulated Trial, he has never displayed any remorse for his conduct even in the face of overwhelming evidence of his guilt.  To the contrary, McHugh's statements on and after January 6 were those of a man bragging about his assault on officers. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

During the riot, McHugh threatened the officers that "this is a good warning to you … you better heed our warning…cause when we do protect our country, you're not going to like it, you're gonna get the fuck out of our way…we will be exercising our second amendment rights!" and

"[w]hat are you gonna do when we protect the Constitution with the Second Amendment., …You ain't gonna hold the line" and "we're coming, you can't stop us forever!".

McHugh has also given at least one interview denying his culpability for the riot at the Capitol.  On December 14, 2021, McHugh challenged the evidence against him in an interview. https://rumble.com/vqsa0j-exclusive-jan-6-political-prisoner-live-from-dc-jail-mom-fights-vaxx-custod.html  McHugh claimed his actions, including speaking on a bullhorn, were political dissent in support of the former President (time 17:00 – 17:38).

McHugh has also denied the facts of his actions on January 6 in an effort to raise money. McHugh has raised more than $70,000 on the online crowdfunding site GiveSendGo.[6]   *See* https://www.givesendgo.com/G27E3; PSR ¶ 116.  On this site, McHugh's fiancée made a fundraising appeal for McHugh's legal and family expenses.   In the introduction of McHugh's GiveSendGo page, McHugh's fiancée, contends that he is a "Patriot" who "stood up for his country that day like so many others to peacefully rally for the truth."  On August 31, 2023, another post was added to McHugh's fundraising site which appears to be from McHugh.   In this post, the author states "I did not hurt anyone" at the Capitol. *See* Image 25.

---

[6] Per the website, McHugh has raised $74,378 as of August 31, 2023. https://www.givesendgo.com/G27E3

**UPDATES**

**Update #21**

**August 31, 2023**

Good Morning Everyone

Let the countdown begin 7 more days and the fate of my life is in the hands of the DOJ, I've been anxious, and nervous with so many thoughts running through my head. I'm having trouble sleeping and am consumed with thoughts of what the outcome will be. I did not hurt anyone and I did not enter the Capital yet they want to give me 11.5 years it hardly seem fair. I ask you all to continue to pray for me and my family along with extra prays for the Proud Boys who have their sentencing this week.

*Image 25, post dated August 31, 2023 on GiveSendGo website for Sean McHugh,*
*https://www.givesendgo.com/G27E3, last accessed August 31, 2023.*

McHugh to this day continues to deny responsibility for his actions at the Capitol where he took part in a violent attack on officers and on the government. McHugh's denial and lack of remorse demonstrates that McHugh's sentence must be sufficient to deter him from ever again engaging in violence in pursuit of his political goals.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96

35

(2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."  *Kimbrough*, 552 U.S. at 108 (cleaned up).  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."  *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021).  Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.  *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district

courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant."  *Id*. at 1095.  "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when

warranted under the circumstances."  *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In  cases  for  which  the  Sentencing  Guidelines  apply,  "[t]he  best  way  to  curtail

'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than
overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP),
Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the
seriousness of [the defendant's] conduct because it does not consider the context of the mob
violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v Patrick McCaughey*, 1:21-CR-40, McCaughey was convicted after trial for violating 18 U.S.C. § 1512 and 111(b) charges, among other offenses.   McCaughey illegally entered the grounds of the U.S. Capitol at approximately 2:00 p.m., and made his way to the bike rack barricade, manned with overwhelmed police officers, on the Southwest Lawn. For approximately 20 minutes, McCaughey joined other rioters in taunting officers manning the police line and then joined the mob that ultimately overwhelmed that line when it fell at approximately 2:28 p.m.  McCaughey climbed the southwest scaffolding and entered the Lower West Terrace tunnel at approximately 2:51 p.m.  He participated in a "heave-ho" push with dozens of rioters against the police line defending against access to the Capitol's interior.  McCaughey stole a police riot shield and used the stolen shield to push against an officer for over two minutes, trapping the officer against a door frame while another rioter assaulted assault the officer.  Moments later,

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

McCaughey used the shield to strike another officer at the tunnel.  Judge McFadden sentenced McCaughey to 90 months' incarceration, 36 months supervised release, and $2,000 in restitution. Unlike McHugh, McCaughey had no criminal history.  Also, unlike McHugh, McCaughey did not bring any weapons with him to the Capitol, and he did not broadcast on social media or boast about his crimes.

In *United States v. Peter Schwartz*, 1:21-CR-178, Schwartz pled to charges including 18 U.S. C. §§ 1752, 111(a)(1) and 231, among others.  Armed with a wooden tire knocker, Schwartz and his then-wife made their way to the thick of the violence and aggressively participated in the effort to overwhelm the police line on the Lower West Terrace. Schwartz threw the a chair at the line of officers, creating an opening in the police line in the northwest corner of the terrace that enabled hundreds of rioters to flood the Lower West Terrace as overwhelmed officers were forced to retreat. He then stole chemical munitions, including pepper spray, that had been left behind by the fleeing officers and used that pepper spray as a weapon to attack those same officers as they desperately tried to escape the growing and increasingly violent mob. Unlike McHugh, Schwartz later made his way up to the inaugural stage and entered the tunnel and the Capitol building, where he again sprayed a line of officers.  Like McHugh, Schwartz was on probation for other crimes when he committed his crimes at the Capitol, and Schwarz bragged to multiple people about his participation in the violence that day.  Judge Mehta sentenced Schwartz to 170 months imprisonment, and a 36-month term of supervised release.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.  The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss,"  18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).  *See Fair*, 699 F.3d at 512 (citation omitted).   But McHugh was convicted of a violation of an offense under Title 18, therefore, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

40

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses[9], the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion

---

[9] The Government is aware that two U.S. Capitol Police Officers want to address the Court in person at the sentencing hearing with respect to McHugh's actions and the riot on January 6. The first officer is U.S. Capitol Police Inspector Thomas Loyd. The second statement is from retired Lieutenant Dennis Kelly. The United States respectfully requests the Court provide time for these witnesses to present their statements at sentencing. Lt. Kelly has incurred personal expenses as a result of January 6, riot at the Capitol.

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution and hold the defendant responsible for his individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require McHugh to pay $2,000 in restitution for his convictions on Counts Four and Five.  This amount fairly reflects McHugh's role in the offense and the damages resulting from his conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.  Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

McHugh's convictions under Sections 111 and 1512 subject him to a statutory maximum fine of $250,000.  *See* 18 U.S.C. § 3571(b)(3).  In determining whether to impose a fine, the

sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, McHugh has raised $73,411 (as of July 23, 2023) through an online crowdfunding site "GiveSendGo." PSR ¶ 116. The website indicates the funds are to be used for legal fees and family expenses, including travel for family members. https://www.givesendgo.com/G27E3. However, as mentioned in section VI(D) above, McHugh is raising money by misrepresenting the reasons that he is in prison. McHugh should not be able to "capitalize" on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of a term of imprisonment of 123 months, to be followed by a three-year term of supervised release, restitution of $2,000, a fine of $73,000, and the mandatory assessment of $100 for each count.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:      */s/ Lynnett M. Wagner*
         LYNNETT M. WAGNER
         Assistant United States Attorney
         Nebraska Bar No. 21606
         Assistant United States Attorney
         United States Attorney's Office
         District of Columbia
         601 D Street NW
         Washington, DC 20530
         (402) 661-3700
         lynnett.m.wagner@usdoj.gov

         */s/ Carolina Nevin*
         CAROLINA NEVIN
         Assistant United States Attorney
         NY Bar No. 5226121
         601 D Street, NW
         Washington, DC 20530
         (202) 803-1612
         carolina.nevin@usdoj.gov